UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
R.C. and M.B., on behalf of their minor child, N.C.,

|  |  |
|---|---|
| Plaintiffs, | **PLAINTIFFS' STATEMENT PURSUANT TO LOCAL RULE 56.1** |
| -against- | 07 CIV 2806 (MDF) |
| BOARD OF EDUCATION OF THE HYDE PARK CENTRAL SCHOOL DISTRICT, | ECF Case |
| Defendant. |  |

------------------------------------------------------------------X

Plaintiffs, R.C. and M.B., by their attorney, Linda A. Geraci, Esq, contend that there are no genuine issues to be tried as to the following material facts:

1.     Plaintiffs are the parents of N.C., a 16 year old student who resides within the Hyde Park Central School District ("District").  Complaint ¶4.

2.     Defendant District is a school district duly organized under the Education Laws of the State of New York and responsible for providing a free, appropriate public education to all students with disabilities who reside in the District.  Complaint ¶6.

3.     N.C. was at all times material to the circumstances underlying this action classified as a student with a disability.  Complaint ¶4.

4.     Plaintiffs instituted this action to obtain reimbursement for tuition paid to the Kildonan School for N.C.'s attendance during the 2005-2006 school year, and also to obtain compensatory services based on the District's failure to provide N.C. a free, appropriate, public

education during the 2004-2005 school year.  Complaint ¶1; M.B. Aff at ¶ 1

5.    N.C. was initially classified during the 1999-2000 school year, when he was in second grade.  (P-7)[1]  Despite the District's implementation of special education services, during 4th and 5th grades N.C. was reading and writing two to three years below grade level.  (T- 492)

6.    During the relevant years in dispute, 2004-2005 and 2005-2006, N.C. was classified as multiply disabled, based on his severe language-based learning disability and his history of a seizure disorder.  However, N.C. has not had a seizure since 1999 or 2000, has not taken medication for seizures since approximately 2003, and does not require any special education, related services, accommodations or modifications at school to address a seizure disorder.  (T-620) M.B. Aff at ¶ 5.

7.    N.C. has average intelligence.  (P- 5, 18; T-969)

8.  At the parents request, the District hired Andreas Smoller, Ph.D. to conduct a neuropsychological evaluation, which was completed in October 2002, when N.C. was in 6th grade.  (P- 18) M.B. Aff at ¶ 6.

9.  Dr. Smoller found significant deficits in the development of reading and spelling skills, visual perception, memory, phonetic word-analysis, and decoding skills.  (P-18)

10.  To address these deficiencies, Dr. Smoller recommended an intensive program of educational remediation, to include small class placement, and "multiple opportunities for individualized one-on-one tutoring".  Dr. Smoller recommended use of an integrated

---

[1]District,  Parent, and Impartial Hearing Officer Exhibits from the record of the impartial hearing are referred to respectively as "D-#",  "P-#", and "IHO-#".  Citations to the hearing transcript will be referenced as "T-page #".

multisensory method, with separate time devoted to work with N.C. on phonemic awareness.
Dr. Smoller further stated that the Kildonan School would be able to provide the type of
intensive, individualized program he believed N.C. required.  (P-18)

11.  The District never implemented an individualized decoding program for N.C., nor
did it implement an integrated multisensory reading program within a small class setting.   M.B.
Aff. at ¶ 9.

12.  During the 2003-2004 school year the District recommended placement in 15:1:1
classes for core academic subjects.  (P- 24)

13.   When the District administered the TONYSS to N.C. during the 2003-2004 school
year (7th grade) he scored only a "2".  This "below proficient" score indicates a "limited
development of reading, writing and listening skills."  (P- 28)

14.  Throughout his tenure in the District, N.C. was unable to complete homework
independently, requiring the direct and significant assistance of his parents, or even his sister
who is four years younger, for two to three hours every night.   These "hellacious homework
evenings" were punctuated by N.C.'s exhibits of severe frustration, which included crying,
ripping up his work, pushing everything off the table, and throwing chairs.  (T- 624, 630, 637,
645)

15.  On March 29, 2004, the CSE met to develop N.C.'s IEP for the 2004-2005 school
year.  (P- 32) The resulting IEP lists inaccurate standardized test scores.  The Broad Reading
score listed is 104; the correct score is 85.  Similarly, the Broad Written Language score is 94;
the correct score contained on the evaluation itself is 77.  (P- 30, 34)   M.B. Aff. at ¶ 13.

