UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
R.C. and M.B., on behalf of their minor child, N.C.,

                          Plaintiffs,

-against-

BOARD OF EDUCATION OF THE HYDE PARK
CENTRAL SCHOOL DISTRICT,

                          Defendant.
----------------------------------------------------------------X

AFFIDAVIT OF
MERRY BUCKHOUT
IN SUPPORT OF
PLAINTIFFS' MOTION
FOR SUMMARY
JUDGMENT

07 CIV 2806
(MDF)

ECF Case

STATE OF NEW YORK   )
                            )SS.:
COUNTY OF DUTCHESS  )

      MERRY BUCKHOUT, being duly sworn, deposes and says:

      1.   I am the mother of N.C., a child classified as multiply disabled by the Hyde Park Central School District ("District"). My husband and I reside at 257 South Quaker Lane, Hyde Park, New York. We filed this action seeking reimbursement of tuition we paid to enroll our son, N.C., in the Kildonan School during the 2005-2006 school year, as well as compensatory services for the District's failure to provide our son a free, appropriate, public education during the 2004-2005 school year. I am fully familiar with all of the facts and circumstances surrounding the Complaint in this matter. I was present for the entirety of the underlying impartial hearing before Impartial Hearing Officer Mindy Wolman, and testified at length regarding the substance of our claims. I make this Affidavit in support of the Plaintiffs' Motion

1

for Summary Judgment to reverse the decision of the State Review Officer of the New York State Education Department (the "SRO") insofar as it denied our claims for tuition reimbursement and compensatory education, and to uphold the decision of the SRO insofar as it found that the District had failed to provide our son an appropriate education during the 2005-2006 school year.

2. After conducting an independent review of the administrative record, the Court should affirm the SRO's determination that the District's 2005-2006 IEP was inappropriate for N.C. After seven days of hearing, held between April 6, 2006 and July 5, 2006, in which testimony was taken and documents were received into the record, both the IHO and SRO correctly found that the District had failed to offer N.C. an appropriate education during the 2005-2006 school year.

3. The SRO erred in ultimately denying our claim for tuition reimbursement based on its finding that the Kildonan School had not provided an appropriate education for our son. The administrative record demonstrates that the Kildonan program was specifically designed to meet N.C.'s unique needs. The Court should reverse the SRO's finding in this regard.

4. The SRO erred in denying our claim for compensatory services. The record below demonstrates that the District's 2004-2005 IEP contained gross procedural violations and that, substantively, the District did not provide an appropriate education to address our son's severe reading and writing needs during the entirety of the 2004-2005 school year. As such, the Court should find that N.C. is entitled to an award of compensatory services.

5. N.C. was initially classified during the 1999-2000 school year, when he was in

second grade. (P-7)[1] Despite the District's implementation of special education services, during 4th and 5th grades N.C. was reading and writing two to three years below grade level. (T- 492) During the relevant years in dispute, 2004-2005 and 2005-2006, N.C. was classified as multiply disabled, based on his severe language-based learning disability and his history of a seizure disorder. However, N.C. has not had a seizure since 1999 or 2000, has not taken medication for seizures since approximately 2003, and does not require any special education, related services, accommodations or modifications at school to address a seizure disorder. (T- 620)

6. At our request the District hired Andreas Smoller, Ph.D. to conduct a neuropsychological evaluation, which was completed in October 2002, when N.C. was in 6th grade. (P- 18)

7. Dr. Smoller found significant deficits in the development of reading and spelling skills, visual perception, memory, phonetic word-analysis, and decoding skills. (P-18)

8. To address these deficiencies, Dr. Smoller recommended an intensive program of educational remediation, to include small class placement, and "multiple opportunities for individualized one-on-one tutuoring". Dr. Smoller recommended use of an integrated multisensory method, with separate time devoted to work with N.C. on phonemic awareness. Dr. Smoller further stated that the Kildonan School would be able to provide the type of intensive, individualized program he believed N.C. required. (P-18)

9. Despite Dr. Smoller's comprehensive report, the District never implemented an individualized decoding program for N.C., nor did it implement an integrated multisensory

---

[1] District, Parent, and Impartial Hearing Officer Exhibits from the record of the impartial hearing are referred to respectively as "D-#", "P-#", and "IHO-#". Citations to the hearing transcript will be referenced as "T-page #".

reading program within a small class setting.

