UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
R.C. and M.B., on behalf of their minor child, N.C.,

                          Plaintiffs,

against                                                         PLAINTIFF'S MEMORANDUM OF
                                                                LAW IN SUPPORT OF MOTION
                                                                FOR SUMMARY JUDGMENT


BOARD OF EDUCATION OF THE HYDE                                  File No.: 07 CIV. 2806
PARK CENTRAL SCHOOL DISTRICT                                    WP4
                                                                ECF CASE
                          Defendant.
------------------------------------------------------------X



LINDA A. GERACI, ESQ., (LAG0687)
Attorney for Petitioners
21 Old Main Street, Suite 203
Fishkill, New York 12524
(845) 896-1106

# TABLE OF CONTENTS

PROCEDURAL HISTORY ........................................................................................1

STATEMENT OF FACTS.......................................................................................1

ARGUMENT...........................................................................................................11

I.    REIMBURSEMENT FOR TUITION FOR N.C.'S EDUCATION AT KILDONAN
      SCHOOL FOR THE 2005-2006 SCHOOL YEAR IS WARRANTED............................11

      A.    N.'s 2005-2006 IEP Failed to Include Goals and Objectives to Address Known
            Deficit Areas ........................................................................................12

      B.    N.'s 2005-2006 IEP Fails to Accurately and Sufficiently Describe his Academic
            Present Levels of Performance ............................................................13

      C.    N.C.'s 2005-2006 IEP is Void Because no Appropriately Qualified Regular
            Education Teacher Participated in the March 8, 2005 CSE Meeting ....................13

      D.    The 2005-2006 IEP is Not Reasonably Calculated to Enable N. to Make Meaningful
            Progress in Reading ........................................................................14

      E.    The  August 31, 2005 IEP is Irrelevant for the Purposes of Tuition
            Reimbursement......................................................................................17

II.   THE KILDONAN SCHOOL WAS AN APPROPRIATE PLACEMENT FOR N.C.
      DURING THE 2005-2006 SCHOOL YEAR ....................................................18

      A.    The SRO Ignored Objective Evidence of Progress................................................19

      B.    Kildonan Addressed N.C.'s Auditory Processing Disorder ..................................20

      C.    Kildonan Addressed N.C.'s Expressive-Receptive Language Disorder ...............22

      D.    To the Extent that N.C. Required Reading Instruction in Content Classes, it was
            Provided by Kildonan .........................................................................23

III..  EQUITABLE CONSIDERATIONS SUPPORT THE PARENTS' CLAIM FOR
      REIMBURSEMENT ..........................................................................................24

IV    COMPENSATORY EDUCATION IS WARRANTED FOR FAILURE TO PROVIDE AN
      APPROPRIATE EDUCATION DURING THE 2004-2005 SCHOOL YEAR .................24

CONCLUSION...................................................................................................25

# TABLE OF AUTHORITES

**Page**

## UNITED STATE SUPREME COURT:

Board of Educ. v. Rowley, 458 U.S. 176 (1982) .............................................................11, 14, 18

Burlington School Comm.v. Department of Educ., 471 U.S. 359 (1985)....................................11

Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993)..................................................11, 18

## FEDERAL COURT OF APPEALS:

Berger v. Medina City Sch. Dist., 348 F.3d 513 (6th Cir. 2003) ............................................19, 20

Cerra v. Pawling Cent. School Dist., 427 F.3d 186 (2d Cir. 2005) ..............................................18

Cleveland Heights-University Heights City Sch. Dist. v. Boss,144 F.3d 391 (6th Cir.1998).......18

Deal v Hamilton County Board of Education, 392 F.3d 840 (6th Cir. 2004) ........................12, 15

Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006) .............18, 19, 20, 21, 22

Gagliardo v. Arlington Central Sch. Dist., 06-1494-CV (2d Cir. 5-30-2007) ...............18, 19, 23

Grim v. Rhinebeck Cent. School Dist., 346 F.3d 377 (2d Cir. 2003) ...........................................12

Mrs. B. v. Milford, 103 F.3d 1114, (2d Cir. 1997) ........................................................14, 15, 16

M.S. v. Yonkers, 231 F.3d 96, (2d Cir. 2000) ........................................................................17, 19

Walczak v. Florida UFSD, 142 F.3d 119 (2d Cir. 1998) ........................................................11, 16

## FEDERAL DISTRICT COURT:

A.C. v. Chappaqua Central School Dist., WL 1259145 (S.D.N.Y. 2007) ..............................19, 20

Antonaccio v Bd. of Ed of Arlington, 281 F. Supp. 2d 710 (S.D.N.Y. 2003) ..............................14

Arlington Cent. Sch. Dist. v. D.K., WL 31521158 (S.D.N.Y. 2002) ............................................11

Bend-Lapine School District v. K.H., WL 1587241 (D. Or. 2005) ..............................................12

County School Board of Henrico County v. R.T., 433 F. Supp. 2d 692 (E. D. Va. 2006) ..........15

J.L. v. Mercer Island School District, 46 IDELR 273 (W.D. WA 2006) ......................................17

Matrejek v. Brewster Central School District, 471 F. Supp. 2d 415 (S.D.N.Y. 2007) ...........14, 24

## **NEW YORK STATE REVIEW OFFICE DECISIONS:**

Application of a Child with a Disability, Appeal No. 06-040 ........................................................25

Application of a Child with a Disability, Appeal No. 04-054 ........................................................25

Application of a Student with a Disability, Appeal No. 04-015 ....................................................23

Application of the Board of Educ. of the Bay Shore Union School District, Appeal No. 00-080 ...
...............................................................................................................................................17

## **FEDERAL STATUTES, RULES, AND REGULATIONS:**

28 U.S.C. §1400 (d)(1)(A) ..........................................................................................................14

34 C.F.R. 300.344[a][2] ...............................................................................................................14

34 C.F.R. 300.345[d] ...................................................................................................................18

## **NEW YORK STATE REGULATIONS:**

8 N.Y.C.R.R § 200.3[a][1][ii] ......................................................................................................14

8 N.Y.C.R.R. §200.4[d][2][i] .......................................................................................................13

8 N.Y.C.R.R. §200.5[d][3] and [4] ..............................................................................................18

PROCEDURAL HISTORY

This is a case arising under the Individuals with Disabilities Education Act upon review of an impartial hearing record. The parents are seeking tuition reimbursement for N.C's placement at the Kildonan School for the 2005-2006 school year, as well as additional educational services for failure to provide an appropriate education during the 2004-2005 school year. The hearing officer found the 2005-2006 IEP inappropriate, found the Kildonan placement inappropriate, and denied the claim for additional services. The State Review Officer ("SRO") affirmed in all respects. Plaintiffs now move for summary judgment.

