------------------------------------------------------------------------------X

In the Matter of the Impartial Hearing of
**N.C.**, by his parents, **R.C.** and **M.B.**,

                                Petitioners,

                  -against-

**THE HYDE PARK CENTRAL SCHOOL DISTRICT,**

                              Respondent.

------------------------------------------------------------------------------X

# IMPARTIAL HEARING OFFICER'S
# FINDINGS OF FACT AND DECISION

NYS ID No. 19110

Hearing Officer: Mindy G. Wolman, Esq.

Record Close Date: September 5, 2006

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                                Page 2

### NAMES AND TITLES OF PERSONS WHO APPEARED ON APRIL 26, 2006

| | | |
|---|---|---|
| M.B. | Mother | |
| R.C. | Father | |
| Mia D. Gurly, Esq. | Attorney | Parents |
| Linda Geraci, Esq. | Attorney | Parents |
| Daniel Petigrow, Esq. | Attorney | School District |
| Krystina Cho, Esq. | Attorney | School District |
| Bridget Becker* | Director of Special Education | Parents/School District[1] |
| Amanda Bagnatto, Ph.D. | Assistant Supervisor for Pupil Personnel Services | School District |

### NAMES AND TITLES OF PERSONS WHO APPEARED ON MAY 8, 2006

| | | |
|---|---|---|
| M.B. | Mother | |
| R.C. | Father | |
| Mia D. Gurly, Esq. | Attorney | Parents |
| Linda Geraci, Esq. | Attorney | Parents |
| Daniel Petigrow, Esq. | Attorney | School District |
| Krystina Cho, Esq. | Attorney | School District |
| Bridget Becker | Director of Special Education | School District |
| Amanda Bagnatto, Ph.D. | Assistant Supervisor for Pupil Personnel Services | School District |
| Jim Walsh* | CSE Chairperson | Parents |
| Karen Sullivan* | Special Education Teacher | Parents |

### NAMES AND TITLES OF PERSONS WHO APPEARED ON MAY 22, 2006

| | | |
|---|---|---|
| M.B. | Mother | |
| R.C. | Father | |
| Mia D. Gurly, Esq. | Attorney | Parents |
| Linda Geraci, Esq. | Attorney | Parents |
| Daniel Petigrow, Esq. | Attorney | School District |
| Krystina Cho, Esq. | Attorney | School District |
| Bridget Becker | Director of Special Education | School District |
| Amanda Bagnatto, Ph.D. | Assistant Supervisor for Pupil Personnel Services | School District |
| Linda Fasolino* | CSE Chairperson | Parents |
| Dr. Robert Lane* | Academic Dean, Kildonan School | Parents |

* Individuals who gave testimony.

---

[1] Ms. Becker appeared on behalf of the School District at all hearings, but was also called as a witness by the Parents on the first hearing date.

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                    Page 3

### NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 1, 2006

| | | |
|---|---|---|
| M.B.* | Mother | |
| R.C. | Father | |
| Mia D. Gurly, Esq. | Attorney | Parents |
| Linda Geraci, Esq. | Attorney | Parents |
| Daniel Petigrow, Esq. | Attorney | School District |
| Krystina Cho, Esq. | Attorney | School District |
| Bridget Becker | Director of Special Education | School District |
| Amanda Bagnatto, Ph.D. | Assistant Supervisor for Pupil Personnel Services | School District |
| Linda Fasolino* | CSE Chairperson | Parents |
| Henry Goetze, Ph.D.* | Psychologist | Parents |

### NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 2, 2006

| | | |
|---|---|---|
| M.B.* | Mother | |
| R.C. | Father | |
| Mia D. Gurly, Esq. | Attorney | Parents |
| Linda Geraci, Esq. | Attorney | Parents |
| Daniel Petigrow, Esq. | Attorney | School District |
| Bridget Becker | Director of Special Education | School District |
| Amanda Bagnatto, Ph.D. | Assistant Supervisor for Pupil Personnel Services | School District |

### NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 5, 2006

| | | |
|---|---|---|
| M.B. | Mother | |
| R.C. | Father | |
| Linda Geraci, Esq. | Attorney | Parents |
| Daniel Petigrow, Esq. | Attorney | School District |
| Krystina Cho, Esq. | Attorney | School District |
| Bridget Becker | Director of Special Education | School District |
| Amanda Bagnatto, Ph.D. | Assistant Supervisor for Pupil Personnel Services | School District |
| Mary Cray* | Special Education Teacher | School District |
| Susan Beaudry* | Speech Teacher | School District |

* Individuals who gave testimony.

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                                 Page 4

### NAMES AND TITLES OF PERSONS WHO APPEARED ON JULY 5, 2006

| | | |
|---|---|---|
| M.B. | Mother | |
| R.C. | Father | |
| Linda Geraci, Esq. | Attorney | Parents |
| Daniel Petigrow, Esq. | Attorney | School District |
| Bridget Becker | Director of Special Education | School District |
| Amanda Bagnatto, Ph.D. | Assistant Supervisor for Pupil Personnel Services | School District |
| Lisa Macklin* | School Psychologist | School District |

---

* Individuals who gave testimony.

