UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
R.C. and M.B., on behalf of their minor child, N.C.,

                          Plaintiffs,                 DEFENDANT'S STATEMENT OF
                                                         MATERIAL FACTS NOT IN
against                                              DISPUTE PURSUANT TO
                                                         RULE 56

BOARD OF EDUCATION OF THE HYDE
PARK CENTRAL SCHOOL DISTRICT,               07 CIV 2806 (MDF)

                        Defendant.                 ECF Case
------------------------------------------------------------X

      Defendant, Board of Education of the Hyde Park Central School District ("District"), by its attorneys Donoghue, Thomas, Auslander & Drohan, LLP, as and for its Statement of Material Facts Not in Dispute, asserts the following:

      1.     N.C. was originally referred to the District's Committee on Special Education ("CSE") towards the end of the 1998-99 school year by his mother, due to "…poor abilities to process information, language difficulties, slowness in reading." [P-2].[1] Based on the initial evaluation, which revealed deficits in organizing information, recalling and processing verbally presented information, significant deficits in receptive and expressive language skills, and a previously diagnosed seizure disorder since birth, the CSE classified N.C. as "other health impaired" on January 28, 2000 [P-5, 6 and 7].

---

[1] Citations to Parent, District and IHO exhibits from the administrative Record in the underlying proceeding will be referenced as "P-#", "D-#" and "IHO-#." Citations to the hearing transcript will be referenced as "Tr. - page #."

2. During the remainder of elementary school, N.C. received a combination of resource room, direct consultant teacher services and speech/language therapy services to address these deficits [P-13]

3. Speech/hearing and neuropsychological evaluations were conducted between March, 2002 and October, 2002 [P-16, 18]. They confirmed continued deficits in receptive and expressive language, auditory processing and reading and writing skills. Those evaluations disclosed:

- significant deficits in understanding paragraphs read aloud, word retrieval, sentence formulation, inferencing and speech flow [P-16, at p. 2].

- severe impairments in ". . . receptive and expressive language, processing speed, auditory processing and verbal and visual memory . . ." [P-18, at p. 8].

The neuropsychologist recommended ". . . intensive speech/language therapy with an emphasis on improving both (N.C.'s) receptive and expressive capabilities . . ." He also argued against introducing a phonics-based instructional approach for reading . . ." based on N.C.'s severely limited auditory processing and short-term memory skills [P-18, at 9].

4. N.C. attended the Haviland Middle School between 2002-03 and 2004-05. In 2002-03, his IEP provided resource room and direct consultant teacher services every other day for math, science and language arts, and speech/language therapy two times per six day cycle [P-19].

5. During the 2003-04 school year, N.C.'s IEP offered him a 15:1 departmentalized class in English, Social Studies and Math, an inclusion class for science and speech/language therapy (5:1) two times per six day cycle [P-24]. He received program modifications of preferential seating, re-teaching materials, modified homework and checking for understanding. Test modifications included extended time (2.0), answers recorded for essays, directions explained and directions read.

6. N.C. demonstrated academic success in seventh grade. His final grades that year were: English - 89, Social studies - 94, Math - 95 and Science - 90 [P-51]. He was also named to the Honor Roll in all four marking periods [Exhibit "A"]. On the Tests of New York State Standards ("TONYSS"), his math score improved to a Performance Level 3 - Proficient, indicating that he possessed "sufficient evidence of key mathematical ideas." [P-28].

7. His teachers commented that, N.C. was "a pleasure to have in class," " well motivated" and was making "good effort with challenging material/concepts." In preparation for the annual review, his special education teacher noted that "...his work is always done to perfection. He is an active participant. Pleasure to have in class." [Exhibit "G"]. She also observed that he is "extremely motivated and puts in 100% effort" and that the quality of his work was "excellent." [Id.] Even his mother acknowledged that he was "doing very well" in school and that the "...small class had really helped [him]" [D-H]

8. In the Spring of 2004, N.C. was reevaluated by the CSE. On the Woodcock-Johnson Test of Cognitive Abilities, N.C.'s performance was mixed. He scored in the low range on tasks requiring him to "...rapidly perform automatic cognitive tasks..." and to "... process speech sounds and blending sounds." [P-29, at p. 3; Tr. 947]. In contrast to these auditory processing and processing speed deficits, N.C.'s abilities on tasks measuring verbal comprehension, visual spatial skills and fluid reasoning were relatively strong [Id., at p. 2, 3 and 5]. Overall, his general intellectual ability score was an 85, in the low average range [Id., at p. 5].

