UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
R.C. and M.B., on behalf of their minor child, N.C.,

                    Plaintiffs,

                                        07 CIV 2806 (MDF)

against

                                        ECF Case

BOARD OF EDUCATION OF THE HYDE
PARK CENTRAL SCHOOL DISTRICT,

                    Defendant.
-------------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF
# CROSS-MOTION FOR SUMMARY JUDGMENT

DONOGHUE, THOMAS, AUSLANDER & DROHAN, LLP
Daniel Petigrow (DP 7422)
Attorneys for Defendant
Board of Education of the Hyde Park Central School District
2517 Route 52
Hopewell Junction, NY 12533
Tel.:   (845) 227-3000
Fax:   (845) 227-6873

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................... ii

PRELIMINARY STATEMENT ................................................ 1

STATEMENT OF FACTS .................................................... 1

## ARGUMENT

### POINT I

THE PARENTS HAVE FAILED TO SUSTAIN THEIR
BURDEN OF PROVING THE APPROPRIATENESS OF
KILDONAN ................................................... 10

### POINT II

THE PARENTS HAVE FAILED TO SUSTAIN THEIR
BURDEN THAT N.C. IS ENTITLED TO COMPENSATORY
EDUCATIONAL SERVICES ..................................... 16

### POINT III

THE PARENTS HAVE NOT PROVED THE DISTRICT'S 2005-
2006 IEP WAS INAPPROPRIATE ................................ 19

### CONCLUSION

THE COMPLAINT SHOULD BE DISMISSED AND THE
DISTRICT'S COUNTERCLAIM SHOULD BE GRANTED IN
ALL RESPECTS .............................................. 23

## TABLE OF AUTHORITIES

Application of a Child with a Disability,
SRO Dec. No. 06-030, (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Application of the Board of Education of the Brewster Central School District,
SRO Dec. No. 05-094 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Application of a Child with a Disability,
SRO Dec. No. 06-073 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Burlington School Committee v. Dept. of Education,
471 U.S. 359 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

BOE of the Hendrick Hudson C.S.D. v. Rowley,
458 U.S. 176 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Burr v. Ambach,
863 F.2d 1071 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Cerra v. Pawling C.S.D.,
427 F.3d 186 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20

Evans v. Bd. of Educ. of Rhinebeck Cent. Sch. Dist.,
930 F.Supp. 83 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Frank G. v. Bd. of Educ. of the Hyde Park Central School District,
459 F.3d 356 (2d. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Gagliardo v. Arlington Central School District,
489 F.3d 105 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 19

Garro v. Connecticut,
23 F.3d 734 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Grim v. Rhinebeck Central School District,
346 F.3d 377 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 19

J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.,
345 F.Supp.2d 386 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Matrejek v. Brewster Central School District,
471 F.Supp.2d 415 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mrs. C. v. Wheaton,
916 F.2d 69 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

M.S. v. Yonkers Board of Education,
231 F.3d 96 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

Schaffer v. Weast,
546 U.S. 49 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Sherman v. Mamaroneck Union Free School District,
340 F.3d 87 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

 St. Johnsbury v. D.H.
240 F.3d 163 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Walczak v. Florida Union Free Sch. Dist.,
142 F.3d 119 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 20, 21

## PRELIMINARY STATEMENT

This lawsuit is an appeal by parents for an administrative decision by the New York State Office of State Review. The brief is submitted in support of cross-motion for summary judgment by defendant, Board of Education of the Hyde Park Central School District's ("District").

## STATEMENT OF FACTS

N.C. was originally referred to the District's Committee on Special Education ("CSE") towards the end of the 1998-99 school year by his mother, due to "...poor abilities to process information, language difficulties, slowness in reading." [P-2].[1]  Based on the initial evaluation, which revealed deficits in organizing information, recalling and processing verbally presented information, significant deficits in receptive and expressive language skills, and a previously diagnosed seizure disorder since birth, the CSE classified N.C. as "other health impaired" on January 28, 2000 [P-5, 6 and 7].

During the remainder of elementary school, N.C. received a combination of resource room, direct consultant teacher services and speech/language therapy services to address these deficits [P-13]

Speech/hearing and neuropsychological evaluations were conducted between March, 2002 and October, 2002 [P-16, 18]. They confirmed continued deficits in receptive and expressive language, auditory processing and reading and writing skills.  Those evaluations disclosed:

> • significant deficits in understanding paragraphs read aloud, word retrieval, sentence formulation, inferencing and speech flow [P-16, at p. 2].

---

[1] Citations to Parent, District and IHO exhibits from the administrative Record in the underlying proceeding will be referenced as "P-#", "D-#" and "IHO-#."  Citations to the hearing transcript will be referenced as "Tr. - page #."