16.  During his testimony at the hearing, the chairperson of the meeting, James Walsh,

was unable to explain how the IEP came to contain inaccurate scores.  (T- 176-178)

17.    Initially, at the meeting, N.C.'s mother was presented with a broad score of 85 for reading.  She was then told that the 85 was an error, and that N.C.'s actual score on Broad Reading was 104.  (T-647) M.B. Aff. at ¶ 14.

18.    Parents' Exhibits 30 and 31 both contain Woodcock Johnson-III scores administered on March 15, 2004.  Although Exhibit 31 is undated, it was clarified at the hearing by the IHO's questioning of Mr. Walsh that the scores contained on that document were from the March 15, 2004 administration of the Woodcock-Johnson-III and were relied on by the CSE in developing the March 29, 2004 IEP. (T-219-220)  Both Exhibits 30 and 31 contain handwritten notations of scores that conflict with the typewritten scores, and with the scores noted on the IEP.  (P-30, 31) M.B. Aff. at ¶ 15.

19.    Because his Broad Reading score was wrongly presented to N.C.'s mother at the meeting as a 104 standard score, she was falsely led to believe his skills in those areas were improving.  (T-651) At the March 29, 2004 CSE meeting, she was not aware that the higher score was actually inaccurate.  This affected her participation in the meeting in that she did not advocate as vehemently as she otherwise would have (and had previously advocated) for an individualized, multisensory, decoding and spelling program for her son.  (T-652-653, 763) M.B. Aff. at ¶ 16.

20.  At the March 29, 2004 meeting the CSE denied the parents' request for a reading program to address N.C.'s decoding deficits.  (T- 650)

21.  Following the meeting, Mrs. M.B. wrote to Mr. Walsh reiterating her request that a program to address decoding be added to the IEP.  (P-33) The District again refused to provide

decoding instruction, saying that reading would be addressed in the small group resource room. M.B. Aff. at ¶ 17.

22.   For the 2004-2005 school year the CSE recommended placement in 15:1 classes for English, math and social studies, placement in an inclusion class for science, and daily resource room.  (P- 32)

23.   Subsequently, during the 2004-2005 school year, N.C.'s score on the Woodcock-Johnson-III Passage Comprehension subtest fell from the 58th percentile to the 19th percentile. (P-30, 34)

25.   His resource room teacher that year, Karen Sullivan, testified that this dramatic decrease was evidence that N.C. had "not progressed much over the year".  (T- 263)

26.   Similarly, N.C.'s score on the Woodcock-Johnson-III Letter-Word Identification subtest decreased from the 24th percentile in March 2004 to the 2nd percentile in January 2005. (P- 30, 34)

27.   N.C.'s Broad Reading score decreased from a standard score of 85 in March 2004 to a standard score of 74 in January 2005.  Bridget Becker, the District's Director of Special Education, testified that this decrease in scores indicated regression in reading.  (T- 133-134)

28.   N.C. again demonstrated below proficient performance ("2") on the NYSTP English Language Arts and Social Studies tests given during the 2004-2005 school year.  (P- 37, 38)

29.   By the end of 8th grade (2004-2005) N.C. could not read a restaurant menu or a road sign.  (T- 671, 690) M.B. Aff. at ¶ 22.

30.   Although N.C. was placed on the honor roll based on the grades he received in 8th grade, these grades do not accurately reflect the lack of progress he was making in reading and

writing.  His grades were based, in part, on his homework assignments which his parents

observed nightly that he was unable to complete.  His parents read all written material to him,

researched for him, scribed his dictated responses because he could not write them himself, and

in many instances wholly completed the assignments for him.  (T- 670-671, 675-678, 681-683)

M.B. Aff. at ¶ 23.