10. During the 2003-2004 school year the District recommended placement in 15:1:1 classes for core academic subjects. (P- 24)

11. When the District administered the TONYSS to N.C. during the 2003-2004 school year (7th grade) he scored only a "2". This "below proficient" score indicates a "limited development of reading, writing and listening skills." (P- 28)

12. Throughout his tenure in the District, N.C. was unable to complete homework independently, requiring the direct and significant assistance of his parents, or even his sister who is four years younger, for two to three hours every night. These "hellacious homework evenings" were punctuated by N.C.'s exhibits of severe frustration, which included crying, ripping up his work, pushing everything off the table, and throwing chairs. (T- 624, 630, 637, 645)

13. On March 29, 2004, the CSE met to develop N.C.'s IEP for the 2004-2005 school year. (P- 32) The resulting IEP lists inaccurate standardized test scores. The Broad Reading score listed is 104; the correct score is 85. Similarly, the Broad Written Language score is 94; the correct score contained on the evaluation itself is 77. (P- 30, 34) During his testimony at the hearing, the chairperson of the meeting, James Walsh, was unable to explain how the IEP came to contain inaccurate scores. (T- 176-178)

14. Initially at the meeting, I was presented with a broad score of 85 for reading. I was then told that the 85 was an error, and that, N.C.'s actual score on Broad Reading was 104. (T- 647)

15. Parents' Exhibits 30 and 31 both contain Woodcock Johnson-III scores administered

4

on March 15, 2004. Although Exhibit 31 is undated, it was clarified at the hearing by the IHO's questioning of Mr. Walsh, that the scores contained on that document were from the March 15, 2004 administration of the Woodcock-Johnson-III and were relied on by the CSE in developing the March 29, 2004 IEP. (T-219-220) Both Exhibits 30 and 31 contain handwritten notations of scores that conflict with the typewritten scores, and with the scores noted on the IEP. (P-30, 31)

16. Because his Broad Reading score was wrongly presented to me at the meeting as 104, I was falsely led to believe his skills in those areas were improving. (T-651) At the March 29, 2004 CSE meeting, I was not aware that the higher score was actually inaccurate. This affected my participation in the meeting in that I did not advocate as vehemently as I otherwise would have (and had previously advocated) for an individualized, multisensory, decoding and spelling program for my son. (T-652-653, 763)

17. At the March 29, 2004 meeting the CSE denied my request for a reading program to address N.C.'s decoding deficits. (T-650) Following the meeting, I wrote to Mr. Walsh reiterating my request that a program to address decoding be added to the IEP. (P-33) The District again refused to provide decoding instruction, saying that reading would be addressed in the small group resource room.

18. For the 2004-2005 school year the CSE recommended placement in 15:1 classes for English, math and social studies, placement in an inclusion class for science, and daily resource room. (P-32)

19. Subsequently, during the 2004-2005 school year, N.C.'s score on the Woodcock-Johnson-III Passage Comprehension subtest fell from the 58th percentile to the 19th percentile. (P-30, 34) His resource room teacher that year, Karen Sullivan, agreed in testimony that this

dramatic decrease was evidence that N.C. had "not progressed much over the year". (T- 263)

20. Similarly, N.C.'s score on the Woodcock-Johnson-III Letter-Word Identification subtest decreased from the 24th percentile in March 2004 to the 2nd percentile in January 2005. (P- 30, 34)

21. N.C. again demonstrated below proficient performance ("2") on the NYSTP English Language Arts and Social Studies tests given during the 2004-2005 school year. (P- 37, 38)

22. By the end of 8th grade (2004-2005) N.C. could not read a restaurant menu or a road sign. (T- 671, 690)

23. Although N.C. was placed on the honor roll based on the grades he received in 8th grade, these grades do not accurately reflect the lack of progress he was making in reading and writing. His grades were based, in part, on his homework assignments which I observed nightly that he was unable to complete. I read all written material to him, researched for him, scribed his dictated responses because he could not write them himself, and in many instances completed the assignments for him. (T. 670-671, 675-678, 681-683) His Social Studies teacher that year, Mrs. Cray, testified that the grades she gave N.C. on his report cards did not accurately reflect the work he actually completed himself. (T-835) For all his classes his grades were based on a modified curriculum.