STATEMENT OF FACTS

N.C. was referred by his parents to the CSE when he was in second grade. (P- 2) Despite the District's implementation of special education services, during 4th and 5th grades N.C. was reading and writing two to three years below grade level. (T-492)

At the parents' request, the District engaged Andreas Smoller, Ph.D., who conducted a neuropsychological evaluation in 2002, when N. was in 6th grade. He found N. to be "significantly lagging in his development of age appropriate reading and spelling skills." (P- 18, p.8) N. had a weakness in visual perception and memory for letters and word configurations; however, "his more pervasive problem is related to a deficit in developing phonetic word-analysis and decoding skills." With regard to academic achievement, on the PIAT-R, N. scored in the 13th percentile in decoding skills, the 14th percentile in reading comprehension skills and 13th percentile in total reading skills. He scored in the 7th percentile in spelling. (P-18, p.5-6)

Dr. Smoller diagnosed N. with a reading disorder, disorder of written expression, mixed receptive-expressive language disorder, and adjustment disorder with mixed disturbance of emotions and conduct. (P.-18, p.8) He recommended an intensive program of educational

-1-

remediation and placement in a small class, with "multiple opportunities for individualized one-on-one tutorial instruction/support to supplement and reinforce the core curriculum material presented in the classroom." (P-18, p.8)   He opined that, "A program such as the one run by the Kildonan School would be able to provide N. with this level of service." (P- 18, p.9)   Specific recommendations also included use of an integrated multi-modal method, with separate time for training in phonemic awareness.

When the CSE met on March 25, 2003 to develop N.'s IEP for the seventh grade (2003-2004), it recommended a special 15:1 class for all subjects.  (P- 24, p.2)  Despite Dr. Smoller's recommendations, the committee did not address N.'s need for a multi-sensory reading program, nor any individual services to address his deficits in decoding. (P- 24, p.3.)  According to the chairperson, James Walsh, there was no reading program at Haviland Middle School for special education students.  (T-507) Although there was a reading program for regular education students, it could contain up to 12 students, and as Mr. Walsh testified, "what good is that?" (T-196, 205)  N. scored below proficient for English and Language Arts on the 7th grade Test of New York State Standards ("TONYSS"), indicating "limited development of reading, writing and listening skills." (P- 28)

During the course of the 7th grade year, and continuing through 8th grade,  N. was unable to complete any homework assignments independently.  His mother testified,  "we would have these hellacious homework evenings"  during which the family sat down for a minimum of two to three hours, stopping for  N.'s emotional breakdowns, during which he would cry, push all his papers off the table, rip things up, crinkle papers, even throw chairs. (T- 624, 630) He would rely on  his sister, who was in the 3rd grade, for help because she could read far better than he could. (T- 637, 645) His

family read all text to him, scribed his dictated responses and frequently completed whole assignments themselves, with limited input from N.C.  (T- 670-671, 675-678, 681-683)

The CSE met on March 29, 2004 to develop N.'s IEP for the 2004-2005, his 8th grade year. (P- 32)  The IEP generated contained errors in the reporting of standardized test scores.  A standard score of 104 in Broad Reading was listed; the correct score taken from the evaluation itself was 85 (P-34, p.3; P- 30[1].)  Similarly, the IEP lists a Broad Written Language Score of 94 rather than the actual score of 77.  The District was unable to explain these discrepancies during the hearing. (T-177) If the parents had realized at the time that the scores were incorrect, they would have been more vehement in opposing the recommended program at that time. (T- 653)   N.'s performance in reading and writing is described in the IEP as "low average", and only cluster scores from the Woodcock-Johnson-II Achievement Tests are reported.  (P- 32, p. 3) The District denied the parents' request, both at the meeting and in a subsequent letter to the chairperson, for an individualized decoding program, recommending resource room instead.  (P-33; T-650)

N.'s 8th grade report cards indicate that the grades were based on a modified program.  (P-51)  These grades did not reflect his independent work product, however,  as his parents provided significant homework assistance. (T- 764) In the eighth grade, for instance,  his mother largely wrote and researched his report on Global Warming, which represented his entire grade for the third quarter. (T- 672, 818-820; P- 64)  N. struggled so much with the reading demands of his 8th grade classes that "for him to get through one paragraph of a social studies textbook would take him like 20 minutes so he would give up immediately." (T- 677-678) Ms. Cray graded N.C. in comparison to the other special education students in his classes, testifying that he was "average

---

[1] The printed score is an 85.  There is a 104 written in pen above the 85.

for a special education student." (T- 758, 791)

During 8th grade, rather than require N.C. to read aloud, Ms. Cray, read aloud to the class. She testified that N.C. was able to "absorb and comprehend" material presented in this manner. (T- 820) Ms. Cray described N.C.'s learning style as "auditory. A lot of stuff was from listening because he did struggle with reading, but if it was read to him, he did comprehend what was being read." (T- 788) Similarly, Ms. Beaudry, N.C.'s, speech/language therapist during middle school, also read aloud to assess N.C.'s listening comprehension, and testified that "he was pretty good at that". (T- 876, 879) She elaborated: "when he is listening and there is context, he can pick up that context and get it", and "he does have auditory processing problems but he has some strength in that area." (T-891, 894)

N.'s 8th grade resource room teacher, Ms. Sullivan, testified that she spent approximately 7 minutes per day individually with N.C. in the resource room. She did not work on decoding at all with him, testifying that "its not something that I would start teaching a student in the 8th grade. We don't even have materials for phonics." (T-237, 258, 269) Both Ms. Sullivan, and Ms. Cray, used 5th grade-level reading materials with N.C. (T- 260, 803) At the end of 8th grade his functional reading skills were so poor that he could not read a road sign or a menu. (T- 690)