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision _____ Page 5

## DOCUMENTARY EVIDENCE

### Parent Exhibits

Exh.
No.          Document Title  / Date / Number of Pages

1.      Prescription from Dr. Stanley Rothman, 5/25/99, 1 p.
2.      Letter to Dr. Neiman from M.B., 6/10/99, 1 p.
3.      Hyde Park Central School District Reading Assessment, 10/4/99, 2 pp.
4.      Hyde Park Central School District 1999-2000 Report Card, 1 p.
5.      Psycho-educational Evaluation, 10/5/99, 10/12/99 and 10/14/99, 5 pp.
6.      Netherwood Elementary School Language Evaluation, 12/10/99, 6 pp.
7.      Hyde Park Central School District 1999-2000 IEP, 1/28/00, 6 pp.
8.      Hyde Park Central School District Consent for Special Education Placement, 1/28/00,
        2 pp.
9.      Hyde Park Central School District CSE meeting minutes, 1/28/00, 2 pp.
10.     Netherwood Elementary School Triennial Evaluation, 3/22/01 and 3/29/01,3 pp.
11.     Social History Update, undated, 1 p.
12.     Letter to Ms. Santora from M.B., 3/1/01, 1 p.
13.     Hyde Park Central School District 2001-2002 IEP, 4/4/01, 10 pp.
14.     Letter to Dr. Heymann from Dr. Stanley Rothman, 11/11/99, 1 p.
15.     Letter to Rosemary Santora or Joyce Long from M.B. 2/6/02, 1 p.
16.     Saint Francis Center for Communication Disorders Speech-Language and Hearing
        Evaluation, 3/19/02 and 3/20/02, 4 pp.
17.     Letter to Joyce Long from Tom Rowley, 6/14/02, 1 p.
18.     Fishkill Consultation Group Report of Neuropsychological Evaluation, 5/22, 7/1, 7/8,
        8/19, 9/9, 9/30, and 10/9, 2002, 10 pp.
19.     Hyde Park Central School District 2002-2003 IEP, 11/8/02, 7 pp.
20.     Hyde Park Central School District CPSE/CSE Attendance Sheet, Report Back Document
        and Minutes, 11/8/02, 5 pp.
21.     Letter to Ms. Santora from M.B., 1/19/03, 3 pp.
22.     Progress Report, 11/02, 2/03, 4/03 and 6/03, 5 pp.
23.     TONYSS test results, 3/03, 2 pp.
24.     Hyde Park Central School District 2003-2004 IEP, 3/25/03, 5 pp.
25.     Hyde Park Central School District Committee on Special Education CPSE/CSE Minutes
        and Attendance Sheet, 3/25/03, 3 pp.
26.     Woodcock-Johnson III test scores, 4/7/03,1 p.
27.     Hyde Park Central School District CPSE/CSE Attendance Sheet, Manifestation and
        Determination Minutes, Annual Review Rationale, and Consent for Special Education
        Placement, 6/23/03, 7 pp.
28.     TONYSS test results, 3/04, 1 p.
29.     Hyde Park Central School District Psychological Report, 3/12/04 and 3/15/04, 8 pp.

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                    Page 6

30.    Woodcock-Johnson III Age Norms, 3/15/04, 1 p.
31.    Results of Woodcock-Johnson III, undated, 2 pp.
32.    Hyde Park Central School District 2004-2005 IEP and attendance sheet, 3/29/04, 8 pp.
33.    Letter to Mr. Walsh from M.B., 4/20/04, 3 pp.
34.    Woodcock-Johnson test scores, 1/3/05, 1 p.
35.    Hyde Park Central School District 2005-2006 IEP, 3/8/05, 5 pp.
36.    Letter to Parents from Jim Walsh, 6/9/05, 1 p.
37.    Letter to Parent or Guardian from Cora Stempel and attached NYSTP ELA Test Results,
       1/10/05, 2 pp.
38.    Letter to Parent or Guardian from Cora Stempel and attached Intermediate Lev el Social
       Studies test results, 6/05, 2 pp.
39.    Letter to Parent or Guardian from Cora Stempel and attached Intermediate Level Science
       test results, 6/05, 2 pp.
40.    Letter to Parent or Guardian from Cora Stempel and attached NYSTP Mathematics test
       results, 5/10/05, 2 pp.
41.    Letter to Superintendent from Mr. and Mrs. R.C., 8/15/05, 1 p.
42.    Psycho educational Report by Henry J. Goetze, Ph.D., 8/17/05 and 8/19/05, 7 pp. and
       Connors Continuous Performance Test-III, 4 pp.
43.    Letter to Dr. Robert Lane from Bridget Becker, 8/26/05, 1 p.
44.    Letter to Parents from Jim Walsh, 8/26/05, 1 p.
45.    Letter to Jim Walsh from Parents, 8/29/05, 1 p.
46.    Committee Meeting Agenda for Wednesday, 8/31/05, 2 pp.
47.    Hyde Park Central School District 2005-2006 IEP, 8/31/05, 7 pp.
48.    Letter to Parents from Janet E. Cerro, 10/5/05, 2 pp.
49.    MARKED FOR IDENTIFICATION ONLY
50.    Letter to Linda A. Geraci from Krystina E. Cho, 2/7/06, 3 pp.
51.    Hyde Park Central School District Student Reports, 6/16/03-6/15/05, 21 pp.
52.    N.C. writing samples from Haviland Middle School, 22 pp.
53.    The Kildonan School Application for Admission, 7/9/05, 4 pp.
54.    Letter to Parents from Bonnie Wilson, 8/10/05, 1 p.
55.    Letter to Parents from Robert A. Lane and Ronald Wilson, 11/22/05, with attached
       Kildonan School Progress Report, 8 pp.
56.    The Kildonan School Interim Report, 1/16/06, with attached Ceramics Report, 12/16/05
57.    Letter to Parents from Robert A. Lane and Ronald Wilson, 3/1/06, with attached
       Kildonan School Progress Report, 2/27/06, 8 pp.
58.    Kildonan Student Profile for 2005-2006, 3 pp.
59.    Notice of Board of Education Review for Special Education, 10/31/05, 1 p.
60.    Booklet from the Academy of Orton-Gillingham Practitioners and Educators, undated,
       6 pp.
61.    Kildonan School Information, 2006, 2 pp.
62.    Robert A. Lane Curriculum Vitae, undated, 3 pp.
63.    Kildonan School Profile, 2005-2006, 3 pp.
64.    "Global Warming: What Can We Do?", undated, 7 pp.

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                                 Page 7

65.    Cold War Exam Unit, undated, 4 pp.
66.    World War II 1941-1945 Test, undated, 10 pp.
67.    MARKED FOR IDENTIFICATION ONLY
68.    Narrative of Progress, 3/8/05, 1 p.
69.    MARKED FOR IDENTIFICATION ONLY
70.    BASC Teacher Protocol, 3/12/04, 2 pp.
71.    MARKED FOR IDENTIFICATION ONLY
72.    June 2006 Year-End Progress Reports, 13 pp.