9. On the Behavioral Assessment System for Children ("BASC"), an assessment measuring clinical and adaptive scales of behavior, N.C. and his teacher reported that he was functioning much better in social and emotional domains than did his mother [P-29]. N.C.'s

responses to questions addressing attitude towards school and teachers, somatization and social stress disclosed a more positive view about himself than what would be considered average [Id., at p. 4]. On questions about interpersonal relations, self-esteem and self-reliance, his responses also fell in the average range. Similarly, the teacher's responses fell in the average range for behaviors that address hyperactivity, aggression, conduct, depression, somatization, learning problems and withdrawal, and in the low range for attention, meaning she saw him more attentive than would be average. By contrast, his mother's responses to questions addressing anxiety, depression, attention, hyperactivity fell in the at-risk range, while her responses on topics measuring levels of withdrawal were clinically significant [Id.].

10. On academic achievement tests, his composite results (based on age norms) continued to be mixed with Math (SS- 101) stronger than reading (SS-85) or writing (SS - 77). On the subtest areas, this scatter was more pronounced. For example, academic fluency skills in reading, writing and math (SS - 76, 82 and 83) were lower than skills measuring letter/word identification, passage comprehension, writing samples, calculation and applied problems (SS - 90, 103, 95, 101 and 110).

11. On March 29, 2004, the CSE met to conduct an annual review and to review the reevaluation. N.C.'s classification was changed from "other health impaired" to "multiply disabled." The CSE recommended that he be mainstreamed for math, but that he continue with the 15:1 departmentalized classes for his English and Social Studies and an inclusion class for Science. The CSE also recommended continued speech/language therapy, twice per six day cycle for 40 minutes to address his receptive and expressive language skill deficits [P-32, at p. 4].

12. At the mother's request, the CSE met again on June 8, 2004, to consider the following issues: (1) a summer reading program; (2) the addition of an auditory training device; and (3) a

reading program for the fall [P-33]. The CSE recommended an additional resource room class where N.C.'s reading needs would be addressed, although it did not recommend a specific one-to-one reading program [P-32, at p. 4]. The CSE also agreed that N.C. continue in a 15:1 departmentalized class for math, added an FM auditory trainer on an as needed basis and further added a 1:1 reading program for the summer only as an extended year service, which it had agreed to previously in a 2001 mediation [P-32, at p. 1, 4; D-C]. The IEP was also amended to offer additional program modifications of large print materials, an additional set of books and a multi-sensory approach for reading activities [P-32, at p. 2].

13. During the 2004-05 school year, N.C. continued to perform successfully in all of his academic subjects. N.C. "came prepared to class", was "eager to work, conscientious and well motivated" and was an excellent class participant [P-51]. He again earned high enough grades to make the Honor Roll in all four marking periods. His final average grades in the four major academic subjects were as follows: English - 89, Social Studies - 88, Math - 96 and Science - 90 [Id.]. On the eighth grade New York State Tests, N.C. attained the higher range of Performance Level 2 for English/Language Arts and Social Studies, and achieved Performance Level 3 in Math and Science, which demonstrated proficiency in those subjects [P-37 - 40].

14. N.C.'s special education teachers during the 2004-05 school year observed that:

- he exhibited a strong ability in class to read and correctly interpret word problems and write accurate responses to those work problems [Tr. 304-05, 308].

- as the year progressed, he improved his independent reading comprehension [Tr. 255-56].