- severe impairments in ". . . receptive and expressive language, processing speed, auditory processing and verbal and visual memory . . ." [P-18, at p. 8].

The neuropsychologist recommended ". . . intensive speech/language therapy with an emphasis on improving both (N.C.'s) receptive and expressive capabilities . . ." He also argued against introducing a phonics-based instructional approach for reading . . ." based on N.C.'s severely limited auditory processing and short-term memory skills [P-18, at 9].

N.C. attended the Haviland Middle School between 2002-03 and 2004-05. In 2002-03, his IEP provided resource room and direct consultant teacher services every other day for math, science and language arts, and speech/language therapy two times per six day cycle [P-19].     5     .

During the 2003-04 school year, N.C.'s IEP offered him a 15:1 departmentalized class in English, Social Studies and Math, an inclusion class for science and speech/language therapy (5:1) two times per six day cycle [P-24]. He received program modifications of preferential seating, re-teaching materials, modified homework and checking for understanding. Test modifications included extended time (2.0), answers recorded for essays, directions explained and directions read.

N.C. demonstrated academic success in seventh grade. His final grades that year were: English - 89, Social studies - 94, Math - 95 and Science - 90 [P-51]. He was also named to the Honor Roll in all four marking periods [Exhibit "A"]. On the Tests of New York State Standards ("TONYSS"), his math score improved to a Performance Level 3 - Proficient, indicating that he possessed "sufficient evidence of key mathematical ideas." [P-28].

His teachers commented that, N.C. was "a pleasure to have in class," " well motivated" and was making "good effort with challenging material/concepts." In preparation for the annual review, his special education teacher noted that "...his work is always done to perfection. He is an active

participant. Pleasure to have in class." [Exhibit "G"]. She also observed that he is "extremely motivated and puts in 100% effort" and that the quality of his work was "excellent." [Id.] Even his mother acknowledged that he was "doing very well" in school and that the "...small class had really helped [him]" [D-H]

In the Spring of 2004, N.C. was reevaluated by the CSE. On the Woodcock-Johnson Test of Cognitive Abilities, N.C.'s performance was mixed. He scored in the low range on tasks requiring him to "...rapidly perform automatic cognitive tasks..." and to "... process speech sounds and blending sounds." [P-29, at p. 3; Tr. 947]. In contrast to these auditory processing and processing speed deficits, N.C.'s abilities on tasks measuring verbal comprehension, visual spatial skills and fluid reasoning were relatively strong [Id., at p. 2, 3 and 5]. Overall, his general intellectual ability score was an 85, in the low average range [Id., at p. 5].

On the Behavioral Assessment System for Children ("BASC"), an assessment measuring clinical and adaptive scales of behavior, N.C. and his teacher reported that he was functioning much better in social and emotional domains than did his mother [P-29]. N.C.'s responses to questions addressing attitude towards school and teachers, somatization and social stress disclosed a more positive view about himself than what would be considered average [Id., at p. 4]. On questions about interpersonal relations, self-esteem and self-reliance, his responses also fell in the average range. Similarly, the teacher's responses fell in the average range for behaviors that address hyperactivity, aggression, conduct, depression, somatization, learning problems and withdrawal, and in the low range for attention, meaning she saw him more attentive than would be average. By contrast, his mother's responses to questions addressing anxiety, depression, attention, hyperactivity fell in the

at-risk range, while her responses on topics measuring levels of withdrawal were clinically significant [Id.].

On academic achievement tests, his composite results (based on age norms) continued to be mixed with Math (SS- 101) stronger than reading (SS-85) or writing (SS - 77). On the subtest areas, this scatter was more pronounced. For example, academic fluency skills in reading, writing and math (SS - 76, 82 and 83) were lower than skills measuring letter/word identification, passage comprehension, writing samples, calculation and applied problems (SS - 90, 103, 95, 101 and 110).

On March 29, 2004, the CSE met to conduct an annual review and to review the reevaluation. N.C.'s classification was changed from "other health impaired" to "multiply disabled." The CSE recommended that he be mainstreamed for math, but that he continue with the 15:1 departmentalized classes for his English and Social Studies and an inclusion class for Science. The CSE also recommended continued speech/language therapy, twice per six day cycle for 40 minutes to address his receptive and expressive language skill deficits [P-32, at p. 4].