      31.  His Social Studies teacher that year, Ms. Cray, testified that the grades she gave N.C.

on his report cards did not accurately reflect the work he actually completed himself.  (T-835)

      32.  For all his classes his grades were based on a modified curriculum.  (P- 51; T- 298)

      33.  Ms. Cray graded N.C. in comparison to the other special education students in his

classes, testifying that he was "average for a special education student."  (T- 758, 791)

      34.   Ms. Sullivan testified that she spent approximately 7 minutes per day individually

with N.C. in the resource room.  She did not work on decoding at all with him, testifying

that "its not something that I would start teaching a student in the 8th grade.  We don't even have

materials for phonics."  (T-237, 258, 269)

      35.  Both the resource teacher, Ms. Sullivan, and the social studies teacher, Ms. Cray,

used 5th grade-level reading materials with N.C.  (T- 260, 803)

      36.  In preparation for N.C.'s annual review on March 8, 2005 to develop the 2005-2006

IEP for 9th grade,  the District again administered the Woodcock-Johnson-III Tests of

Achievement on January 3, 2005.  N.C.'s standard scores dropped by 11 points on Broad

Reading, by 22 points on Letter-Word Identification, and by 16 points on Passage

Comprehension.  (P-34)

      37.  For the 2005-2006 year, the CSE recommended special classes in a 15:1 ratio for

English and social studies, inclusion classes for science and math, daily resource room, and speech/language therapy in a group of 5 students.  (P- 35)

38.   The CSE on March 8, 2005 did not include the participation of a regular education teacher who could have taught N.C. in 9th grade.  (P- 35; T-301)

39.   The 2005-2006 IEP describes N.C. reading ability as low average.  (P-35) His actual broad reading score of 74 is well below average.  (T- 248)

40.   The 2005-2006 IEP contains only one goal for reading, to read and understand content from subject-area classes.  The chairperson, Linda Fasolino, described this goal as "the overall reading goal for a child transitioning into high school."  (T- 321)

41.   There are no goals for decoding or reading fluency, despite the CSE's statement in the IEP that "academic deficits are displayed in reading, specifically decoding and fluency."  (P- 30, 34, 35)

42.    Ms. Fasolino testified that the reading and writing goals on the 2005-2006 IEP do not address all of N.C.'s reading and writing needs.  (T- 321-323)

43.    Ms. Cray, N.C.'s 8th grade special education teacher, testified that she personally observed that he had decoding deficits that were not addressed by the 2005-2006 IEP.  (T- 826, 829)

44.   At the meeting Ms. Fasolino informed Mrs. M.B. that the District was considering establishing a reading program for 9th grade students.  M.B. called Ms. Fasolino twice during the subsequent two weeks to inquire as to the status of the development of the reading program but did not get a timely return call.  Eventually, she received word from the high school guidance counselor that the District would not be offering a reading program for high school students.  (T-

693-698)

45.   The March 8, 2005 IEP contained four speech/language objectives: to use strategies for auditory recall; to express conclusions and main ideas; to convey extended explanations and provide detailed descriptions; and to understand and use vocabulary related content area curriculum.  (P-35) Ms. Beaudry, the speech/language therapist who recommended these objectives, described her anticipated work on them as "teaching strategies that N. needs to be successful in school."  (T-896)

46.   On August 15, 2005 the parents gave timely, written notice of their intent to enroll N.C. in the Kildonan School for the 2005-2006 school year.  (P- 41) They chose Kildonan because they understood it to be a school for children of average intelligence which would provide a comprehensive language based program to address N.C.'s language- based learning disability.  M.B. Aff. at ¶ 29; Complaint at ¶30.

47.   On Friday, August 26, 2005 the parents received a notice scheduling a CSE meeting for August 31, 2005.  (P- 44) On Monday, August 29, 2005, M.B. submitted a written request to postpone the meeting due to the unavailability of the parents' attorney whom they wished to attend.  (P- 45) The District denied the request and held the meeting as scheduled.  M.B. Aff. at ¶ 30.

48.   Once the other CSE members had convened, the chairperson, Bridget Becker, telephoned M.B. and asked if she would like to participate by telephone.  M.B. reiterated her desire to postpone the meeting until her attorney, who was out of town, could be present.  M.B. did not inform Ms. Becker that her attorney had advised her not to attend the meeting.  (T- 711-712) M.B. Aff. at ¶ 31.