24. His resource room teacher during 8th grade testified that she spent approximately 7 minutes per day individually with N.C. She did not work on decoding at all with him, testifying that "its not something that I would start teaching a student in the 8th grade. We don't even have materials for phonics." (T-269)

25. In preparation for N.C.'s annual review on March 8, 2005 to develop the 2005-2006

IEP for 9th grade, the District again administered the Woodcock-Johnson-III Tests of Achievement on January 3, 2005. N.C.'s standard scores dropped by 11 points on Broad Reading, by 22 points on Letter-Word Identification, and by 16 points on Passage Comprehension. (P-34)

26. For the 2005-2006 year, the CSE recommended special classes in a 15:1 ratio for English and Social Studies, inclusion classes for science and math, daily resource room, and speech/language therapy in a group of 5 students. (P-35)

27. The 2005-2006 IEP contains only one goal for reading, to read and understand content from subject-area classes. There are no goals for decoding or reading fluency, despite the CSE's statement in the IEP that "academic deficits are displayed in reading, specifically decoding and fluency." (P- 30, 34, 35)

28. At the meeting, the chairperson, Linda Fasolino, informed me that the District was considering establishing a reading program for 9th grade students. I called Ms. Fasolino twice during the subsequent two weeks to inquire as to the status of the development of the reading program but did not get a timely return call. Eventually, I received word from the high school guidance counselor that the District would not be offering a reading program for high school students. (T- 693-698)

29. On August 15, 2005 my husband and I gave timely, written notice of our intention to enroll N.C. in the Kildonan School for the 2005-2006 school year. (P- 41) We chose Kildonan because we understood it to be a language-based program, which would provide a comprehensive program to address N.C.'s language- based learning disability.

30. On Friday, August 26, 2005 I received a notice scheduling a CSE meeting for August

7

31, 2005. (P- 44) On Monday, August 29, 2005, I submitted a written request to postpone the meeting due to the unavailability of our attorney who we wished to attend. (P- 45) The District denied the request and held the meeting as scheduled.

31. Once the other CSE members had convened, the chairperson, Bridget Becker, telephoned me and asked if I would like to participate by telephone. I reiterated my desire to postpone the meeting until our attorney, who was out of town, could be present. Contrary to the District's assertions, I did not inform Ms. Becker that our attorney had advised me not to attend the meeting. (T- 711-712)

32. At the August 31, 2005 CSE meeting, the CSE added the services of a direct consultant teacher for reading in a 5:1 setting. (P- 47)  We did not receive this IEP until after the 2005-2006 school year had begun.

33. In August 2005, Henry Goetze, Ph.D. conducted a comprehensive psychological evaluation of N.C. (P- 42)

34. N.C. attained the following standard scores:

Weschler Individual Achievement Test-II:  Word Reading: 64

Wide Range Achievement Test: Reading Recognition      69

35. In addition, N.C. scored below the 1st percentile on the Peabody Individual Achievement Reading Comprehension subtest. (P-42)

36. Dr. Goetze concluded that "[N.C.] has been receiving remedial assistance in the home district since 2nd grade. Unfortunately, there is little evidence that the interventions have been successful at resolving his significant handicap in language mediated tasks such as reading and writing. In fact, relative to his peers, it seems that N. has slipped further and further behind

his classmates...." (P- 42, p. 7)

37. Dr. Goetze recommended that N.C. be placed in a school with demonstrated expertise in educating severely learning disabled students, which would offer small group instruction and daily one-to-one reading instruction by educators with a strong background in phonological processing. (P- 42; T- 612)

38. N.C. began attending Kildonan in September 2005. During the 2005-2006 school year he received daily one to one reading and writing instruction using the Orton Gillingham approach. In addition, he was provided a 9th grade college preparatory curriculum in classes averaging 8 students. (T- 332) Use of the Orton Gillingham approach was "very prominent" in the subject matter courses. (T- 336) Many of the students have difficulty with auditory processing, and so all classes use a combination of visual, auditory, and kinesthetic (hands-on) instruction. (T- 394, 429)

39. During the 2005-2006 school year, N.C. made progress in a wide variety of reading, writing and language skills, including: phonemic awareness, syllabification, spelling rules, writing basic and expanded paragraphs, reading fluency and prosody, and cursive writing. (T- 358, 360, 364; P- 55, 56, 57, 72) Mid-way through the year, N.C. began volunteering to read aloud in literature class nearly every day. (P-72, p.3; T-363)