During the 2004-2005 school year, N.'s score on the Passage Comprehension subtest of the Woodcock-Johnson declined from the 58th to the 19th percentile, which Ms. Sullivan testified demonstrated that he had "not progressed much over the year." (T- 263) Similarly, his score on the Letter-Word Identification subtest fell from the 24th percentile in March 2004 to the 2nd percentile in January 2005. (P-30,34) Finally, N.C.'s Broad Reading score decreased from a standard score of 85 to 74 between March 2004 and January 2005. Bridget Becker, Director of Special Education, testified that this drop indicated regression in reading. (T- 133-134) Finally,

-4-

N.'s scores on the 2005 NYSTP ELA and Social Studies tests were below proficent. (P-37, 38)

The CSE  met again on March 8, 2005 to develop N.'s IEP for the 2005-2006 school year, recommending  inclusion classes in science and math, special (15:1) classes for English and social studies, resource room (5:1) and speech/language therapy (5:1). (P- 35) The CSE did not include a 9th grade regular education teacher, despite the recommendation for inclusion  math and science. (T- 301; P-32,35)

Notwithstanding  N.'s Broad Reading score on the Woodcock-Johnson of 74, his Letter-Word Identification score of 68 and his Passage Comprehension score of 87,  the IEP contained only one goal for reading and failed to require a reading class to address his worsening deficiencies.  (P- 30, 34, 35) The IEP is devoid of goals for decoding and  reading fluency despite the committee's acknowledgment that "academic deficits are displayed in reading, specifically decoding and fluency." (P- 35, p.4) According to Ms. Fasolino, "the overall reading goal for a child transitioning into high school is to improve reading comprehension skills" and this goal is to be addressed through subject area material. (T-321)   Ms. Fasolino admitted that the reading and writing goals on the 2005-2006 IEP do not address all of N.C.'s reading and writing needs.  (T-321-323)  Ms. Cray, similarly admitted that she personally observed that N.C. had decoding deficits that were not addressed by the 2005-2006 IEP.  (T- 826, 829)

The March 8, 2005 IEP contained four speech/language objectives: to use strategies for auditory recall; to express conclusions and main ideas; to convey extended explanations and provide detailed descriptions; and to understand and use vocabulary related content area curriculum.  (P-35) Ms. Beaudry, the speech/language therapist who recommended these objectives, described them as strategies to assist N. in being successful at school. (T-896)

At the CSE meeting the chairperson, Linda Fasolino, informed the parents that the District

was considering establishing a reading program at the high school, and told Mrs. Costa "to call her to find out how that was going."  (T- 693-697) Mrs. Costa called her twice during the next two weeks but got no response.  Ms. Fasolino eventually informed Mrs. Costa "that this reading program that the district was considering was still on the table but it didn't look good".  (T- 698) Mrs. Costa was finally told by Mrs. Rodriquez, the guidance counselor, that there was no reading program in the high school but that there should be one. (T-698)

On August 15, 2005, the parents notified the District they intended to enroll N. in Kildonan School, a school for students of average intelligence with language-based learning disabilities, for the 2005-2006 school year. (P- 41)   On Friday, August 26, 2005 the parents received a notice scheduling a CSE meeting for August 31. (P- 44; T- 710) On Monday, August 29, 2005, M.B. faxed a letter to the scheduled chairperson, Mr. Walsh, informing him that she was unavailable on August 31st and requesting an alternate date (T- 711; P- 45)  Her request to postpone the meeting was ignored and ultimately denied.  Ms.  Becker, who ended up actually chairing the meeting, called M.B. after the CSE meeting had convened  on August 31 and asked her if she would like to participate by phone. (T- 711-712) M.B. reiterated her request to postpone the meeting so that her attorney, who was out of town at the time, could be  present. (T- 712)  She did not tell Ms. Becker that her attorney had advised her not to participate.

The meeting proceeded despite M.B.'s request to postpone. No one was present who had been at the March meeting, and no one was present who could have been one of N.'s teachers in ninth grade.  (T- 42, 847)  The CSE considered the same documents that had been considered at the March meeting, with the addition of the parents' ten-day letter. According to Ms. Becker, before the District received the 10-day letter, N.  had not been "on the radar screen" and the CSE had not intended to meet again prior to the school year. (T- 107-108) ) At the August meeting, the

CSE, only after being told that N. would no longer be attending school in the District, added a

direct consultant teacher for reading in a 5:1 setting.  However, this reading group did not exist

then, nor was it in existence when the impartial hearing was held. (T- 202-203)  The parents did

not receive the August 31, 2005 IEP until after the 2005-2006 school year had begun.  (T-98)

In August, 2005, the parents engaged psychologist Henry J. Goetz, Ph.D to evaluate N.

N.'s score of 64 on the WIAT-II Word Reading Subtest placed him at the first percentile

compared to his same aged peers, constituting a severe reading deficit. He achieved a score of

only 69 on the Wide Range Reading Recognition Achievement Test, indicating 3rd grade level

reading skills. Similarly, he scored below the first percentile on the Peabody Individual

Achievement Reading Comprehension Test. (P- 42)

Dr. Goetz concluded:

> It is clear from the current tests of his academic functioning that N.'s reading and
> writing ability are far below levels predicted by his intelligence. ... He has been
> receiving remedial assistance in the home district since 2nd grade.  Unfortunately,
> there is little evidence that the interventions have been successful at resolving his
> significant handicap in language mediated tasks such as reading and writing.  In
> fact relative to his peers, it seems that N. has slipped further and further behind his
> classmates .... (P- 42, p.7)

Dr. Goetz cautioned that N.'s advancing age left little time for intervention and

recommended that he be considered for placement in a school which has expertise in working with

severely learning disabled students, where he would benefit from small group and 1:1 instruction

by educators with a strong background in phonological processing. (P- 42, p.7)  He considered it

crucial  that N. receive reading instruction on a daily basis. (T- 612)

N. began attending the Kildonan School in September, 2005. His academic classes

averaged eight students. (T-332)  In addition, N. was provided an individual, daily, 45 minute

language tutorial taught by a teacher certified in the Orton-Gillingham approach and mentored on

a continuing basis by a fellow of the Academy of Orton-Gillingham Practitioners and Educators.