**School District Exhibits**

A.    Haviland Middle School 2004-2005, 2 pp.
B.    Transition Plan Survey, 2/28/05, 1 p.
C.    Mediation Agreement and Correspondence, various dates in 2001, 7 pp.
D.    Annual Review Report, 5/15/03, 1 p.
E.    Annual Review Report, 3/29/04, 1 p.
F.    Annual Review Report, 3/12/05, 1 p.
G.    Memo from Heather Sarles, 2/20/04, 1 p.
H.    Social History Update, undated, 2 pp.
I.    Behavior Assessment for Children, 3/12/04, 13 pp.
J.    Behavior Assessment for Children, 3/14/04, 11 pp.
K.    Behavior Assessment for Children, 3/12/04, 13 pp.

**Impartial Hearing Officer Exhibits**

IHO-1      Request for an Impartial Hearing, 1/31/06, 6 pp.
IHO-2      Letter from Hearing Officer, 3/13/06, 1 p.
IHO-3      Letter from Krystina E. Cho with annexed exhibits A-D, 4/4/06, 14 pp.
IHO-4      Letter from Mia D. Gurley, with annexed exhibits A-J, 4/40/06, 39 pp.
IHO-5      Letter from Krystina E. Cho, 4/14/06, 3 pp.
IHO-6      Order on School District's Pre-Hearing Motion to Dismiss Claims Related to
           the 2003-2004 and 2004-2005 School Years, 4/17/06, 4 pp.
IHO-7      Letter from Hearing Officer, 5/23/06, 1 p.
IHO-8      Letter from Hearing Officer, 6/5/06, 1 p.

**Post-Hearing:  Hearing Officer Exhibits**

IHO-9      Letter from Hearing Officer, 7/6/06, 1 p.
IHO-10     Letter from Daniel Petigrow, 7/12/06, 1 p.
IHO-11     Letter from Hearing Officer, 8/20/06, 1 p.
IHO-12     Letter from Hearing Officer, 9/8/06, 1 p.
IHO-13     Parents' Memorandum of Law, undated (submitted 9/5/06), 33 pp.
IHO-14     District's Post-Hearing Brief, 9/5/06, 29 pp.

On January 31, 2006, the parents of N.C., by their attorney Linda Geraci, Esq., filed a request for an impartial hearing (Exh. IHO-1) under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. section 1415(f)(1) and Article 89 of the New York State Education Law. I was appointed as impartial hearing officer on February 6, 2006 and the matter came on for a pre-hearing conference on March 13, 2006 (a written summary of the pre-hearing conference was sent to the parties' attorneys, see Exh. IHO-2). Hearings went forward on April 26, 2006, May 8, 2006, May 22, 2006, June 1, 2006, June 2, 2006, June 5, 2006 and July 5, 2006.

Lists of the individuals who attended the hearings and the documentary evidence submitted are appended to this decision and order. The compliance date for issuing a decision was extended several times. All extensions have been documented in the Record.

## BACKGROUND

N.C. is a fifteen year old male, and has been classified as a student with a disability since the third grade. His present disability classification ("multiple disabilities") is not in dispute. N.C. has a seizure disorder. His cognitive ability is within the average range, and he has been diagnosed with a reading disorder, disorder of written expression, and mixed receptive-expressive language disorder. N.C. attended Hyde Park Central School District's (the "District" or "School District") public schools from kindergarten through the end of the 2004-2005 school year. He completed the eighth grade in June of 2005, and his parents, R.C. and M.B. (the "Parents") unilaterally placed him at the Kildonan School ("Kildonan") for the 2005-2006 school year. Kildonan has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities.

The within proceeding pertains to the Parents request for tuition reimbursement for the cost of the N.C.'s placement at Kildonan for the 2005-2006 school year, compensatory education for the period February 2004 through June 2004, compensatory education for the 2004-2005 school year, and reimbursement for the cost of a private psycho-educational evaluation.[2]

---

[2] Neither party made closing statements in this proceeding, opting instead to present their closing arguments in their post-hearing briefs. The District waived its opening statement (Tr. 4/26/06 at 21). The legal arguments, as set forth herein, are based on the Parents' opening statement (Tr. 4/26/06 at 10-21), the Parent's Memorandum of Law (Exh. IHO-13), the District's Post-Hearing Brief (Exh. IHO-14), and in parties' pre-hearing submissions on the statute of limitations issue (Exhs. IHO-3, IHO-4, and IHO-5).

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                    Page 9

## PROCEDURAL HISTORY

Prior to the first hearing in this proceeding, the District moved to dismiss the Parent's compensatory education claims as for the 2003-2004 school year (based on the statute of limitations and the failure to state a cause of action) and the 2004-2005 school year (based on the failure to state a cause of action). Although I denied the motion to dismiss, the timeliness issue remains unresolved. In denying the motion to dismiss, I found, inter alia, that:

> Since the amended IDEA[3] and the relevant regulations provide
> only one circumstance (a facially insufficient complaint) in which a
> due process complaint can be dismissed on its face without a
> hearing, I do not believe that I have the statutory or regulatory
> authority to simply dismiss the Parents' claims for the 2003-2004
> and 2004-2005 school years without affording them a due process
> hearing at which they will have the opportunity to present
> witnesses and documentary evidence and to cross-examine District
> witnesses. ["Order on School District's Pre-Hearing Motion to
> Dismiss Claims Related to the 2003-2004 and 2004-2005 School
> Years (the "Dismissal Motion"), Exh. IHO-6 at 3].

I also noted in that Order that even if I did have the authority to dismiss the claims on a motion to dismiss, I would not do so:

> On the face of the complaint, the 2003-2004 claims do not appear to
> be time-barred because the Parents' seek relief only for the second
> half of the school year (February through June 2004) . . . Moreover,
> looking at all the facts in favor of the non-moving party, which I
> must do on a motion to dismiss for the failure to state a case of
> action, the Parents have stated a cause of action for compensatory
> education or services for the 2003-2004 and 2004-2005 school
> years. (Dismissal Motion, Exh. IHO-6 at 3-4).

At the close of the July 5, 2006 hearing, the parties agreed that it would not be necessary to re-brief the District's statute of limitations challenge to the Parents' compensatory education claims (Tr. 7/5/06 at 978-980) because the timeliness issue had been fully briefed in the parties'

---

[3] On December 3, 2004, Congress amended the IDEA, and the amendments became effective July 1, 2005 [Individuals with Disabilities Education Improvement Act of 2004 ("IDEA 2004"), Pub. L. No. 108-446, 118 Stat. 2647]. All references to the IDEA used herein refer to the amended provisions of IDEA 2004, unless otherwise specified.