- he did not require a specialized reading class because the program of services and modifications that he was receiving under the IEP enabled him to be successful [Tr. 799].

- he displayed an "amazing amount of effort, . . .was very conscientious and . . . was highly motivated to improve his reading skills" throughout the year [Tr. 236].

15. Among the services he received during the 2004-05 school year was resource room in a small group of five students, which focused on reading and writing skills [P-32, at p. 4; Tr. 213, 238-39], and was taught by a "seasoned" special education teacher who was trained in multi-sensory approaches to reading and writing [Tr. 242, 265-66].

16. On March 8, 2005, the CSE met to develop N.C.'s 2005-06 IEP [P-35]. The CSE again recommended a resource room to support his reading goals in ninth grade at the high school [Id., at p. 1, 4]. The CSE also recommended a departmentalized special class 15:1 for English and Social Studies, and a direct consultant teacher inclusion model every other day for Math and Science, his stronger subjects [Id.]. Class notes and clarifying directions and checking for understanding were offered as additional program modifications [Id., at p.2]. Extended time for tests was increased from double time to triple time [Id.]. In addition, speech/language therapy was recommended two times per six day cycle [Id, at p.1, 4]. Furthermore, the CSE again recommended extended year services in the area of reading instruction of three hours per week. [Id.].

17. On August 19, 2005, the parents delivered written notice to the District that they were rejecting N.C.'s IEP for the 2005-2006 school year, and that they had unilaterally enrolled N.C. in the Kildonan School for the 2005-2006 school year and would seek reimbursement of tuition and related expenses [P-41].

19. Unbeknownst to the District, the Parents had N.C. privately evaluated by Dr. Henry Goetze in August of 2005 [P-42; Tr. 756]. Dr. Goetze evaluated N.C. without consulting with any of N.C.'s classroom or special education teachers or his speech/language therapist [Tr. 581-82]. Dr.

Goetze admitted he was unfamiliar with how the departmentalized classes operated at the Haviland Middle School and had never observed any of the special education programs offered by Hyde Park [Tr. 579-80].

20.     Dr. Goetze acknowledged that N.C.'s reading scores were "relatively stable" and mixed specifically for decoding for the period 2000-2004 [Tr. 591]. Also, when showed the computer printout of the scores from 2004, he confirmed that his opinion relied on incorrect scores on the IEP in concluding that N.C.'s reading ability had decreased [Tr. 592-93].

21.     Dr. Goetze testified that N.C.'s performance on the 8th grade New York State tests in English and Social Studies were surprisingly higher than what he would have expected [Tr. 601-02]. He also confirmed that his opinion N.C. needed an intensive 1:1 program, such as Kildonan offered, because it was the optimal setting for him [Tr. 604]. Finally, he confirmed that Kildonan provides students with no direct reading or writing instruction in the content area classes [Tr. 605].

### N.C.'s Performance at Kildonan School During 2005-06

22.     The Kildonan School is a private school that admits only children diagnosed with a language based reading disability [P-61; Tr. 331]. According to its Academic Dean, its curriculum is designed ". . . to not include too many independent reading and writing requirements" [Tr. 334]. Kildonan does not employ speech/language therapists and does not offer speech/language therapy [Tr. 371, 388].

23.     None of N.C.'s content area teachers or his language trainer testified in the underlying hearing; only Kildonan's Academic Dean, Dr. Robert Lane testified, even though he never instructed N.C. [Tr. 384]. Dr. Lane, however, confirmed that:

- no direct reading or written instruction occurs in the content area classes [Tr. 388-90].

- primarily, the content area teachers provide instruction by ". . . reading aloud to students [Tr. 334, 346-48, 389-90, 420, 427].

- students know they are not going to be required to read in class." [Tr. 346-47].

- because students read at different levels in the content area classes, the teacher does a significant amount of reading while students follow along in their copy of the text [Tr. 348, 389-90, 420].

- N.C. had difficulty with the pacing of assignments ". . . making corrections with concepts between terms and between topics within the term. . ." [Tr. 397-98].