At the mother's request, the CSE met again on June 8, 2004, to consider the following issues: (1) a summer reading program; (2) the addition of an auditory training device; and (3) a reading program for the fall [P-33]. The CSE recommended an additional resource room class where N.C.'s reading needs would be addressed, although it did not recommend a specific one-to-one reading program [P-32, at p. 4]. The CSE also agreed that N.C. continue in a 15:1 departmentalized class for math, added an FM auditory trainer on an as needed basis and further added a 1:1 reading program for the summer only as an extended year service, which it had agreed to previously in a 2001 mediation [P-32, at p. 1, 4; D-C]. The IEP was also amended to offer additional program

modifications of large print materials, an additional set of books and a multi-sensory approach for reading activities [P-32, at p. 2].

During the 2004-05 school year, N.C. continued to perform successfully in all of his academic subjects. N.C. "came prepared to class", was "eager to work, conscientious and well motivated" and was an excellent class participant [P-51]. He again earned high enough grades to make the Honor Roll in all four marking periods. His final average grades in the four major academic subjects were as follows: English - 89, Social Studies - 88, Math - 96 and Science - 90 [Id.]. On the eighth grade New York State Tests, N.C. attained the higher range of Performance Level 2 for English/Language Arts and Social Studies, and achieved Performance Level 3 in Math and Science, which demonstrated proficiency in those subjects [P-37 - 40].

N.C.'s special education teachers during the 2004-05 school year observed that:

- he exhibited a strong ability in class to read and correctly interpret word problems and write accurate responses to those work problems [Tr. 304-05, 308].

- as the year progressed, he improved his independent reading comprehension [Tr. 255-56].

- he did not require a specialized reading class because the program of services and modifications that he was receiving under the IEP enabled him to be successful [Tr. 799].

- he displayed an "amazing amount of effort, . . .was very conscientious and . . . was highly motivated to improve his reading skills" throughout the year [Tr. 236].

Among the services he received during the 2004-05 school year was resource room in a small group of five students, which focused on reading and writing skills [P-32, at p. 4; Tr. 213, 238-39], and was taught by a "seasoned" special education teacher who was trained in multi-sensory approaches to reading and writing [Tr. 242, 265-66].

On March 8, 2005, the CSE met to develop N.C.'s 2005-06 IEP [P-35]. The CSE again recommended a resource room to support his reading goals in ninth grade at the high school [Id., at p. 1, 4]. The CSE also recommended a departmentalized special class 15:1 for English and Social Studies, and a direct consultant teacher inclusion model every other day for Math and Science, his stronger subjects [Id.]. Class notes and clarifying directions and checking for understanding were offered as additional program modifications [Id., at p.2]. Extended time for tests was increased from double time to triple time [Id.]. In addition, speech/language therapy was recommended two times per six day cycle [Id, at p.1, 4]. Furthermore, the CSE again recommended extended year services in the area of reading instruction of three hours per week. [Id.].

On August 19, 2005, the parents delivered written notice to the District that they were rejecting N.C.'s IEP for the 2005-2006 school year, and that they had unilaterally enrolled N.C. in the Kildonan School for the 2005-2006 school year and would seek reimbursement of tuition and related expenses [P-41].

Unbeknownst to the District, the Parents had N.C. privately evaluated by Dr. Henry Goetze in August of 2005 [P-42; Tr. 756]. Dr. Goetze evaluated N.C. without consulting with any of N.C.'s classroom or special education teachers or his speech/language therapist [Tr. 581-82]. Dr. Goetze admitted he was unfamiliar with how the departmentalized classes operated at the Haviland Middle School and had never observed any of the special education programs offered by Hyde Park [Tr. 579-80].

Dr. Goetze acknowledged that N.C.'s reading scores were "relatively stable" and mixed specifically for decoding for the period 2000-2004 [Tr. 591]. Also, when showed the computer

printout of the scores from 2004, he confirmed that his opinion relied on incorrect scores on the IEP in concluding that N.C.'s reading ability had decreased [Tr. 592-93].

Dr. Goetze testified that N.C.'s performance on the 8th grade New York State tests in English and Social Studies were surprisingly higher than what he would have expected [Tr. 601-02]. He also confirmed that his opinion N.C. needed an intensive 1:1 program, such as Kildonan offered, because it was the optimal setting for him [Tr. 604]. Finally, he confirmed that Kildonan provides students with no direct reading or writing instruction in the content area classes [Tr. 605].

### N.C.'s Performance at Kildonan School During 2005-06

The Kildonan School is a private school that admits only children diagnosed with a language based reading disability [P-61; Tr. 331]. According to its Academic Dean, its curriculum is designed ". . . to not include too many independent reading and writing requirements" [Tr. 334]. Kildonan does not employ speech/language therapists and does not offer speech/language therapy [Tr. 371, 388].

None of N.C.'s content area teachers or his language trainer testified in the underlying hearing; only Kildonan's Academic Dean, Dr. Robert Lane testified, even though he never instructed N.C. [Tr. 384]. Dr. Lane, however, confirmed that:

- no direct reading or written instruction occurs in the content area classes [Tr. 388-90].