49.  At the August 31, 2005 CSE meeting, the CSE added the services of a direct consultant teacher for reading in a 5:1 setting.  (P- 47)

50.  The parents did not receive this IEP until after the 2005-2006 school year had begun. M.B. Aff. at ¶ 32.

51.  In August 2005, Henry Goetze, Ph.D. conducted a comprehensive psychological evaluation of N.C.  (P- 42)

52.  N.C. attained the following standard scores:

Weschler Individual Achievement Test-II:  Word Reading:  64

Wide Range Achievement Test: Reading Recognition        69       (P-42)

53.  In addition, N.C. scored below the 1st percentile on the Peabody Individual Achievement Reading Comprehension subtest.  (P-42)

54.  Dr. Goetze concluded that "[N.C.] has been receiving remedial assistance in the home district since 2nd grade.  Unfortunately, there is little evidence that the interventions have been successful at resolving his significant handicap in language mediated tasks such as reading and writing.  In fact, relative to his peers, it seems that N. has slipped further and further behind his classmates...."  (P- 42, p. 7)

55.  Dr. Goetze recommended that N.C. be placed in a school with demonstrated expertise in educating severely learning disabled students, which would offer small group instruction and daily one-to-one reading instruction by educators with a strong background in phonological processing.  (P- 42; T- 612)

56.  N.C. began attending Kildonan in September 2005.  During the 2005-2006 school year he received daily one to one reading and writing instruction for 45 minutes using the Orton

Gillingham approach.  In addition, he was provided a 9th grade college preparatory curriculum in classes averaging 8 students.  (T- 332)

57.   Orton-Gillingham is a direct, systematic, multisensory, phonics-based approach to reading and writing instruction.  (P-60; T-336-337)

58.   Use of the Orton-Gillingham approach is "very prominent" in the subject matter courses at Kildonan.  (T- 336) All content area teachers receive 90 hours of initial training in Orton-Gillingham with regularly scheduled continuing training and mentoring by a highly experienced Orton-Gillingham teacher. (T-339-340)

59.   Many of the students have difficulty with auditory processing, and so all classes use a combination of visual, auditory, and kinesthetic (hands-on) instruction.  (T- 394)

60.   Dr. Lane, the Academic Dean of Kildonan, testified that "we stress very seriously the fact that no class should be predominantly auditory or discussion-based in nature as some of our students have difficulties with auditory processing....teachers are using the visual and kinesthetic...as much as they would use discussion or reading aloud in text."  (T- 429)

61.   During those portions of classes when text-based materials are being used, the text is read aloud by students who volunteer or by the teacher so that students can demonstrate their mastery of the material without being unduly limited by their lower-level reading skills.  (T- 389, 392, 427-429)

62.  During 8th grade, N.C.'s special education teacher, Ms. Cray, also read aloud to the class.  She testified that N.C. was able to "absorb and comprehend" material presented in this manner.  (T- 820)

63.  Ms. Cray described N.C.'s learning style as "auditory.  A lot of stuff was from

listening because he did struggle with reading, but if it was read to him, he did comprehend what was being read."  (T- 788)

64.  Similarly, Ms. Beaudry, N.C.'s, speech/language therapist during middle school, also read paragraphs and questions aloud to assess N.C.'s listening comprehension.  She testified that "he was pretty good at that".  (T- 876, 879) She elaborated: "when he is listening and there is context, he can pick up that context and get it", and "he does have auditory processing problems but he has some strength in that area.".  (T-891, 894)

65.  Vocabulary instruction in content areas classes at Kildonan uses the Orton-Gillingham approach.  All content area teachers and all language tutorial teachers teach a standard format and process for completing writing assignments.  (T- 375, 389)

66.  All four of the speech/language objectives of the 2005-2006 IEP were addressed within the context of the Kildonan program.  (T- 371-373)

67.  During the 2005-2006 school year, N.C. made progress in a wide variety of reading, writing and language skills, including: phonemic awareness, syllabification, spelling rules, writing basic and expanded paragraphs, reading fluency and prosody, and cursive writing.  (T- 358, 360, 364; P- 55, 56, 57, 72)