40. Kildonan administered standardized testing in October 2005 and May 2006. N.C. maintained or improved his standard scores in all areas (P-72):

|  | 10/05 | 5/06 |
|---|---|---|
| Woodcock Reading Mastery Test Word Identification: | 77 | 81 |
| Woodcock Reading Mastery Test Word Attack: | 83 | 90 |

| | | | |
|---|---|---|---|
| Gray Oral Reading Test-4 | Rate | 4 | 4 |
| | Accuracy | 4 | 5 |
| | Fluency | 1 | 2 |
| Test of Written Spelling | | 76 | 81 |
| Gates-MacGinitie Reading Tests | Vocabulary | 14%ile | 18%ile |
| | Comprehension | 14%ile | 28%ile |

41. N.C. maintained excellent grades and received two awards for academic effort. Teacher comments were positive overall. His American Literature teacher described his growth over the course of the school year as "impressive". (P- 55, 57, 72)

42. To address N.C.'s weak auditory processing, Dr. Lane testified, based on his ongoing discussion with and supervision of all of N.C.'s teachers, that both the science and social studies teachers adjusted their teaching strategies by providing class notes, providing additional assistance in highlighting material, previewing lessons, providing written directions, repeating and simplifying multistep directions, and creating a written check off system for completion of directions. (T- 353, 357, 363, 430)

43. As a result of these additional services, N.C.'s progress reports indicate that he participated in class discussions, asked questions to better understand the material and was able to consistently respond to teacher questions directed to him. (P- 55, 57, 72)

44. As a result of his attendance at Kildonan during the 2005-2006 school year, I observed that my son was able to maintain good grades, consistently complete his homework without my assistance, increase his scores on standardized testing in all aspects of reading and

spelling, and improve his self-confidence with regard to academic tasks. (P-55, 57, 72; T-722)

45. On January 31, 2006, my husband and I requested an impartial hearing seeking reimbursement of the tuition and all related expenses of N.C.'s placement at Kildonan for the 2005-2006 school year. We also sought additional compensatory services for the District's failure to provide a free, appropriate public education for our son between February 2004 and June 2004, and during the 2004-2005 school year. Finally, we sought reimbursement of Dr. Goetze's evaluation. (IHO- 1)

46. Impartial Hearing Officer Mindy Wolman was duly appointed and hearings were conducted on April 26, 2006, May 8, 2006, May 22, 2006, June 1, 2006, June 2, 2006, June 5, 2006 and July 5, 2006.

47. A decision was issued by the Hearing Officer on September 26, 2006 finding that the District had failed to offer N.C. an appropriate program for the 2005-2006 school year. She further found that N.C.'s placement at Kildonan was also inappropriate and denied the parents' claim for tuition reimbursement. Finally, she denied the parents' claims for compensatory education/additional services for the 2003-2004 and 2004-2005 school years, and for reimbursement of the Goetze evaluation.

48. On December 22, 2006, the SRO issued a decision upholding the IHO's decision in its entirety.[2]

49. The Court should uphold the SRO's finding that the 2005-2006 IEP failed to provide an appropriate education, and reverse the SRO's finding that the Kildonan School was

---

[2] The parents did not appeal the IHO's denial of their claims for compensatory education for a portion of the 2003-2004 school year or for reimbursement of the costs of Dr. Goetze's evaluation.

11

inappropriate. The record evidence demonstrates that, at the time we placed our son at Kildonan, it offered a program designed to meet his unique needs. As necessary, the Kildonan teachers modified and supplemented the basic program of small classes and 1:1 Orton-Gillingham instruction to address N.C.'s individual issues. He made significant progress which we observed directly, and which is reflected in his test scores and progress reports. The Court should further find that equitable considerations support our claim for tuition reimbursement.

50. The Court should reverse the SRO's finding that N.C. is not entitled to compensatory services, and that the District's 2004-2005 IEP was appropriate for him. The record below demonstrates that the 2004-2005 IEP contained numerous procedural violations, and that substantively the District did not address the full range of N.C.'s reading and writing deficits, and that, as a result, he regressed significantly on standardized testing over the course of the year.

51. N.C. requires additional compensatory services in the form of individual tutoring in reading and writing by a certified Orton-Gillingham teacher to remedy the deprivation of an appropriate education that occurred during the 2004-2005 school year.

52. The Plaintiffs' Motion for Summary Judgment should be granted in all respects.

_____
Merry Buckhout

Sworn to before me this 22
day of June, 2007,

_____
Notary Public

THERESA A. DEVENS
Notary Public, State of New York
No. 01DE6154538
Qualified in Dutchess County
Commission Expires October 23, 2010