(P- 60; T- 332, 338-340)   This approach, found to be highly successful for students with

impaired phonemic awareness and decoding skills, is diagnostic and prescriptive, explicit,

language-based, structured, sequential, multisensory and flexible. (P-60; T- 336-337) The

language tutors tailor their instruction to each student's individual level and address decoding,

vocabulary, reading fluency, reading comprehension, spelling, handwriting and expository

writing.  (T- 338, 341)   Two hours of homework assignments are given per night to reinforce the

material covered in the tutorials (T- 345)   The fact that all the students have language-based

learning disabilities allows students to "breathe a sigh of relief" because "their peers share similar

experiences," having also struggled with reading and writing. (T- 347)

      Use of the Orton-Gillingham approach is "very prominent" in the subject matter courses

at Kildonan.  (T- 336) All content area teachers receive 90 hours of initial training in Orton-

Gillingham with regularly scheduled continuing training and mentoring by a highly experienced

Orton-Gillingham teacher. (T-339-340)   Many of the students have difficulty with auditory

processing, and so all classes use a combination of visual, auditory, and kinesthetic (hands-on)

instruction.  (T- 394) As Dr. Lane, the Academic Dean of Kildonan, testified, Kildonan

> stress[es] very seriously the fact that no class should be predominantly auditory or
> discussion-based in nature as some of our students have difficulties with auditory
> processing....teachers are using the visual and kinesthetic...as much as they would
> use discussion or reading aloud in text. (T- 429)

 During those portions of classes when text-based materials are being used, the text is read aloud

by students who volunteer or by the teacher so that students can demonstrate their mastery of the

material through tests, class participation, and other comprehension activities without being

unduly limited by their lower-level reading skills.  (T- 389, 392, 427-429)  Mid-way through the

year, N.C. began volunteering to read aloud in literature class nearly every day.  (P-72, p.3; T-363)

Vocabulary instruction in content areas classes at Kildonan uses the Orton-Gillingham approach.

All content area teachers and all language tutorial teachers teach a standard format and process for

completing writing assignments.  (T- 375, 389)

The Kildonan faculty and administration were aware of N.C.'s weakness in auditory

processing upon his admission to the school.  (T- 351, 394)   To address this weakness,  both the

science and social studies teachers adjusted their teaching strategies specifically to accommodate

N.C. by providing him class notes, providing him additional assistance in highlighting material,

previewing lessons, providing written directions, repeating and simplifying multistep directions,

and creating a written check off system for completion of directions.  (T- 353, 357, 363, 430)

Moreover, the social studies teacher modified the pacing of his class to ensure that N.C. was able

to keep up with the material. (T- 355)  As a result of these individualized services, modifications

and accommodations, N.C.'s progress reports indicate that he participated in class discussions,

asked questions to better understand the material and was able to consistently respond to teacher

questions directed to him.  (P- 55, 57, 72)

Kildonan worked with N.C. on all four of the speech/language objectives contained on the

District's recommended March 8, 2005 IEP "on almost a daily basis."  (T-373) Addressing each of

the 4 objectives specifically, Dr. Lane elaborated:

> Auditory recall strategies are *explicitly* taught in subject matter classes.  Students
> are taught how to discern what's the most important piece of information in a
> statement or in a discussion.  In terms of the other goals, conclusions and main idea
> fit very well with reading comprehension, but also *comprehension of spoken
> language* and that's addressed as I described earlier normally in the–not only in the
> language training tutorial but also in the subject matter classes.  Conveying
> extended explanation and providing detailed descriptions is also directly addressed
> in particular in the literature class.  One of the main thrusts on a strategy level in
> the literature course is how to develop a statement and support it with textual

-9-

evidence.  I think that that's been a skill that N. has made a lot of good improvement on and that I believe directly addresses number three.  Vocabulary is not only addressed directly in the language training tutorial but subject matter teachers use the Orton-Gillingham approach for vocabulary in reading–in literature–in all four subject matter courses.  Looking at vocabulary words on the level of breaking it down into prefixes, roots and suffixes to get to the origin and understanding of the word as well as how it relates to other words in the concept [they are] learning at that point.  (T-371-373)(emphasis added)

N. made progress in all areas at Kildonan school during the 2005-2006 school year.  When N. entered Kildonan School, his phonemic awareness was faulty on the most basic level: he was not able to differentiate between sounds and had difficulty representing all the syllables in a word when trying to spell a multi-syllabic word. Significantly, he improved his understanding of phonemes and learned the five basic kinds of syllables to make his decoding more automatic.  He learned spelling rules and generalizations,  became able to successfully use a  basic paragraph structure, and began working on expanded paragraph structures. (T- 360) During the last 10 to 15 minutes of each  tutorial session N. read aloud from a novel, allowing him immediate feedback from the teacher on how he was applying his new skills. His reading rate and his accuracy both improved, as did his intonation and expression.  (T- 364)

The progress N. achieved at Kildonan is reflected in the standardized testing administered in October 2005 and May 2006.  In October 2005 his standard scores on the Word Identification and Word Attack subtests of the Woodcock Reading Mastery Tests were 77 and 83, respectively. By May 2006 his scores on these subtests had increased to 81 and 90.  His decoding accuracy, as measured by the Gray Oral Reading Tests  increased from the 2nd  to the 5th percentile.  On the Gates-MacGinitie Reading Test N.'s vocabulary and comprehension scores increased from the 14th percentile to the 18th percentile and from the 14th percentile to the 28th percentile, respectively. Finally, achievement in spelling improved from the 5th percentile to the 10th percentile.  Consistent

with improved test performance, his grades at Kildonan ranged from C+ to A for all three terms, and he received awards for Academic Effort for both the Fall and Winter terms. (P- 55, 56, 57, 71) According to his mother, since entering Kildonan, "he has a lot more confidence in his abilities, he has a better sense of humor. He seems more relaxed."   Significantly, he was now able to complete his homework assignments independently.  (T- 722)

ARGUMENT

I.      REIMBURSEMENT FOR TUITION FOR N.C.'S EDUCATION AT KILDONAN
        SCHOOL FOR THE 2005-2006 SCHOOL YEAR IS WARRANTED.