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                                                          Page 10

submissions in support of, and in opposition to, the District's motion to dismiss (See Exhs. IHO-3, IHO-4 and IHO-5; Tr. 7/5/06 at 981).

## POSITIONS OF THE PARTIES

### Tuition Reimbursement

The Parents contend that the program and placement recommended by the District did not offer N.C. a free appropriate public education ("FAPE") for the 2005-2006 school year. The District's Committee on Special Education ("CSE") prepared two different Individualized Education Program's ("IEP's) for the 2005-2006 school year. The IEPs were prepared as a result of the CSE's March 8, 2005 and August 31, 2005 meetings. The Parents contend that the IEPs were both procedurally and substantively defective. The procedural challenges pertain to the lack of mandated participants at the meetings. The substantive challenges go to the failure to accurately and sufficiently describe N.C.'s levels of performance, the failure to provide adequate goals and objectives to address all areas of need, and the failure to offer a program which was reasonably calculated to allow him to make reasonable progress. The Parents maintain that in order to make progress, N.C. needs to have a 1:1 reading program that emphasizes decoding skills. The Parents contend that Kildonan met their child's special education needs during the 2005-2006 school year, and was therefore an appropriate placement for him. They also contend that equitable factors support their claim for tuition reimbursement.

The District requests that the Parents' claim for tuition reimbursement be denied in its entirety. It contends that the IEP prepared by the District's CSE was reasonably calculated to provide N.C. with meaningful educational benefits. It asserts that there were no procedural defects with respect to the March 8, 2005 IEP, and that the IEP provided an appropriate and comprehensive program in the least restrictive environment. It argues that the Kildonan placement was not appropriate because the school does not provide the speech and language therapy necessary to address N.C.'s auditory processing deficits and his receptive and expressive language difficulties. It also notes that the placement is too restrictive because there are no mainstreaming opportunities, and that the content area teachers do not provide reading instruction, but instead read aloud to the students.

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                    Page 11

**Compensatory Education**

The Parents' compensatory education claim pertains to the period February 2004 through June 2004, and September 2004 through June 2005. The Parents contend that procedural violations with respect to the IEPs for the 2003-2004 and 2004-2005 school years infringed upon the Parents' opportunity to participate in the development of the IEPs which resulted in a loss of educational opportunities. The Parents further contend that the IEPs were substantively inappropriate because they did not provide for an intensive 1:1 reading program to address his deficits in decoding, reading fluency, reading comprehension, spelling and written expression. They contend that N.C. is entitled to compensatory services in the form of individual tutoring by a teacher trained in the Orton-Gillingham method.

The District opposes the Parents' compensatory education claim on both procedural and substantive grounds. The District contends that the compensatory education claim for the period February through June of 2004 is barred by the two year statute of limitations contained in IDEA 2004. It further contends that N.C. is not entitled to compensatory education because the District provided him with appropriate educational services during the 2003-2004 and 2004-2005 school years. It also notes that compensatory education is not an appropriate remedy because the student isn't "aging out." Even if "aging out" were not an issue, the District maintains that the student would not be entitled to compensatory education because there has been no gross violation of the IDEA, nor has the student been excluded from school or denied appropriate educational services for an extended period of time.

**Psycho-educational Evaluation**

The Parents also seek an order directing the District reimburse them for the cost of an psycho-educational evaluation performed by Henry Goetze, Ph.D. (Exh. 42). The District contends that the Parents are not entitled to reimbursement evaluation because they did not seek an independent evaluation prior to Dr. Goetze's evaluation.

## TESTIMONY AND DOCUMENTARY EVIDENCE

The relief requested in this proceeding encompasses three school years (2003-2004, 2004-2005, and 2005-2006), and the testimony and documentary evidence go back to June of 1999

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                        Page 12
_____

when N.C. , a second grade student at the time, was first referred to the CSE by his mother. The
pre-2003 evidence was allowed into the Record for historical purposes only.

      The Parents presented the testimony of Bridget Becker, the District's Director of Special
Education; James Walsh, CSE Chairperson, Karen Sullivan, N.C.'s resource room teacher (2004-
2005); Linda Fasolino, CSE Chairperson and N.C.'s special education teacher from the first half
of the 2004-2005 school year; Dr. Robert Lane, Academic Dean, Kildonan; Dr. Henry Goetze,
psychologist, and M.B., the student's mother.  The Parents' documentary evidence included
IEPS, evaluations, correspondence, CSE records, test/evaluation results, examples of N.C.'s
classwork, homework and school exams, progress reports and report cards, and documentation
about Kildonan and the Orton-Gillingham teaching methodology.

      The District presented the testimony of Mary Cray, N.C.'s English and Social Studies
teacher and case manager for the 2004-2005 school year; Susan Beaudry, N.C.'s speech/language
therapist; and Lisa Macklin, school psychologist. The District's documentary evidence included
school records, a mediation agreement, annual review reports, correspondence, a social history
update, and the data forms from the Behavior Assessment for Children ("BASC").

      The testimony and documentary evidence will be discussed more fully below.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Tuition Reimbursement

      A board of education may be required to pay for educational services obtained for a child
by the child's parent, if the services offered by the board of education were inadequate or
inappropriate, the services selected by the parent were appropriate, and equitable considerations
support the parent's claim. [Florence County School District Four v. Carter, 510 U.S. 7 (1993),
School Committee of Burlington v Department of Education of Massachusetts, 471 U.S. 359
(1985)]. The party seeking to challenge an IEP under the IDEA, which in this case is the
student's parents, bears the burden of persuasion. [Shaffer v. Weast, 126 S.Ct. 528 at 537 (2005);
Cabouli v. Chappaqua Central School District, 2005 WL 3500287 (SDNY, 2005)].