24.  According to N.C.'s progress report, by mid-year, he was receiving C's and D's on tests and quizzes in Global Studies; it was a "challenge for him to understand the material" in Global Studies; and in Global Studies and American Literature, his teachers reported that N.C. rarely participated in class discussions [P-57, at p.3 and p. 5]. Also, on selected subtests of standardized reading assessments administered at Kildonan, N.C. continued to demonstrate significant weaknesses in fluency and decoding [Gray Oral Reading Test - accuracy (5th%); fluency (4th%) [P-63].

**Impartial Hearing**

25.  On January 31, 2006, the parents requested an impartial hearing in which they sought: (1) compensatory educational services to remediate N.C.'s reading deficits for both the 2003-2004 and 2004-2005 school years; (2) reimbursement of tuition and all costs related to N.C.'s attendance at Kildonan for the 2005-2006 school year; and (3) reimbursement of the cost of an private psycho-educational evaluation conducted by Dr. Henry J. Goetze conducting in August of 2005, in the sum of $962.50 [IHO-1].

26. On September 5, 2006, after seven days of hearing, the IHO issued her Findings of Fact and Decision [Affidavit of Daniel Petigrow ("Petigrow Affidavit"), Exhibit "C"]. She found, among other things, that: (a) the 2005-06 IEP recommended by the CSE on March 8, 2005 was inappropriate solely because the goals and objectives did not address N.C.'s decoding and spelling deficits; (b) N.C.'s placement at Kildonan was inappropriate because: (i) Kildonan failed to provide N.C. with the speech and language therapy that the CSE had recommended to address his well documented expressive and receptive language deficits and auditory processing difficulties; (ii) because no reading and writing instruction occurs in any of his content area classes; and (iii) the Kildonan teachers read to students; and (c) the Parents' claim for compensatory services from the 2004-05 school year was not supported because the District committed no gross procedural errors, supplied all of the recommended services under N.C.'s 2004-05 IEP and N.C. did not require a daily 1:1 multi-sensory reading program to benefit from his education. As a result of these findings, the IHO denied the Parents' claims for tuition reimbursement and compensatory educational services.

**SRO Decision**

27. Both parties appealed to the State Review Officer ("SRO"). On December 22, 2006, the SRO issued a written decision affirming the IHO's finding that N.C.'s unilateral placement was inappropriate and rejecting the Parents' claims for tuition reimbursement and additional services regarding the 2004-05 school year and affirming the IHO's finding that the District's 2005-06 IEP developed on March 8, 2005 was inappropriate because it failed to include goals to address N.C.'s reading decoding, reading fluency and spelling deficits [Petigrow Affidavit, Exhibit "D"].

**District Court Proceedings**

28. The Parents commenced action in the United States District Court for the Southern District of New York on April 6, 2007 [Petigrow Affidavit, Exhibit "A"]. The District filed an answer and counter-claim on May 8, 2007 [Petigrow Affidavit, Exhibit "B"]. The Parents filed an answer to the counter-claim on May 22, 2007 [Id., Exhibit "C"]. The parties have agreed that the Court should review the matter based upon motions for summary judgment, and the administrative Record before the SRO.

WHEREFORE, it is respectfully requested that the Complaint be dismissed in all respects and that the counterclaim be granted in all respects, together with such other, further, and different relief as the Court may deem just and proper.

Dated: Hopewell Junction, New York
August 3, 2007

Yours, etc.

DONOGHUE, THOMAS, AUSLANDER & DROHAN, LLP

By: _____/s/ Daniel Petigrow_____
Daniel Petigrow (DP 7422)
Attorneys for Defendant
Board of Education of the Hyde Park Central School District
2517 Route 52
Hopewell Junction, NY 12533
Tel.: (845) 227-3000
Fax: (845) 227-6873

TO: LINDA A. GERACI, ESQ.
Attorney for Plaintiffs
21 Old Main Street
Suite 203
Fishkill, NY 12524