- primarily, the content area teachers provide instruction by ". . . reading aloud to students [Tr. 334, 346-48, 389-90, 420, 427].

- students know they are not going to be required to read in class." [Tr. 346-47].

- because students read at different levels in the content area classes, the teacher does a significant amount of reading while students follow along in their copy of the text [Tr. 348, 389-90, 420].

- N.C. had difficulty with the pacing of assignments ". . . making corrections with concepts between terms and between topics within the term. . ." [Tr. 397-98].

According to N.C.'s progress report, by mid-year, he was receiving C's and D's on tests and quizzes in Global Studies; it was a "challenge for him to understand the material" in Global Studies; and in Global Studies and American Literature, his teachers reported that N.C. rarely participated in class discussions [P-57, at p.3 and p. 5]. Also, on selected subtests of standardized reading assessments administered at Kildonan, N.C. continued to demonstrate significant weaknesses in fluency and decoding [Gray Oral Reading Test - accuracy (5th%); fluency (4th%) [P-63].

**Impartial Hearing**

On January 31, 2006, the parents requested an impartial hearing in which they sought: (1) compensatory educational services to remediate N.C.'s reading deficits for both the 2003-2004 and 2004-2005 school years; (2) reimbursement of tuition and all costs related to N.C.'s attendance at Kildonan for the 2005-2006 school year; and (3) reimbursement of the cost of an private psycho-educational evaluation conducted by Dr. Henry J. Goetze conducting in August of 2005, in the sum of $962.50 [IHO-1].

On September 5, 2006, after seven days of hearing, the IHO issued her Findings of Fact and Decision [Affidavit of Daniel Petigrow ("Petigrow Affidavit"), Exhibit "C"]. She found, among other things, that: (a) the 2005-06 IEP recommended by the CSE on March 8, 2005 was inappropriate solely because the goals and objectives did not address N.C.'s decoding and spelling deficits; (b) N.C.'s placement at Kildonan was inappropriate because: (i) Kildonan failed to provide N.C. with the speech and language therapy that the CSE had recommended to address his well documented expressive and receptive language deficits and auditory processing difficulties; (ii)

-8-

because no reading and writing instruction occurs in any of his content area classes; and (iii) the Kildonan teachers read to students; and (c) the Parents' claim for compensatory services from the 2004-05 school year was not supported because the District committed no gross procedural errors, supplied all of the recommended services under N.C.'s 2004-05 IEP and N.C. did not require a daily 1:1 multi-sensory reading program to benefit from his education. As a result of these findings, the IHO denied the Parents' claims for tuition reimbursement and compensatory educational services.

### SRO Decision

Both parties appealed to the State Review Officer ("SRO"). On December 22, 2006, the SRO issued a written decision affirming the IHO's finding that N.C.'s unilateral placement was inappropriate and rejecting Plaintiff's claims for tuition reimbursement and additional services regarding the 2004-05 school year and affirming the IHO's finding that the District's 2005-06 IEP developed on March 8, 2005 was inappropriate because it failed to include goals to address N.C.'s reading decoding, reading fluency and spelling deficits [Petigrow Affidavit, Exhibit "D"].

### District Court Proceedings

The Parents commenced action in the United States District Court for the Southern District of New York on April 6, 2007 [Petigrow Affidavit, Exhibit "A"]. The District filed an answer and counter-claim on May 8, 2007 [Id., Exhibit "B"]. The Parents filed an answer to the counter-claim on May 22, 2007 [Id., Exhibit "C"]. The parties have agreed that the Court should review the matter based upon motions for summary judgment, and the administrative Record before the SRO without the need for the Court to hear additional evidence.

## ARGUMENT

## POINT I

## THE PARENTS HAVE FAILED TO SUSTAIN THEIR BURDEN OF PROVING THE APPROPRIATENESS OF KILDONAN.

**A.**　**Legal Standard for Determining Whether the Parents' Unilateral Placement was Appropriate.**

To establish an entitlement to tuition reimbursement, the parents must demonstrate: (i) the District's IEP was inappropriate; and (ii) the parents' private placement was appropriate to their child's needs; and (iii) equitable considerations support the parents' claim. Burlington School Committee v. Dept. of Education, 471 U.S. 359 (1985).

In reviewing a parental placement, it is permissible to find such a program appropriate only if it provides education instruction specifically designed to meet the needs of the disabled child. Gagliardo v. Arlington Central School District,489 F.3d 105, 115 (2d Cir. 2007), citing Frank G. v. Bd. of Educ. of the Hyde Park Central School District, 459 F.3d 356, 365 (2d. Cir. 2006). A child's progress at the private school, "...is relevant to the Court's review...", but even if progress is demonstrated, that does not itself demonstrate the appropriateness of the private placement. Id..