68.  Mid-way through the year, N.C. began volunteering to read aloud in literature class nearly every day.  (P-72, p.3; T-363)

69.  Kildonan administered standardized testing in October 2005 and May 2006.  N.C. maintained or improved his standard scores in all areas (P-72):

|  | 10/05 | 5/06 |
|---|---|---|
| Woodcock Reading Mastery Test Word Identification: | 77 | 81 |

| | | | |
|---|---|---|---|
| Woodcock Reading Mastery Test Word Attack: | | 83 | 90 |
| Gray Oral Reading Test-4 | Rate | 4 | 4 |
| | Accuracy | 4 | 5 |
| | Fluency | 1 | 2 |
| Test of Written Spelling | | 76 | 81 |
| Gates-MacGinitie Reading Tests | Vocabulary | 14%ile | 18%ile |
| | Comprehension | 14%ile | 28%ile |

70.  N.C. maintained excellent grades and received two awards for academic effort. Teacher comments were positive overall.  His American Literature teacher described his growth over the course of the school year as "impressive".  (P- 55, 57, 72)

71.  The Kildonan faculty and administration were aware of N.C.'s weakness in auditory processing upon his admission to the school.  (T- 351, 394)

72.  To address N.C.'s weak auditory processing, Dr. Lane testified, based on his ongoing discussion with and supervision of all of N.C.'s teachers, that both the science and social studies teachers adjusted their teaching strategies  by providing class notes, providing additional assistance in highlighting material, previewing lessons, providing written directions, repeating and simplifying multistep directions, and creating a written check off system for completion of directions.  (T- 353, 357, 363, 430)

73.  The social studies teacher modified the pacing of his class to ensure that it was consistent with N.C.'s needs.  (T- 355)

74.  As a result of these additional services, N.C.'s progress reports indicate that he

participated in class discussions, asked questions to better understand the material and was able to consistently respond to teacher questions directed to him.  (P- 55, 57, 72)

75.   As a result of his attendance at Kildonan during the 2005-2006 school year, the parents observed that N.C. was able to maintain good grades, consistently complete his homework without their assistance, increase his scores on standardized testing in all aspects of reading and spelling, and improve his self-confidence with regard to academic tasks.  (P-55, 57, 72; T-722) M.B. Aff. at ¶ 44.

76.   On January 31, 2006, the parents requested an impartial hearing seeking reimbursement of the tuition and all related expenses of N.C.'s placement at Kildonan for the 2005-2006 school year.   They also sought additional compensatory services for the District's failure to provide a free, appropriate public education for N.C. between February 2004 and June 2004, and during the 2004-2005 school year.  Finally, they sought reimbursement of Dr. Goetze's evaluation.  (IHO- 1)

77.   Impartial Hearing Officer Mindy Wolman was duly appointed and hearings were conducted on April 26, 2006, May 8, 2006, May 22, 2006, June 1, 2006, June 2, 2006, June 5, 2006 and July 5, 2006.  M.B. Aff. at ¶ 46.

78.   A decision was issued by the Hearing Officer on September 26, 2006 finding that the District had failed to offer N.C. an appropriate program for the 2005-2006 school year.  She further found that N.C.'s placement at Kildonan was also inappropriate and denied the parents' claim for tuition reimbursement.  Finally, she denied the parents' claims for compensatory education/additional services for the 2003-2004 and 2004-2005 school years, and for reimbursement of the Goetze evaluation.  M.B. Aff. at ¶ 47.

79. On December 22, 2006, the State Review Officer issued a decision upholding the

IHO's decision in its entirety.[2]  M.B. Aff. at ¶ 48.

Dated: June 26, 2007
       Fishkill, NY

/s/ Linda A. Geraci

Linda A. Geraci (LAG0687)
Attorney for Plaintiffs
21 Old Main Street
Suite 203
Fishkill, NY 12524
(845) 896-1106

---

[2]The parents did not appeal the IHO's denial of their claims for compensatory education for a portion of the 2003-2004 school year or for reimbursement of the costs of Dr. Goetze's evaluation.