        Under the analysis set forth in Burlington School Comm.v. Department of Educ., 471 U.S. 359 (1985) and Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993), parents who unilaterally place their disabled child in a private school are entitled to tuition reimbursement if the school district failed to provide an appropriate IEP, if the private placement meets the student's needs, and if equitable circumstances support the parent's claim.  An IEP is appropriate if the procedural requirements of IDEA have been met, and the IEP is "reasonably calculated to confer educational benefit". Board of Educ. v. Rowley, 458 U.S. 176 (1982) It must be capable of producing meaningful progress, not regression.  Walczak v. Florida UFSD, 142 F.3d 119 (2d Cir. 1998).   Violations of the procedural requirements of IDEA will give rise to relief when they seriously limit the parents ability to participate in the creation of the IEP, or deprive the student of educational benefit.  Arlington Cent. Sch. Dist. v. D.K., 2002 WL 31521158 (S.D.N.Y. 2002); Deal v Hamilton County Board of Education, 392 F.3d 840 (6th Cir. 2004).  N.C.'s 2005-2006 IEP contained significant procedural violations, and was substantively inappropriate.  The SRO's determination in this regard is entitled to deference and must be upheld.

        A.      N.'s 2005-2006 IEP Failed to Include Goals and Objectives to Address Known

-11-

Deficit Areas.

An IEP "shall list measurable annual goals, consistent with the student's needs and abilities." 8 NYCRR §200.4(d)(iii). As found by the State Review Officer, despite N.'s severe deficits in decoding, reading fluency and spelling, the IEP did not include goals to address those areas. The only reading goal is to "demonstrate an improvement in comprehension skills necessary to read for information and understanding." There were no goals directed toward his areas of most severe deficit. Moreover, it is clear from the testimony of Linda Fasolino that this sole comprehension goal was not individualized to N., as she described the goal as "the overall goal for a child transitioning into high school." It appears that decoding and fluency goals are not provided for any of the District's high school students. (T-321) Ms. Fasolino further admitted that N.C.'s reading deficits are not limited to comprehension, and that the full scope of his reading and spelling needs is not addressed by the limited reading and writing goals on the IEP. (T- 321-323) Her testimony was corroborated by Mary Cray, who observed deficiencies in decoding which were not addressed by the 2005-2006 IEP. (T- 826, 829) The SRO correctly found the IEP inappropriate, based on its failure to include decoding, spelling and reading fluency goals. As the Second Circuit noted in Grim v. Rhinebeck Cent. School Dist., 346 F.3d 377, 382 (2d Cir. 2003), "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." See also, Bend-Lapine School District v. K.H., WL 1587241 (D. Or. 2005)(IEP inappropriate due to inadequate goals).

B.     N.'s 2005-2006 IEP Fails to Accurately and Sufficiently Describe his Academic Present Levels of Performance.

The IEP must describe the student's present levels of performance and needs in the areas of academic achievement, physical development, social development and management needs in

sufficient detail to guide teachers who must implement the IEP, as well as enable the CSE to draft appropriate goals and objectives. The IEP must accurately reflect the evaluations in identifying the student's needs. 8 N.Y.C.R.R. §200.4(d)(2)(i).

The description of N.C.'s academic abilities and needs in the 2005-2006 IEP is both vague and insufficient. It is taken verbatim from the 2004-2005 IEP, with no revision to account for the regression on standardized testing that occurred that year. (P- 32, at 2-3; P- 35, at 3-4) N.'s performance in reading and writing is described as "low average." (P- 35, at 3) However, N.'s Broad Reading score at the time was 74, significantly below average. (T-248) Ms. Cray admitted that reporting only a broad score does not give enough information about N.C.'s specific deficits. (T- 825-826) Although the committee acknowledged the decoding and fluency deficits, in describing the way his disability affects involvement in general education the IEP states misleadingly: "N. has a significant delay in written expression and reading comprehension." (P- 35, at 3) There is no mention of spelling, despite his standard score of 75 on the Woodcock-Johnson. The IEP does not instruct N.'s teacher to address spelling. (T- 828) The District's failure to accurately describe N.'s present levels of academic performance is a procedural violation significant enough to render the IEP inappropriate.

C.    N.C.'s 2005-2006 IEP is Void Because no Appropriately Qualified Regular Education Teacher Participated in the March 8, 2005 CSE Meeting

A regular education teacher *of the child* is required to be present at every CSE meeting, if the student will be participating in regular education. 34 C.F.R. 300.344[a][2]; 8 N.Y.C.R.R § 200.3[a][1][ii]. Failure to conduct the meeting with a properly constituted committee renders the resulting IEP a nullity. Particularly when the CSE proposes to place the child in regular education for some of the day, the committee must include a regular education teacher who could

-13-

potentially be one of the child's teachers. The regular education teacher at the March 8, 2005 CSE

meeting was Jessica Culley, a middle school teacher. Given that N. was recommended for

transition from a self-contained math class  to an inclusion math class in high school and also for

an inclusion science class,  the CSE should have included a high school math or science teacher to

discuss how N.'s needs would be addressed in the inclusion settings, and what modifications and

accommodations would be available.  The District's failure to convene a validly composed CSE

interfered with the parents' participation, by denying them the opportunity to question a teacher

who would have implemented the recommended program  This violation has been found

significant enough to invalidate the IEP.  Matrejek v. Brewster Central School District, 471 F.

Supp. 2d 415 (S.D.N.Y. 2007)

> D.    The 2005-2006 IEP is Not Reasonably Calculated to Enable N. to Make Meaningful
>        Progress in Reading.

One stated purpose of IDEA is to prepare students with disabilities for employment and

independent living. 28 U.S.C. §1400 (d)(1)(A); Antonaccio v Bd. of Ed of Arlington, 281 F. Supp.

2d 710 (S.D.N.Y 2003). Districts must provide a "basic floor of opportunity" consisting of services

that are "individually designed to provide educational benefit" to a child with a disability. Rowley

at 201.  The benefit must be "gauged in relation to a child's potential."  Deal v. Hamilton County

Board of Educ. 392 F.3d 840 (6th Cir.2004).  See, Mrs. B. v. Milford, 103 F.3d 1114 (2d.Cir. 1997).

Predetermination of a program without regard for the student's individual needs deprives parents of

meaningful participation in the child's IEP process.  Deal, supra.

Here, when compared to his average intelligence coupled with his strong determination and

motivation, the IEP fails to provide a program that can reasonably be expected to result in N.

making meaningful progress in reading and writing.  Since at least 2002, the District has known of

N.'s severe reading and writing disorders yet has failed to address phonemic awareness, decoding, fluency, or spelling.  The District's inaction demonstrates "the inertia to which Congress was referring when it wrote in the IDEA that 'the implementation of this chapter has been impeded by low expectations and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities.'  County School Board of  Henrico County v. R.T., 433 F. Supp. 2d 692 (E. D. Va. 2006).