      The IDEA mandates that school districts provide students with disabilities with a free
appropriate public education ("FAPE"). A FAPE includes special education and related services

designed to meet the student's unique needs, provided in conformance with a comprehensive written IEP [20 U.S.C. §§1401(d), 1412(a)]. A student has been provided with a FAPE when the school district has (a) complied with the procedural requirements set forth in the IDEA and (b) the IEP developed by its CSE through the IDEA procedures is reasonably calculated to enable the student to receive educational benefits [Board of Education v. Rowley, 458 U.S. 176 ( 1982)]. School districts must also appropriately evaluate the child [U.S.C. §1414(a) and (b)] and offer a program and placement in the least restrictive environment [20 U.S.C. §1412(a)].

In determining whether the School District offered N.C. a FAPE for the 2005-2006 school year, the inquiry must focus on the March 8, 2005 IEP (Parent Exh. 35), which was the IEP that had been provided to the Parents as of the time that they enrolled N.C. at Kildonan (See Application of the Board of Education of the Chappaqua Central School District, Appeal No. 05-105). The IEP prepared as a result of the August 31, 2005 CSE meeting is not relevant for the purposes of determining whether or not the District offered N.C. a FAPE for the 2005-2006 school year as of the time that his parents unilaterally placed him at Kildonan.[4]

Even if it the August 31, 2005 IEP was relevant for the purposes of the considering the Parents' tuition reimbursement claim, the IEP would not support a finding that the School District had offered N.C. an appropriate program and placement for the 2005-2006 school year because it was procedurally defective. Although school districts are required to comply with all IDEA requirements, not all procedural errors render an IEP legally inadequate under the IDEA [Grim v. Rhinebeck Central School District, 346 F.3d 377 (2d Cir. 2003)]. If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE [J.D. v. Pawlet School District , 224 F. 3d 60 (2d Cir. 2000)]. "A denial of FAPE occurs when procedural inadequacies either result in a loss of educational opportunity for the student, or seriously infringe on the parents' opportunity to participate in the IEP formulation process, or compromise the development of an appropriate IEP in a way that deprives the student of

---

[4] On August 15, 2005, the Parents notified the School District of their intent to unilaterally place N.C. at Kildonan and seek tuition reimbursement (Exh. 41). The CSE met on August 31, 2005 and made new program recommendations, but the IEP (Parent Exh. 47) was not provided to the Parents prior to the beginning of the 2005-2006 school year (Tr. 4/26/06 at 98).

educational benefits under that IEP" [See, Application of the board of Education of the City
School District of the City of Buffalo, SRO Appeal No. 06-040, citations omitted). The failure to
include all mandated CSE participants may, but need not, invalidate an IEP. In the case of the
August 31, 2005 IEP, the procedural violations rise to the level of seriously infringing on the
Parents' opportunity to participate in the IEP formulation process. The CSE that met on August
31, 2005 did not include N.C.'s parents or any of his actual teachers or service providers. The
CSE's refusal to reschedule the CSE meeting at the Parents' request was not reasonable. Ms.
Becker testified that such requests are normally granted by the School District (Tr. 4/26/06 at 23).
The CSE did not reschedule the meeting regarding N.C.'s education program because the School
District purportedly wanted to have the meeting prior to the beginning of the school year.

 The net result was that the August 31, 2005 IEP was prepared by a group of individuals
who had limited, if any, personal knowledge about N.C.  Since the sole purpose of the meeting
was purportedly to develop a reading program that would address the Parents' concerns and,
hopefully, obviate the need for a private school placement, the decision to proceed without his
Parents' input makes little sense.  It would be difficult, at best, to prepare an IEP that addressed
the Parents' concern about the need for an intensive reading program without parental input.

 The procedural irregularities cited by the Parents with respect to the March 8, 2005 IEP
do not invalidate or void the IEP. There was no requirement that the CSE include a regular
education high school teacher at the meeting. The School District complied with the mandate that
the CSE include a "regular education teacher of the student whenever the student is or may be
participating in the regular education curriculum." (8 NYCRR §200.3(a)(1)(ii)). The regular
education teacher CSE participant must be, if the student is receiving general education services
(as N.C. was), "a teacher qualified to serve nondisabled students who is providing regular
education instruction to the student."   At the time that the IEP was prepared, N.C. was a middle
school student.  The CSE that prepared the March 8,2005 IEP included Jessica Culley, who was
N.C.'s "actual regular education teacher" (see Exh. 51 at 1 and Exh. 35 at 4). The fact that she
did not teach at the high school does not, as the Parents contend, render the IEP a nullity.

 An appropriate IEP must accurately reflect the results of evaluations to identify the
student's needs, and set forth annual goals and short-term instructional objectives related to those

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                    Page 15

needs, and provide for the use of appropriate special education services. (<u>Application of a Child with a Disability</u>, Appeal No. 06-030; <u>Application of a Child with a Disability</u>, Appeal No. 04-046).

The March 8, 2005 IEP also adequately describes N.C.'s "present levels of academic performance." The evaluation data listed included the January 2005 administration of the Test of Adolescent Language, the January 2005 Woodcock-Johnson III ACH Test (reading, written language and math clusters), and the March 2004 results of the Woodcock-Johnson-III Cognitive Test. These assessments were current and provided sufficient information for the IEP's description of N.C.'s cognitive ability and present levels of academic performance. The IEP also notes N.C.'s deficits in written expression, receptive and expressive language delays, as well as his decoding and auditory processing issues, and significant delays in written expression. His difficulties in reading comprehension and reading fluency are noted as well. The IEP describes his relative strength in mathematics, his work ethic and desire to succeed, etc. The IEP also addresses the extent to which N.C.'s anxiety and difficulty in communicating adversely effect his school performance.

N.C.'s IEP need not include a daily 1:1 multi-sensory reading program and small classes throughout the day, as the Parents contend, in order to provide N.C. with FAPE. The March 8, 2005 IEP provides N.C. with a range of services, specifically targeted to meet his individual special education needs. In order to provide him with more support and allow him to work at a slower place, the IEP provides for placement in special classes (15:1) for English and Social Studies (the content area classes that have a greater reading and writing component). The IEP provides for placement in a mainstream classes for math and science (subjects in which he has demonstrated proficiency), with the support of a direct consultant teacher every other day. The IEP also provides for daily resource room instruction in a small group (5:1) for additional reading support, and for speech and language therapy in a small group(5:1) twice in a six day cycle. (Parents Exh. 35).