As this Court stated in Gagliardo:

> ...even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where, as here, the chief benefit of the chosen school was the kind of educational and environmental advantages that might be preferred by parents of any child, disabled or not.

489 F.3d, at 115.

This Court has also held that the issue of appropriateness of the parents' unilateral placement (like that of the school district's placement) turns on whether the placement is reasonably calculated

-10-

to enable the child to receive educational benefits. Frank G., 459 F.3d at 364; Gagliardo, 489 F.3d, at 112.

**B.    Deference Accorded to the SRO's Decision**

In reviewing the SRO's decision, "substantial deference" is owed to the SRO on matters of educational policy. Cerra v. Pawling C.S.D., 427 F.3d 186, 191 (2d Cir. 2005). The amount of progress a disabled student makes at a private school has been determined by this Court to be such an issue, regarding which the SRO is owed substantial deference:

> ...(A)n assessment of educational progress is a type of judgment for which the District Court should defer to the SRO's educational experience, particularly where, as was the case here, the District Court's decision was based solely on the record before the IHO.

M.S. v. Yonkers Board of Education, 231 F.3d 96, 105 (2d Cir. 2001).

Judicial review of an administrative decision under IDEA is, of course:

> ...by no means an invitation to the Courts to substitute their own notions of sound educational policy for those of the school authorities which they review.

BOE of the Hendrick Hudson C.S.D. v. Rowley, 458 U.S. 176, 206 (1982). The IDEA obligates a court reviewing the administrative record from a due process hearing to base its decision on a "preponderance of the evidence." 20 USC §1415(i)(2). The Second Circuit has long held that under the IDEA, a court must accord "due weight" to the findings of a state administrative proceeding "...mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119 (2d Cir. 1998), quoting Board of Educ. v. Rowley, 458 U.S. 176, 206, 208 (1982); see also, Grim v. Rhinebeck Central School District, 346 F.3d 377, 381 (2d Cir. 2003); Sherman v. Mamaroneck Union Free School District, 340 F.3d 87 (2d Cir. 2003); M.S. v. Yonkers,

231 F.3d 96 (2d Cir.2000).    As the Second Circuit held in <u>M.S.</u> (when discussing the appropriateness of the District Court reversing the SRO on his finding regarding the appropriateness of a unilateral parental placement):

> "...(A)n assessment of educational progress is a type of judgment for which the SRO should defer to the SRO's educational experience, particularly where, as was the case here, the District Court's decision was based solely on the record before the SRO."

<u>M.S.</u>, at 105.

In a similar vein, the Second Circuit has also held, in another case regarding a claim for tuition reimbursement at the Kildonan School, that district courts should be careful not to substitute their judgment on a highly contested matter of educational policy – effective methods for educating dyslexic students:

> "...(T)he District Court concluded that [the student] must be educated using a single educational methodology in a fully segregated environment in order to receive the "educational benefit" sufficient to meet the basic floor of opportunity...The Court reached this conclusion despite contrary holdings of the IHO and SRO, and despite the IDEA's preference for educating students in the least restrictive environment possible...Accordingly, in violation of <u>Rowley</u>, the District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy - effective methods of educating dyslexic students - in direct contradiction of the opinions of state administrative officers who had heard the same evidence."

<u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 383 (2d Cir. 2003).

## C.  **Application of the Legal Principles Governing Review of Administrative Decisions under IDEA to the Facts of this Case**.

Viewed against this legal backdrop, we respectfully submit to the District Court that there exists no basis for disturbing the SRO's supportable finding that the parents failed to sustain their

burden of showing the appropriateness of Kildonan. We respectfully point out that, in this case, as in M.S., the record before this Court is the same as that which was presented to the SRO – therefore, there exists an even stronger reason for deferring to the SRO's findings in this regard.  The SRO properly found that Kildonan failed to address N.C.'s well-documented ". . . special education needs related to his auditory processing disorder, his combined expressive-receptive language disorder, his need for reading instruction in content area classes or his deficits in reading and understanding of the content of material in those classes." [Petigrow Affidavit, Exhibit "E", at p. 11].

　　　As the SRO noted, the parents did not call any of the student's content area teachers or language trainer at Kildonan to vouch for or describe the appropriateness of the program in the hearing [Id., at p. 10]. Instead, they relied upon the testimony of Dr. Robert Lane, the Academic Dean at Kildonan, who never instructed N.C. [Tr. 384].  The SRO found that Dr. Lane was unable to describe the particular strategies employed by each of the specific content area teachers, nor could he state "how any of the content area vocabulary used by the student was incorporated into the language training tutorial . . ." [Petigrow Affidavit, Exhibit "E", at p. 10].