   Relying on the resource room to address N.C.'s reading needs was inappropriate, given N.C.'s lack of success in resource room the previous year.  Ms. Sullivan, spent only seven minutes per day individually with N. (T- 258, 237) Although N. guessed at words during the limited times he read to her, Ms. Sullivan did not work on phonics because "it's not something that I would start teaching a student in the eighth grade.  We don't even have materials for phonics."(T- 269)

   While attending essentially the same program during 2004-2005, N.'s Broad Reading score dropped from 85 in March 2004 to 74 in January 2005.  (P- 30, 34) Ms. Becker admitted in testimony that these scores indicated regression.  (T- 133-134) Similarly, Ms. Sullivan admitted that N.'s decline in passage comprehension from the 58th percentile in March 2004 to the 19th percentile in January 2005 "could indicate the child has not progressed much over the year."  (T- 263) See, Mrs. B. v. Milford, supra., at 1121(finding an IEP inappropriate based on the "inescapable fact that over the course of three years, despite being of average to slightly below average intelligence, M.M. did not advance more than one grade level in any subject.")  Dr. Goetze obtained similarly low scores when he tested N. in August 2005, during which time N. was receiving summer reading services three hours per week.  (T- 608) Finally,  N. scores  on the NYSTPP ELA and Social Studies tests in 2005 were below proficiency. (P- 37, 38)

   The District seems to rely nearly exclusively on N.'s grades during 2004-2005 as

justification for its 2005-2006 IEP.   N.'s grades, however,  are not reliable indicators of more than

trivial progress. As stated by the Second Circuit, where a child is *mainstreamed* , passing grades

and regular advancement from grade to grade are generally accepted indicators of satisfactory

progress. Walczak, 142 F.3d at 130.  If the child has attended self-contained special education

classes, courts should rely on tests scores and similar *objective criteria*   Id. N.  followed a

modified curriculum for all core subjects.  (P- 51) In the eighth grade, N.'s resource room and

social studies teachers were giving him fifth grade level work.  (T-260)

 N.'s grades were based on a limited curriculum, and did not represent his independent

work.  For instance, in English, the first two quarters of the year were devoted to preparation for

the New York State mandated exam.  Consequently, N.C.'s reading demands during this time were

limited to one to three- page passages.  (T- 809) The third quarter grade was based solely on a

research paper on global warming, written  mainly by N.C.'s mother.  Ms. Cray testified that had

she known at the time that this paper was not N.C.'s work, his final grade in English would have

been lowered.  (T- 809, 820) During the final quarter, the class covered a single novel, Holes,

which was read aloud by the teacher and some of the students.  (T- 820)   It was clear from her

testimony, that Ms. Cray graded N.C. compared to other special education students, based on

completion of a modified curriculum.  She described him as "average *for a special education

student*" and testified that he produced "quality work *for his abilities*."  (T- 785, 791)  N.C.'s

mother did most of N.'s homework in Social Studies and helped him significantly in other classes.

Ms. Cray admitted that his social studies grade did not reflect his own true abilities.  (T- 835)

 Furthermore, N.'s grades are not valid indicators of progress when viewed in the context of

regression in reading on standardized testing, and his inability to apply reading skills in daily life.

At the end of 8th grade he was still unable to read road signs or menus.  The State Review Officer,

to whom deference is owed on issues of determining educational progress, has held that a <u>fourth</u> grade child who could not read menus or street signs had not made meaningful progress, despite passing grades.  <u>Application of the Board of Educ. of the Bay Shore Union School District,</u> Appeal No. 00-080. The District's 2005-2006 IEP will not lead to meaningful progress, nor will it further the stated purpose of the statute to prepare N.C. for employment and independent living. <u>See</u>, <u>J.L. v. Mercer Island School District</u>, 46 IDELR 273 (W.D. WA 2006) Moreover, District staff admitted that the IEP failed to accurately describe N.C.'s present levels of performance in reading and failed to include goals in decoding, spelling and reading fluency.  The District cannot, therefore, rely on the grades it has given "to argue that the remedial measures in the IEP are, as a matter of law, reasonably calculated to deliver educational benefits." <u>M.S. v. Yonkers</u>, 231 F.3d 96 (2d Cir. 2000) The Second Circuit in <u>M.S.</u> found that "the substantial defects and omissions in the IEP deprive the fact-finder of data concerning S.S.'s initial abilities and deficits needed to measure S.S.'s subsequent performance."  The myriad deficiencies in N.C.'s IEP similarly dictate that the District be foreclosed from arguing that the grades it has chosen to give N.C. constitute evidence of the appropriateness of its IEPs.

E.    <u>The August 31, 2005 IEP is Irrelevant for the Purposes of Tuition Reimbursement.</u>

For purposes of tuition reimbursement, the relevant IEP is the one the parents had when they unilaterally enrolled their child in a private school.  <u>Cerra v. Pawling Cent. School Dist.</u>, 427 F.3d 186, 194 (2d Cir. 2005).  The District conceded that N.'s parents did not receive a copy of the August 31, 2005 IEP prior to the start of the 2005-2006 school year.  (T- 98) In making their decision to place N. at Kildonan, the parents relied on the March 8, 2005 IEP.  Therefore, the August 2005 IEP is irrelevant for purposes of tuition reimbursement.  Even if the August IEP had been relevant, it is void, due to its creation at a CSE meeting which did not include the parents,

-17-

despite their reasonable request for an adjournment to allow for the attendance of their attorney.   A

meeting may be conducted without the parents only after the CSE has attempted to schedule it at a

mutually convenient time.  34 C.F.R. 300.345[d]; 8 NYCRR 200.5[d][3] and [4].

II.    THE KILDONAN SCHOOL WAS AN APPROPRIATE PLACEMENT FOR N.C.
       DURING THE 2005-2006 SCHOOL YEAR

       A unilateral parental placement is appropriate if it offers "education instruction specifically

designed to meet the unique needs of a handicapped child, supported by such services as are

necessary to permit the child to benefit from instruction."  Frank G. v. Board of Educ. of Hyde

Park, 459 F.3d 356, 365 (2d Cir. 2006);  Gagliardo v. Arlington Central Sch. Dist., 06-1494-CV

(2nd Cir.  5-30-2007)(citing Rowley, 458 U.S. at 188).  The parents' placement  is not required to be

perfect.  Cleveland Heights-University Heights City Sch. Dist. v. Boss, 144 F.3d 391, 399 (6th

Cir.1998).  It need not employ certified special education teachers or develop a written IEP.