Where the March 8, 2005 IEP falls short, however, is in the long term goals and short term objectives. The annual goals and short-term objectives should address all of N.C.'s deficit areas:

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                Page 16

> The IEP shall list measurable annual goals, consistent with the
> students needs and abilities. The measurable annual goals,
> including benchmarks or short-term objective must relate to (1)
> meeting the student's needs that result from the student's disability
> to enable the student to be involved in and progress in the general
> education curriculum and meeting each of the student's other
> educational needs that result from the student's disability; and (2)
> meeting each of the student's other educational needs that result
> from the student's disabilities. [8 NYCRR §200.4(d)(iii)]

N.C. has significant delays in his reading and writing skills. The CSE noted that: "Academic deficits are displayed in reading, specifically decoding and fluency. . . Deficits in the language area continue to impact academic progress, particularly in reading and written expression. . ." (Parent Exh. 35 at 4).

The reading and writing goals were quite limited. The sole annual reading goal was to "demonstrate an improvement in comprehension skills necessary to read for information and understanding." The sole short-term objective/benchmark pertained to the ability to read and understand content in subject area materials. The sole annual writing goal was to "demonstrate an improvement in written language skills necessary to write for information, understanding, and written expression." The two writing short-term objectives/benchmarks listed under the annual writing goal pertained to writing organized sentences and paragraphs in logical sequential order, and writing an essay that is "coherent, sequential and logical in its development." Although the reading and writing goals were appropriate for N.C, they were inadequate because they did not address all deficit areas. The failure to address  decoding and reading fluency (and spelling) delays/deficits renders the IEP for the 2005-2006 school year substantively insufficient. The IEP's failure to adequately address N.C.'s special education needs in these areas constitutes a denial of FAPE.  As such, the Parents have met the first of the three Burlington criteria for tuition reimbursement.

Parents have the burden of establishing the appropriateness of the placement and program that they have chosen for their child. (Application of a Child with a Disability, Appeal No. 95-57; Application of the Bd. of Educ., Appeal No. 02-093). In order to meet that burden, they must show that the private school offered an educational program which met the student's special

education needs (Burlington, 471 U.S. at 370; Application of a Child with a Disability, Appeal No. 94-29). The private school need not employ certified special education teachers, nor have its own IEP for the student (Application of a Child with a Disability, Appeal Nos. 94-20; 02-093).

Although the restrictiveness of the Kildonan program does not constitute an absolute bar to reimbursement, the school's failure to provide speech and language services is problematic. Kildonan targeted N.C.'s reading and writing deficits. It did not address his speech and language needs or auditory processing issues.  While the failure to provide related services need not in and of itself render a parental unilateral private school placement inappropriate (Application of the New York City Department of Education, Appeal No. 05-074), in this instance the program failed to address core components of N.C.'s disability and special education needs, thereby rendering it an inappropriate program.

The documentary evidence and testimony are replete with references to N.C.'s receptive and expressive language delays, and his auditory processing issues. (Parent Exhs. 6, 16, 18, 29, 42).  His 2005-2006 IEP includes speech and language therapy as part of his educational program. It also includes speech and language goals.  N.C. received speech and language therapy while attending the District's schools for several years, and continues to need such services (See District Exhs. D, E, F). Susan Beaudry, the speech teacher who provided N.C. with speech and language services from 2002 through 2005, testified that N.C. has word finding difficulties, as well as difficulties in word retrieval and in listening for information. These difficulties impacted on his reading and writing abilities (Tr. 6/5/06 at 871). As of the end of the 2004-2005 school year, N.C. was still working on, and making progress toward,  his receptive and expressive language skills (Tr. 6/5/06 at 878-887).  As reflected in his IEP for the 2005-2006 school year and in Ms. Beaudry's testimony, N.C. continued to need speech and language services. (Parents Exh. 35;  Tr. 6/5/06 at 895-897).

Dr. Robert Lane, the Academic Dean from Kildonan, confirmed that Kildonan does not provide speech therapy. He testified that "he thought" that all of N.C.'s speech and language goals were being addressed. He said that auditory recall strategies are taught in the subject matter classrooms, and that the language training tutorials and the literature class involved the "conveying of extended explanations." He opined that N.'s speech and language needs were

being addressed on an almost daily basis.  (Tr. 5/22/06 at 371-373) .

During cross-examination, Dr. Lane testified that N.C.'s content area teachers did not have New York State certifications, and that reading and writing instruction takes place primarily in the 1:1 language tutorials. (Tr. 5/22/06 at 388).  Students are not required to read aloud in class, although they sometimes volunteer to do so. N.C. rarely volunteers. Instruction in the content area classes primarily involves teachers reading to the students. Students are not expected to read independently. (Tr. 5/22/06 at 389-390)

N.C.'s annual speech/language goal for the 2005-2006 school year is to "demonstrate an improvement in language skills necessary to speak and listen for information, understanding, expression and social interaction" (Parent Exh. 35). The IEP short-term objectives/benchmarks are to demonstrate (a) the ability to utilize strategies to assist in auditory recall; (b) an understanding of and an ability to express conclusions and main idea; (c) the ability to convey extended explanations and provide detailed descriptions; and (d) the ability to understand and use vocabulary related content area curriculum (Parents Exh. 35). These were separate and apart from N.C.'s writing goals/objectives, which included the ability to (a) write organized sentences and paragraphs in a logical, sequential order; and (b) write an essay that is coherent, sequential and logical in its development.

Kildonan is not appropriately addressing N.C.'s expressive and receptive language needs or taking his auditory processing disorder into account in the implementation of his educational program. The  Kildonan program is designed to serve the needs of dyslexic students of average to above average intelligence. In addition to instruction in the core subject areas of mathematics, literature, science and social studies, the Kildonan program focuses on the remediation of reading, writing and spelling skills. The presentation of subject matter in the content area classes is "designed to meet the learning style of dyslexic students." Reading and writing demands are "reduced or removed entirely" from the content area courses.  (Parent Exh. 61).  There is nothing in the written material about the Kildonan program that indicates that it is in any way designed to address the needs of students with auditory processing deficits, or with expressive and receptive speech and language disorders.  Dr. Lane's testimony was consistent with the written description of the Kildonan program: the students at Kildonan are of average to above-average intelligence

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                                 Page 19

and are "either diagnosed with dyslexia or reading-based learning disability or exhibit a
constellation of symptoms that would suggest a reading-based learning disability" (Tr. 5/22/06 at
331).