　　　The Record establishes that Kildonan did not supply any services to address N.C.'s well-documented expressive and receptive language and auditory processing deficits [Petigrow Affidavit, Exhibit "D", at p. 17, citing P-6, 16, 18, 29 and 42].  For years, N.C. received speech and language therapy services as part of his IEP [P-19, 24 and 32].  The progress reports from N.C.'s speech therapist comment on these deficits and the need for him to continue receiving these services [D-D, E and F].  N.C.'s 2005-2006 IEP also provides that he was to receive such services and includes specific goals and objectives to address these need [P-35]. Kildonan's Academic Dean testified that

although N.C. has speech/language deficits, he received no speech/language therapy services at Kildonan [Tr. 371, 388].

In addition, Dr. Lane's testimony established that no direct reading or writing instruction occurs in N.C.'s content area classes, as students are not expected to read in class, but instead are read aloud to by their teachers [Tr. 388-90, 404, 420]. As the IHO noted, this testimony is confirmed by Kildonan's own brochure that "...[r]eading and writing demands are 'reduced or removed entirely' from the content area courses." [P-61]. Such evidence ignores N.C.'s need for reading and writing in the content area classes, which no one disputes is appropriate [P-35, at p. 5].

Moreover, although his teachers did not testify, N.C.'s progress reports state that he had difficulty with the pacing of assignments [Tr. 353-54]; had trouble "...making connections with concepts between terms and between topics within the term..." and didn't volunteer in class [Tr. 397-98]. Thus, the Record clearly shows Kildonan as a placement that failed to provide instruction specifically designed to meet N.C.'s unique needs.

In several recent decisions, the SRO has also determined Kildonan to be inappropriate for students with significant auditory processing deficits, in that, Kildonan does not furnish speech/language services to address these deficits, and Kildonan's content area teachers do not provide direct reading instruction; instead they read aloud to their students. See, e.g., Application of a Child with a Disability, App. No. 06-030 (2006); Application of the Board of Education of the Brewster Central School District, App. No. 05-094 (2005).

At least one federal district court in the Southern District of New York, when reviewing the SRO's determination, specifically found that Kildonan was not appropriate because that placement provided no speech/language therapy to address the student's significant speech delays. Matrejek

v. Brewster Central School District, 471 F.Supp.2d 415, 429 (S.D.N.Y. 2007). Similarly, the administrative record here unequivocally establishes that N.C. has a significant auditory processing disorder and a combined expressive-receptive language disorder, and requires speech language therapy to meet this unique need [P-16, at p. 2; P-18, at pp. 6-8].   The SRO found, and the Record demonstrates conclusively, that Kildonan did not offer N.C. any services to address these needs. Accordingly, the SRO correctly ruled Kildonan to be inappropriate.

Finally, because all of the children at Kildonan are disabled, there are admittedly no mainstreaming opportunities for N.C., even though he had demonstrated proficiency in Math and Science according to the New York State tests in those content areas [Exhibits "39" and "40"]. N.C.'s needs are clearly not so severe that he must be educated exclusively in a school for students with disabilities. M.S. v. Board of Education of Yonkers City School District, 231 F.2d 96 (2d Cir. 2000). The LRE requirement is a valid consideration on the appropriateness of the student's needs, and the Parents have failed to meet their burden of proof in this regard.

Accordingly, the Court should affirm the SRO's findings that the Parents failed to sustain their burden of proof with regard to Kildonan.

## POINT II

## THE PARENTS HAVE FAILED TO SUSTAIN THEIR BURDEN THAT N.C. IS ENTITLED TO COMPENSATORY EDUCATIONAL SERVICES.

The Parents argue that N.C. should be awarded compensatory education services in the form of a 1:1 reading program to remediate his reading deficits based on alleged declining reading scores and the failure of the District to provide a 1:1 reading program during the 2004-2005 school year. However, the evidence in the Record conclusively establishes that N.C. received appropriate educational services in the form of a departmentalized class program, with speech/language services, and the addition of a resource room class to specifically address reading in 8th grade, plus program modifications and test modifications under his IEP's for those years. Assisted by this program of services, N.C. was successful in his education and, accordingly, the SRO's denial of compensatory services should be affirmed.

It is well settled law in the Second Circuit that compensatory education may be an appropriate remedy under the IDEA for a student who: (a) is no longer eligible to receive special education services because of age; and (b) has been subject to a gross violation of the IDEA resulting in the student's exclusion from school or the student's loss of appropriate educational services for an extended period of time. See, Garro v. Connecticut, 23 F.3d 734 (2d Cir. 1994); Mrs. C. v. Wheaton, 916 F.2d 69 (2d Cir. 1990); Burr v. Ambach, 863 F.2d 1071 (2d Cir. 1988).