Florence County School District Four v. Carter, 510 U.S. 7 (1993).  Parents are not required to

prove that the placement "furnishes every special service necessary to maximize their child's

potential." Frank G., supra. at 365.  Rather, the placement must offer "some element of special

education services in which the public school placement was deficient."  Berger v. Medina City

Sch. Dist., 348 F.3d 513, 523 (6th Cir. 2003)  A private school may not be found appropriate if its

"chief benefits" are "the kind of educational and environmental advantages and amenities that

might be preferred by parents of any child, disabled or not." Gagliardo, supra.  It is appropriate for

Courts to consider objective evidence of the child's progress at the private school.  Frank G; A.C.

v. Chappaqua Central School Dist., WL 1259145 (S.D.N.Y. 2007).  Parents are not held to the

same strict standard of placement in the least restrictive environment as are school districts.  M.S v.

Board of Education of City School District of City of Yonkers, 231 F.3d 96, 105 (2d. Cir. 2000).

The SRO's finding that Kildonan was inappropriate is unsupported by record evidence, and not entitled to deference.

A.  The SRO Ignored Objective Evidence of Progress.

The Kildonan School provided N. the type of program recommended by both Dr. Smoller and Dr. Goetze.  It is dedicated exclusively to the education of students with language-based reading disorders, who have average cognitive ability.  Consistent with professional recommendations, N. received intensive reading, writing and spelling instruction every day using the Orton-Gillingham approach, specially designed instruction tailored to the learning styles of students with language-based learning disabilities  The remainder of the day he attended small classes, taught by teachers extensively trained in educating learning disabled students, who employ multisensory instruction, drawing from the principles of Orton-Gillingham to teach students to read vocabulary, and using a consistent method of teaching expository writing.  (T-373) N. progressed with this approach, maintaining strong grades, garnering positive comments from his teachers , completing assignments independently, improving his standardized test scores, and growing in confidence and self-esteem.  The SRO ignored objective evidence of progress, basing his determination on his erroneous belief that Kildonan had not addressed all of N.C.'s needs, as discussed below.  Failure to give due consideration to objective evidence, such as improved test scores, as well as subjective evidence, such as improved confidence and homework completion, is directly contrary to established precedent.  See, Frank G., supra. (finding placement appropriate based on improved grades and SAT score, as well as small class size and instructional modifications); A.C. v. Chappaqua, supra. (finding placement appropriate based on increased independence in toileting and eye contact). N.C.'s progress was the direct result of the Kildonan

-19-

program; it was not "mere happenstance". <u>Berger v. Medina</u>, <u>supra.</u>, at 522, n.6.[2]

B.     <u>Kildonan Addressed N.C.'s Auditory Processing Disorder.</u>

The SRO erroneously found that Kildonan did not address N.'s auditory processing

disorder. The Kildonan staff was aware of N.'s difficulties with auditory processing when he first

enrolled. (T-351, 394) As Dr. Lane testified, the size and pacing of the content area classes are

"designed exclusively for students with learning disabilities, some of whom, <u>many</u> of whom have

processing speed issues." (T- 345) In addition to the inherent structure of these classes, Kildonan

provided N.C. additional services and accommodations, specifically in response to the needs he

presented. For instance, the social studies teacher provided him sets of class notes, with additional

assistance in learning to highlight important information (T- 353; P- 55 at.5) In addition, the

teacher met with him to preview assignments and "made sure that the pacing in the class was a

good match for N.'s rate of processing." (T- 355) Similarly, his science teacher provided written

directions, simplified to one or two steps, with places for N. to check off as completed. (T- 430)

The science and social studies teachers, as well as Dr. Lane, all noted that these modifications were

effective. (Lane, 363, 430) Rather than being hampered by auditory processing issues, N. was

"able to exchange ideas and information efficiently with ... other students and present that

information to the class." (Lane 363) Furthermore, N.C.'s progress reports indicate that he

participated in class discussions, asked questions to better understand the material and consistently

responded to teacher questions directed to him. (P- 55, 57, 72) The type of adjustments Kildonan

made to tailor its program to N.C. are precisely the type of accommodations that led the Second

_____

[2]Although <u>Frank G.</u> requires a reviewing Court to defer to the SRO's assessment of
educational progress, in N.C.'s case the SRO engaged in no assessment of the extent to which
objective evidence indicated that N.C. was progressing at Kildonan, leaving no finding in this
regard to which the Court must defer. <u>Id.</u> at 367.

Circuit in <u>Frank G.</u> to find the Upton Lake Christian Academy, a regular education parochial school, appropriate for a student with ADHD.  Along with small class size, the Court relied on accommodations such as a communications book, extended time for assignments, quiet work areas, and oral tests.  <u>Id</u>, at 366.

The SRO relies heavily on the fact that students are permitted to volunteer to read aloud in content classes, with the volunteers supplemented by the teachers.  The SRO's statement that N.C.'s "significant auditory processing deficits limit his ability to follow verbal directions and/or absorb verbally-presented instructions" is not supported by a citation to the record, and is, in fact, expressly contradicted,  not only by the testimony of Dr. Lane, but by the testimony of the District's own witnesses.  (SRO Decision at 11) Ms. Cray, a special education teacher who taught N.C. two subjects, described him as an auditory learner,  and believed he was able to comprehend material she read aloud.  His speech therapist, Ms. Beaudry, similarly read to N.C. and stated that, as long as information was presented in context, he was "pretty good at that."  When three credible witnesses, who all had ample knowledge of N.C. in an educational environment, testified that N. was able to absorb verbally-presented material, it was error for the SRO to base his decision on an unsupported assumption to the contrary.    Moreover, Dr. Lane was clear that reading aloud is but one instructional strategy.  His testimony, unrebutted by any other evidence in the record,  is that: "the material isn't just being taught auditorily, its done in a multisensory nature so that he is able to use both hands-on and visual modalities...to reinforce the weaker auditory piece."  (T- 394) Again he emphasized: "we stress very seriously the fact that no class should be predominantly auditory or discussion-based in nature as some of our students have difficulties with auditory processing....teachers are using the visual and kinesthetic...as much as they would use discussion or reading aloud in text."  (T- 429) Furthermore, students do not listen passively; they are taught to