    N.C. has not been diagnosed with dyslexia. Although he has been diagnosed with a
reading disorder, he has also been diagnosed with a disorder of written expression and a mixed
receptive-expressive language disorder. He also has an auditory processing disorder. These
diagnoses have been consistent over the years.  Although the Kildonan program may well address
some of N.C.'s deficits in the areas of reading and writing, it does not address his receptive-
expressive language disorder. N.C.'s has auditory processing difficulties result in his having
difficulty in the "ability to analyze and synthesize auditory stimuli" (Parent Exh. 29 at 3). Since
the Kildonan program is designed for dyslexic students, material is read to the students in the
content area classes.  The presentation of material in a primarily auditory fashion by reading to
students is not appropriate for N.C.

    A review of the progress reports from N.C.'s teachers at Kildonan reveals that little, if
any, attention has been paid to N.C.'s speech/language issues and auditory processing problems
(Parents Exhs. 55, 56,57, 72).  Certainly, if progress was made it has not been noted.  A review
of the progress report for N.C.'s 1:1 daily language training classes for the Fall term reveals that
the focus of his instruction and skill development for that term was in the following areas:
cursive writing , keyboarding, basic phonics, spelling, reading aloud, and making flash cards to
identify the different parts of speech (Parents Exh. 55). The progress report for the Winter term
reveals continued instruction and practice in cursive writing, basic phonetic concepts, spelling,
sentence patterns, the composition of paragraphs, keyboarding skills and reading aloud (Parents
Exh. 57). The final progress report for the Spring term reveals continued instruction and practice
in cursive writing, basic and advanced phonetic concepts, spelling, composing complex and
complex sentences, writing expanded paragraphs and essays (including developing an outline),
and reading aloud (Parents Exh. 72).  According to Timothy Heaton, N.C.'s Language Training
instructor, over the course of the 2005-2006 school year, N.C. made moderate gains in his word
identification skills, solid gains in his word attack skills, moderate gains in his reading rate,
fluency and accuracy, a slight gain in vocabulary, significant gains in his reading comprehension,

and slight improvements in spelling (Parents Exh. 72). Progress toward receptive and expressive language goals are not addressed in the progress reports for N.C.'s 1:1 language training class, nor are strategies for accommodating his auditory processing deficits. They do not appear to be addressed in the content area classes either. Notwithstanding Dr. Lane's assertion that N.C.'s expressive and receptive language goals and his auditory processing deficits were addressed on an almost daily basis in his content area courses, the progress reports for the those classes make no note of such instruction or of any progress in those areas. Nor do the reports note the strategies being used to address and accommodate N.C.'s auditory processing issues. (See Parent Exhs. 55, 57 and 72).

The Kildonan program did not address N.C.'s need for reading instruction in content area classes or his deficits in the area of reading and understanding the content of material in those classes. N.C.'s IEP goal for reading pertains to his ability to "read and understand content in subject area materials" (Parents Exh. 35 at 5). There is no dispute that this is an appropriate goal for him. This goal is not being addressed at Kildonan because the reading in the content area classes (social studies, literature, science) is very limited. The teachers read to the students instead. There is no reading instruction in those classes. As per Dr. Lane's testimony, it is clear that all reading instruction takes place in the daily 1:1 language tutorials. Reading and understanding content in subject area materials are not mentioned in the language training progress reports, or in the content area progress reports (Parent Exhs. 55, 57, 72). The manner in which this goal was addressed, and the progress, if any, that he made in working toward this goal is not addressed in the progress reports.

The Parents did not meet their burden of establishing that the Kildonan program met N.C.'s special education needs because they did not set forth the manner in which the Kildonan Program addressed N.C.'s need for reading instruction in content area classes, his combined expressive-receptive language disorder, or special education needs with respect to his auditory processing disorder. The failure of the Kildonan program to meet these aspects of N.C.'s special education needs renders the placement inappropriate (See Application of the Board of Education of the Brewster Central School District, Appeal No. 05-094, Application of a Child with a Disability, Appeal No. 03-060). Since the Parents did not establish that the placement at

Kildonan was appropriate for their son during the 2005-2006 school year, they have not met the second criteria for tuition reimbursement and are not entitled to tuition reimbursement for the cost of N.C.'s tuition at Kildonan for the 2005-2006 school year.

Having determined that the Parents did not establish that the placement at Kildonan met N.C.'s special education needs, I need not address whether equitable considerations support their claim for reimbursement.

## Compensatory Education/Services

Compensatory education is the continuation of instruction for a student after he or she is no longer eligible for instruction because of age or graduation (Application of the Board of Education of the East Greenbush Central School District, Appeal No. 03-010; Application of a Child with a Disability, Appeal No. 02-019). Compensatory education is available as an equitable remedy where "there has been a gross violation of the accommodating resulting in the denial of, or exclusion from, educational services for a substantial period of time (Burr v. Ambach, 863 F.2d 1071[2d Cir. 1988]; Mrs. C. v. Wheaton, 916 F.2d 69 [2d Cir. 1990]. Compensatory services, which is a similar remedy, does not require that a student is no longer eligible for instruction due to age or graduation.

Compensatory services have been awarded to students who remain eligible to attend school and have been denied appropriate services. Compensatory services are appropriate if such deprivation of instruction can be remedied through the provision of additional services before the student becomes ineligible for instruction by reason of age or graduation (See Application of a Child with a Disability, Appeal No. 05-057, Application of a Child with a Disability, Appeal No. 02-042; Application of a Child with a Disability, Appeal No. 02-030).

The Parents contend that N.C. is entitled to compensatory services, for the time periods February 2004 through June 2004 and September 2004 through June 2005 based on procedural violations which resulted in the loss of educational opportunities and seriously infringed upon the Parents' opportunity to participate in the development of the IEPs for the 2003-2004 and 2004-2005 IEPs, and based on substantive defects in the IEPS for those school years. The Parents contend that the IEPS lacked the intensive reading program that N.C. needed to address his deficits in decoding, reading fluency, reading comprehension, spelling, and written expression.