A student residing in the State of New York "ages out" from the right to receive special education under the IDEA and Article 89 of the N.Y. Educ. Law, when receiving a diploma or turning 21 years of age. New York Education Law, §§ 3202(1)(a) and 4402(1)(a); See, also, St. Johnsbury v. D.H. 240 F.3d 163, 169 (2d Cir. 2001). As of the date the hearing was requested, N.C.

was fourteen years old. Clearly N.C. is not eligible to age-out for a number of years. Since he remains eligible to receive FAPE from the District, N.C. does not qualify under the first criteria for compensatory education.

Even if he had "aged out", N.C. would not be entitled to compensatory education in the absence of evidence the District had committed a gross violation of the IDEA, resulting in his exclusion from school or denial of appropriate educational services to him for an extended period of time. Mrs. C. v. Wheaton, 916 F.2d at 75. In order for compensatory education to be appropriate, the violations must have been so egregious that it resulted in the denial of or exclusion from educational services for a substantial period of time. See, Garro, 23 F.3d, at 737; Wheaton, 916 F.2d, at 75.

Here, the Parents presented no evidence showing N.C. to have been excluded from school or denied appropriate educational services for an extended period of time. To the contrary, in 2004-2005, the IEP developed at CSE meetings on March 29, 2004, and amended on June 8, 2004, composed of appropriate personnel and based on evaluations that identified N.C.'s needs [P-32]. That IEP offered N.C. a blend of departmental 15:1 classes in the primary content area and a daily resource room class for reading instruction taught by a seasoned teacher trained in multi-sensory reading instruction; and speech language services twice per six day cycle in a small group [P-32; Tr. 172, 229]. N.C. received all of the services recommended by the CSE for the 2004-05 school year. During that time frame, he demonstrated academic success based on his grades, in which he made the Haviland Middle School Honor Roll in all four marking periods for 8th grade [P-51]. On the eighth grade State tests, he demonstrated proficiency in Math and Science, and scored at a range very close to proficiency in English and Social Studies [P-37, 38, 39 and 40]. Even his mother admitted

-17-

that N.C. performed well in school with the program of services that were provided in 8th grade [D-H; Tr. 748 ]. For the foregoing reasons, the SRO's determination that N.C. received FAPE under the 2004-05 IEP, and did not require a daily 1:1 multi-sensory reading program during the 2004-05 school year in order to receive FAPE should be affirmed.

## POINT III

### THE PARENTS HAVE NOT PROVED THE DISTRICT'S 2005-2006 IEP WAS INAPPROPRIATE.

The District respectfully submits that the SRO erroneously ruled its 2005-2006 IEP for N.C. to be inappropriate.  It is now settled law that the Parents, as the parties challenging the IEP and seeking relief in the form of tuition reimbursement, bear the burden of proof in this administrative proceeding. Schaffer v. Weast, 546 U.S. 49, 126 S. Ct. 528, 537 (2005).  Under Schaffer, the parents now have the burden of demonstrating that the program recommended by the CSE was inappropriate. Gagliardo, 489 F.3d, at 112.

To meet this burden, the parents must initially demonstrate that: (a) the District did not comply with the procedural requirements of IDEA; and (b) the IEP was not reasonably calculated to enable the child to receive meaningful educational benefit. Bd. of Ed. of Hendrick Hudson C.S.D. v. Rowley, 458 U.S. 176 (1982).  According to Rowley, and its progeny, "[t]he IDEA 'expresses a strong preference' for the educational mainstreaming of children with disabilities 'to the maximum extent appropriate,' and therefore 'special education and related services must be provided in the least restrictive environment consistent with a child's needs.'" Id., at 207; see also, Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d, at 379 (2d Cir. 2003); J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F.Supp.2d 386, 393 (S.D.N.Y. 2004). Placement in more restrictive settings, such as "dedicated special education classrooms... and private institutions" are permitted only when the nature or severity of a child's disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." J.R. v. Bd. of Educ., 345 F.Supp.2d , at 393, citing Walczak v. Florida Union Free Sch. Dist., 142 F.2d 119, 122 (2d Cir.

-19-

1998). "A school district is not, however, required to furnish 'every special service necessary to maximize each handicapped child's potential'.", but rather be designed to produce progress, not regression. See, Cerra v. Pawling Cent. Sch. Dist., 427 F.3d, at 195 (2d Cir. 2005), citing Rowley, 458 US., at 199; Walczak, 142 F.3d, at 130.