-21-

listen for information, highlight key points, and "be able to discuss and make connections to other pieces of text and other information they are learning." (T- 366) In fact, N.C. volunteered to read in literature class nearly every day during the second half of the year. (P-72; T-363)

C.    Kildonan Addressed N.C.'s Expressive-Receptive Language Disorder.

First, the fact that N. did not receive speech therapy at Kildonan is not dispositive. Frank G., supra., at 365. Dr. Lane testified unequivocally that the four speech and language objectives on the IEP are being addressed at Kildonan. Contrary to the SRO's findings, he elaborated on how these oral language objectives were addressed within the context of the Kildonan program, a language-based program serving children with language-based disabilities. (Lane, 371-373) N.C.'s speech therapist, who worked with him all through middle school, chose these four areas to work on for 2005-2006, categorizing them as "strategies" she would teach N.C. to be successful. The Hearing Officer doubted that these strategies were actually being taught at Kildonan, given that the progress reports do not reference them. However, the progress reports describe the content of the courses, as well as N.C.'s progress towards mastery of the curriculum. The fact that the progress reports do not list every strategy students are taught does not contradict Dr. Lane's unrebutted testimony, based on intimate knowledge of the program, supervision of all the teachers, observation of N.C., and multiple discussions with all his teachers, that these four strategies were taught to N.C. throughout the day at Kildonan. See, Application of a Student with a Disability, Appeal No. 04-015 (SRO credited testimony of Dr. Lane that Kildonan addressed student's speech/language goals withing its curriculum). This case is therefore distinguishable from Gagliardo, supra, in which the Oakwood School, a regular education school with no services to address the student's emotional needs, was held inappropriate for a student whose own psychiatrist had recommended placement in a therapeutic program.

D.    <u>To the Extent that N.C. Required Reading Instruction in Content Classes, it was Provided by Kildonan.</u>

Finally, the SRO based his decision on the erroneous premise that N.C. required reading instruction in content classes and did not receive it at Kildonan.  Neither of the independent psychologists who evaluated N.C., Dr. Smoller and Dr. Goetze, recommended that reading instruction occur in other areas of the curriculum: math, social studies or science.  Rather, both of these psychologists stressed that N.C. should be in small content-area classes, receive daily, intensive reading instruction, and be taught by teachers with significant expertise in teaching children with severe deficits in phonological processing.  Dr. Goetze testified that he had observed both tutorials and content classes at Kildonan, was aware that actual reading instruction occurs only in the tutorials, and believed the Kildonan program to be in line with his recommendations for N.C.  (T-605)  Furthermore, it is not accurate to conclude that no reading instruction occurs outside the tutorials, as all content teachers, trained themselves in the Orton-Gillingham approach, use that approach when teaching students how to read unfamiliar vocabulary words.  (Lane, 389) This case is therefore distinguishable from <u>Matrejek,</u> <u>supra.</u> at 14-15, in which  Kildonan was found inappropriate, largely because several private evaluators testified that the student required reading instruction in every class.  In N.C.'s case the Kildonan program provided exactly what Dr. Goetze testified he needed.[3]

III.    EQUITABLE CONSIDERATIONS SUPPORT THE PARENTS' CLAIM FOR REIMBURSEMENT.

_____

[3]In addition, in <u>Matrejek,</u>, Kildonan did not appear to adequately address the student's attentional issues.  Despite progress reports replete with comments from every teacher that the student had difficulty focusing in class, the teachers did not implement any services or strategies to regain his attention, even allowing him to doodle during lessons.  Moreover, his grades were deteriorating and he consistently failed to complete homework.  By contrast, N. maintained good grades, evidenced no issues with distractibility or homework completion, and was provided with numerous modifications and accommodations to address language and auditory processing issues.

Consideration of the equities is appropriate only after the parents have successfully prevailed on the first two prongs of the tuition reimbursement test, and is relevant only to the fashioning of relief.  Gadsby v. Grasmick, 109 F.3d 940, 955 (4th Cir.1997)  Here, the parents were fully cooperative with the District, repeatedly apprizing the CSE of their concerns, and giving timely notice of the unilateral placement.   The equities support an award of tuition reimbursement.

IV     COMPENSATORY EDUCATION IS WARRANTED FOR FAILURE TO PROVIDE AN
       APPROPRIATE EDUCATION DURING THE 2004-2005 SCHOOL YEAR.

Compensatory education is warranted to remedy gross procedural violations of IDEA which result in the denial of an appropriate education for a substantial period of time. Garro v. Connecticut, 23 F.3d 734 (2d Cir. 1994).   Although generally a remedy for students who have aged out of eligibility for instruction,  SRO's have  awarded additional educational services to younger students where the services could remedy the deprivation.  Application of a Child with a Disability, Appeal Nos. 06-040, FN 4 and 04-054. The procedural and substantive failings of the District's 2004-2005 IEP warrant an award of additional, compensatory services.

The 2004-2005 IEP fails to accurately and sufficiently describe N.'s academic present levels of performance.  (P- 32) Literally devoid of descriptive information concerning N.'s reading deficits, it makes only conclusory statements about his spelling and writing needs.  Moreover, the IEP contains scores that are inconsistent with the actual evaluation scores,  and so cannot be said to be based upon appropriate evaluative information.    There are no goals addressing decoding, fluency or spelling. These errors resulted in a loss of educational opportunity for N.  and seriously interfered with his parents' participation in the IEP's development.

Substantively,  N.'s 2004-2005 IEP  did not recommend any services that could be expected to lead to meaningful progress in reading and writing.   Despite significant regression in most aspects of reading and writing, the CSE refused to provide an individualized reading program,

stating repeatedly that a decoding program did not exist in the middle school.  Its reliance on the resource room to address N.C.'s decoding deficits was clearly misplaced, as it failed to even provide phonics material for Ms. Sullivan to use. The District's intransigence resulted in N. entering 9th grade without being able even to read a menu or road sign.  The fact that the District recommended and continued the special class and resource room program, despite documented regression warrants an award of compensatory education.

<u>CONCLUSION</u>

For the foregoing reasons the parents motion for summary judgment should be granted.

Respectfully submitted:

<u>/s/ Linda A. Geraci (LAG 0687)</u>

Attorney for Parents
21 Old Main Street, Suite 203
Fishkill, NY 12524
(845) 896-1106