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                Page 22

The District contends that the claim for compensatory education/services for the period February through June of 2004 is time-barred. The Parents contend that the claim is not time-barred because the action was commenced within two years of February of 2004.

Requests for due process hearings under the IDEA must be commenced, unless State law provides otherwise, within two years from the time that the party knew, or should have known, about the action that forms the basis of the complaint [20 U.S.C. §1415(b)(6)(B); 20 U.S.C. §1415(f)(3)(C)]. New York State law also provides for a two year statute of limitations [N.Y. Educ. Law §4404(1)]. The timeliness issue therefore turns on when the Parents knew, or should have known, of the alleged procedural violations and the failure to recommend an intensive reading program. The IEP for the 2003-2004 school year was developed on March 25, 2003 (Parent Exh. 24). As of the March 25, 2003 CSE meeting, which N.C.'s mother attended, the Parents were, or should have been, aware any procedural violations that may have occurred. They were also clearly aware that the CSE was not recommending that N.C. be provided with an intensive 1:1 reading program for the 2003-2004 school year. Another CSE meeting regarding the 2003-2004 school year was held on June 23, 2003 (Parent Exh. 27). N.C.'s mother attended that meeting and signed a consent for special education placement on that date. If any procedural violations had occurred up until that point, N.C.'s parents knew or should have known about them. They also knew that, once again, the CSE had determined that the District would not provide an intensive 1:1 reading program.

The Parents' compensatory education claim for the 2003-2004 school year is untimely because the initial date upon which the Parents knew or should have known about the basis of their claim (March 25, 2003) was more than two years prior to the (January 31, 2006) commencement of this action. Even if the time is measured from the June 23, 2003 CSE meeting, more than two years elapsed prior to the commencement of this action.[5]

---

[5] The two-year statute of limitations does not apply when a parent was prevented from requesting the hearing due to specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint, or by the local educational agency's withholding or information that it was required to provide to the parent [20 U.S.C. §1415(f)(3)(D)(I); 8 NYCRR § 200.5(j)(1)(I)]. Neither of these situations occurred with respect to the 2003-2004 compensatory education/services in this proceeding, and there is thus no basis for tolling the two-year statute of limitations (See, Application of a Child with a Disability (SRO 06-086)].

Although the Parents' claim for compensatory education/services for the time period February through June of the 2003-2004 school year is time-barred, their compensatory education/services claim for the 2004-2005 school year is not time-barred. The IEP for that school year was prepared on March 29, 2004 (within the two years preceding the filing of the impartial hearing request in this proceeding). N.C. would be entitled to compensatory services for that school year if he had been denied appropriate services and the deprivation could be remedied through the provision of additional instruction before he becomes ineligible for instruction by reason of age or graduation.

N.C. was not deprived of appropriate services during the 2004-2005 school year. There were no gross procedural violations. The procedural errors raised in the Parents' Memorandum of Law do not support a finding that there was a deprivation of appropriate services.  Nor was N.C. denied appropriate educational services for an extended period of time. His IEP for 2004-2005 provided for special classes (15:1 staffing ratio) for English, Math and Social Studies, Science in an inclusion class, resource room support five days a week (in a 5:1 setting) , and speech and language therapy. The IEP also provided for three hours per week of 1:1 resource room services during the summer. He was not excluded from school, and received all recommended services. Moreover, he did not need, as the Parents contend, a daily 1:1 multi-sensory reading program during the 2004-2005 school year in order to have received "appropriate services." Although 1:1 instruction may well have been beneficial, an intensive 1:1 program was not a necessary component of "appropriate services" for the 2004-2005 school year.

In the absence of a gross violation of the IDEA resulting in the denial of, or exclusion from, services over a substantial period of time, there is no entitlement to compensatory education/services. The failure to include a daily 1:1 multi-sensory reading program in N.C.'s IEP did not constitute a gross violation of the IDEA. Nor did the failure to provide such services constitute the denial of services or an exclusion from services. As such, there is no entitlement to compensatory education/services for the 2004-2005 school year.

**Reimbursement for the Private Evaluation**

Under certain circumstances, a parent who disagrees with a school district's evaluation may obtain an individual educational evaluation, at a school district's expense [8 NYCRR

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                                Page 24

§200.5(g)]. However, N.C.'s Parents are not entitled to reimbursement for the cost of Dr.
Goetze's psycho-educational evaluation because they did not comply with the Regulation
200.5(g) requirement that they request an independent evaluation prior to obtaining it. There has
been no allegation that the District's evaluation was inappropriate or insufficient. N.C. was
already enrolled in Kildonan at the time of Dr. Goetze's evaluation, and Kildonan had requested
a more current evaluation. It is quite clear from the testimony of N.C.'s mother that the Parents
did not have N.C. evaluated by Dr. Goetze because they were concerned that the District's
evaluation had been inadequate or insufficient. Instead, Dr. Goetze's evaluation was obtained for
the purpose of determining whether the Kildonan placement would be appropriate, and because
Kildonan staff had advised her that N.C.'s evaluations were not sufficiently current (Tr. 6/2/06 at
701-703; 757-758). The Parents did not advise the District that they were obtaining an evaluation
from Dr. Goetze and did not provide the District with a copy of the evaluation (Tr. 6/2/06 at 759-
760). As such, the Parents are not entitled to reimbursement for the cost of the evaluation.

**ORDER**

        The Parents' requests for tuition reimbursement for the cost of N.C.'s tuition at Kildonan
for the 2005-2006 school year, compensatory education/services for 2003-2004 and 2004-2005
school years, and reimbursement for the cost of Dr. Goetze's evaluation are hereby denied.

Dated: September 26, 2006

                                    _____
                                    MINDY G. WOLMAN, ESQ.
                                    Impartial Hearing Officer

**APPEAL NOTICE ON NEXT PAGE**

Matter of N.C. v. The Hyde Park Central School District
Findings of Fact and Decision                                            Page 25

**PLEASE TAKE NOTICE**

Within 35 days of the date of this decision, the parent and/or the Board of Education of the City of New York has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b])  Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.