In her Decision, the IHO acknowledged that, procedurally, the March 8, 2005 IEP was adequate because the CSE was comprised of the appropriate individuals and the IEP adequately identified N.C.'s present levels of academic performance, including recent evaluative data, and his deficit areas in reading, written expression, receptive and expressive language skills and auditory processing of information [Petigrow Affidavit, Exhibit "D", at p. 14-15]. She also found that, substantively, the program of services, which offered a blend of special classes (15:1) for English and Social Studies (the content area classes focusing primarily on reading and writing skills), inclusion classes for Math and Science, with the support of direct consultant teacher services, a resource room class (5:1) for reading support, and related services of speech and language therapy (5:1) twice pe six day cycle, was sufficient to address N.C.'s needs [Id., at p. 15]. The only flaw she detected, and on which she concluded the District had denied FAPE, was the absence of a specific goal and objective to address N.C.'s decoding, fluency and spelling deficits [IHO Decision, at p. 16].

The SRO affirmed this finding that the 2005-06 IEP did not provide FAPE solely based on its lack of a annual goal to address "reading decoding, reading fluency and spelling deficits." [Petigrow Affidavit, Exhibit "E", at p. 9].

However, the IDEA does not require the District to develop an IEP that maximizes N.C.'s ability to decode and spell. The goals not only must be related to the child's needs but enable the student " . . . to be involved in and make progress in the general education curriculum . . ." 20 U.S.C.

§1414(d)(A)(i).  As the testimony shows, N.C. was entering high school where students' academic focus is the comprehension of the content area materials presented [Tr. 452, 829].  The reading goal and objective adequately addresses his need to comprehend the information he reads.  The writing goal and objectives similarly address the need to write organized sentences and paragraphs in sequential order, skills that will be tested in the high school curriculum.

The IEP also provides for program modifications such as preferential seating to eliminate any distractions, re-teaching of materials and checking for understanding, clarifying directions and a copy of class notes to address his information processing, fluency, and written expression weaknesses. [P-35, at 2].  The IEP provides for testing accommodations, including triple time to reduce the pressure on tests that involved more writing activities; and test questions read and directions read and explained to address N.C.'s deficits in processing speed and reading fluency. Id.  The goals and objectives developed for N.C. adequately identified the areas of weakness in reading, writing, math word problems and language.  Thus, the 2005-06 IEP was reasonably designed to produce progress, and not regression. Walczak, 142 F.3d, at 130.

Also, if judged from the previous two years, at the Haviland Middle School, none of the IEPs included specific decoding or spelling goals and objectives, yet N.C. demonstrated academic progress as shown by his making the academic honor roll for eight consecutive marking periods, and the classroom work he produced for his teachers [P-51; Tr. 236, 255-56, 304-08 and 799].

As the SRO itself recently stated:

". . . if a procedural violation is alleged, an administrative officer may find that a child did not receive FAPE only if the procedural inadequacies (a) impeded the child's right to FAPE, (b) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of FAPE to the child, or (c) caused a deprivation of educational benefits."

-21-

Application of a Child with a Disability, SRO Dec. No. 06-073, citing 20 U.S.C., §1415[f][3]]E][ii];

8 N.Y.C.R.R., §200.5[i].  The SRO further concluded that the 2004-05 IEP, which also included no

specific goals and objectives in decoding, fluency and spelling provided N.C. with FAPE.

Thus, the lack of specific decoding, fluency and spelling goals in the 2005-06 IEP, which otherwise

met all of the procedural and substantive requisites under the IDEA, does not alone warrant a finding

that N.C. suffered a ". . . loss of educational opportunity [resulting] in the denial of [FAPE]." Evans

v. Bd. of Educ. of Rhinebeck Cent. Sch. Dist., 930 F.Supp. 83, 93 (S.D.N.Y. 1996).

 Accordingly, the District Court should reverse the SRO and find that the Parents failed to

sustain their burden of proving the District's 2005-06 IEP was inappropriate.

## CONCLUSION

**THE COMPLAINT SHOULD BE DISMISSED AND THE
DISTRICT'S COUNTERCLAIM SHOULD BE GRANTED IN
ALL RESPECTS.**

Dated: Hopewell Junction, New York
     August 3, 2007

                      Yours, etc.,
                      DONOGHUE, THOMAS, AUSLANDER & DROHAN, LLP

By:       */s/ Daniel Petigrow*
                      Daniel Petigrow (DP 7422)
                      Attorneys for Defendant
                      Board of Education of the Hyde Park Central School District
                      2517 Route 52
                      Hopewell Junction, NY 12533
                      Tel.:   (845) 227-3000
                      Fax:   (845) 227-6873