

# The University of the State of New York
## The State Education Department
### State Review Officer

No. 06-127

Application of a CHILD WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Hyde Park Central School District

**Appearances:**
Linda A. Geraci, Esq., attorney for petitioners

Donoghue, Thomas, Auslander, & Drohan, LLP, attorney for respondent, Daniel Petigrow, Esq., of counsel

## DECISION

Petitioners appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their son's tuition costs at the Kildonan School (Kildonan) for the 2005-06 school year and denied their request for additional services relating to the 2004-05 school year. The Board of Education cross-appeals from the impartial hearing officer's determination that the individualized education program (IEP) resulting from the March 29, 2004 Committee on Special Education (CSE) meeting failed to offer the student an appropriate educational program for the 2005-06 school year. The appeal must be dismissed. The cross-appeal must be dismissed.

Petitioners' son was 14 years old and in the ninth grade at Kildonan at the commencement of the impartial hearing in April 2006 (Tr. p. 481). The Commissioner of Education has not approved Kildonan as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). The student has a diagnosed seizure disorder and exhibits significant auditory processing, memory, as well as expressive and receptive language deficits that affect his reading, communication, and written expression (Parent Ex. 6 at p. 5; Parent Ex. 7 at p. 1; Parent Ex. 14; Parent Ex. 18 at pp. 6, 7, 8). The student's eligibility for special education services as a student with multiple disabilities (see 8 NYCRR 200.1[zz][8]) is not in dispute.

Petitioners referred their son to respondent's CSE on June 10, 1999 when he was eight and one-half years old and in the second grade (Parent Ex. 6 at p. 1). Respondent's CSE

convened on January 28, 2000 and reviewed evaluative information regarding the student (Parent Ex. 7 at p. 6). Administration of the Wechsler Intelligence Scale for Children-Third Edition (WISC-III) in October 1999 had yielded a full scale IQ score of 90, a verbal IQ score of 101, and a performance IQ score of 78, indicating the student was functioning in the "low end of average range" and revealing a significant discrepancy between his verbal and performance abilities (Parent Ex. 5 at p. 2). The student also achieved scores on the Woodcock Johnson Tests of Achievement-Revised (WJ-R ACH) that were generally below grade level expectations demonstrating difficulty with tasks that require abilities in visual perceptual organization (Parent Ex. 5 at pp. 3, 5). The student achieved a standard score of 86 (18th percentile) on the Peabody Picture Vocabulary Test-Revised (PPVT-R), which was within normal limits but at the low end of the range (Parent Ex. 6 at p. 1). The evaluator opined that the errors made by the student were "unusual," suggesting either a perceptual distortion or an inability to "retrieve [the words] intact" from short-term memory (id.). The student's score on the Expressive One-Word Picture Vocabulary Test-Revised (EOWPVT-R) was within normal limits; however, the evaluator indicated that the student's responses on this assessment were characterized by phonemic errors (Parent Ex. 6 at p. 2). Administration of the Clinical Evaluation of Language Fundamentals 3 (CELF-3) had yielded a receptive language standard (and percentile) score of 82 (12) and an expressive language standard (and percentile) score of 75 (5) (id.). The evaluator determined that the student exhibited significant deficits in expressive language, including problems with word retrieval during spontaneous speech, phonemic errors, and problems expressing ideas with precision (Parent Ex. 6 at p. 5). Results of a reading assessment conducted by respondent's reading specialist indicated the student was able to read grade level material with assistance, but his reading was described as slow and choppy with many repetitions (Parent Ex. 3 at p. 2).

Although not reviewed by the CSE at the January 28, 2000 meeting, a letter dated November 11, 1999 from the student's pediatric neurologist indicated that an MRI of the student's head, obtained in April of 1999 following a seizure, revealed left temporal lobe atrophy involving the hippocampus (Parent Ex. 14).

Respondent's CSE determined the student eligible for special education programs and services as a student with other health-impairment at the January 28, 2000 meeting and developed the student's IEP for the remainder of the 1999-2000 school year (Parent Ex. 7 at pp. 1, 6; Parent Ex. 5 at p. 1). The CSE recommended that the student receive direct and indirect consultant teacher services in an integrated setting, teaching assistant services in an integrated setting for language arts and math, and individual speech-language therapy two times per week (Parent Ex. 7 at p. 1). Modifications included preferential seating and extended time (1.5) for tests (Parent Ex. 7 at pp. 1-2). The CSE determined that an occupational therapy "screen/evaluation" should be performed to further assess the student's needs (Parent Ex. 7 at p. 6).

The student continued to receive a variety of special education programs, related services, and extended school year services throughout elementary school and the sixth grade when he entered respondent's middle school (see Parent Ex. 10 at pp. 1, 2; Parent Ex. 13 at pp. 2, 5; Parent Ex. 17; Parent Ex. 19 at pp. 1, 6; Parent Ex. 25 at p. 3; Dist. Ex. C).

In February 2002, when the student was in the sixth grade, petitioners requested an independent neuro-psychological evaluation of their son and advised respondent that they were obtaining a private speech and hearing evaluation (Parent Ex. 15). The neuropsychological evaluation was conducted over seven days between May and October 2002 (Parent Ex. 18 at p. 1). The evaluator reported test results commensurate with results previously obtained, indicating that the student's overall level of cognitive functioning was in the average range (Parent Ex. 18 at p. 1). The evaluator noted deficits in the areas of receptive and expressive language, processing speed, auditory processing, and verbal and visual memory, as well as in reading, writing, and spelling, and opined that the student's weaknesses within the mnemic areas were consistent with the probability of a lesion in the hippocampal regions of the temporal lobe (Parent Ex. 18 at p. 8). He made numerous recommendations for the student, including intensive speech-language therapy with an emphasis on receptive and expressive language, and a twelve month educational program, and stated that the student's very severe limitations in short-term memory and auditory processing argued against a phonics based instructional approach for reading (Parent Ex. 18 at p. 9). A private speech and hearing evaluation was conducted in March 2002 and included an extensive battery of formal and informal assessments, including the Test of Language Competence–Expanded Edition: Level Two (TLC-2), the EOWPVT-R and the CELF 3 (Parent Ex. 16 at pp. 1, 4). The student exhibited significant weaknesses in language, including in his auditory comprehension of paragraphs, word retrieval, sentence formulation, and speech flow (Parent Ex. 16 at p. 2). The evaluator recommended that the student receive individual or small group speech-language therapy, as well as a central auditory processing evaluation (CAPE), following completion of an audiological evaluation (Parent Ex. 16 at p. 3).

For the 2003-04 school year, when petitioners' son was in the seventh grade, respondent's CSE recommended that the student's placement be changed from regular education academic classes to "departmentalized" special classes with a student to staff ratio of 15:1+1 (Parent Ex. 24 at pp. 1, 3; Parent Ex. 27 at p. 3; Tr. p. 509). Respondent's CSE continued to recommend individual summer reading instruction for the student after the sixth and seventh grades (Parent Ex. 24 at p. 3; Parent Ex. 25 at p. 2; Parent Ex. 27 at p. 3).

Respondent conducted a reevaluation of the student in March 2004 when he was 12 years old and in the seventh grade. Respondent's school psychologist administered the Woodcock Johnson III Tests of Cognitive Abilities (WJ-III COG) to assess the student's cognitive functioning and the Behavior Assessment System for Children (BASC) to assess his social and emotional functioning (Parent Ex. 29 at pp. 2, 4). Cognitive testing yielded a general intellectual ability (GIA) IQ score of 85 (16th percentile), indicating low average intellectual abilities, a verbal ability score of 93 (32nd percentile), a thinking ability score of 88 (21st percentile), and a cognitive efficiency score of 78 (7th percentile) (Parent Ex. 29 at p. 2). The student achieved standard (and percentile) subtest scores of 70 (9) in auditory processing, 83 (12) in phonemic awareness, 75 (5) in processing speed, and 87 (19) in short-term memory (Parent Ex. 29 at pp. 3-4). The student was administered the BASC self-report, his mother completed the BASC-Parent Form, and the student's special education teacher completed the BASC-Teacher Form (Parent Ex. 29 at p. 4). The student scored in the average to low range on all composites and scales, which did not indicate any concerns. The special education teacher's responses on the BASC-Teacher Form placed the student in the "at risk" range in anxiety, and the student's mother's responses on the BASC-Parent Form placed the student in the "at risk" range in hyperactivity,

3

anxiety, depression, attention problems, social skills, and leadership skills, and in the clinically significant range in withdrawal (Parent Ex. 29 at p. 5). The evaluator recommended a variety of program modifications to be considered by respondent's CSE when developing the student's IEP for the 2004-05 school year (Parent Ex. 29 at p. 5).

Respondent administered the Woodcock-Johnson III Tests of Achievement (WJ-III ACH) to the student in March 2004 (see Parent Ex. 30). This testing indicated low average abilities in reading (broad reading SS 85), average abilities in mathematics (broad math SS 102), and low skills in written language (broad written language SS 77) (Parent Ex. 30; Parent Ex. 31 at p. 2). The student achieved standard (and percentile) subtest scores of 90 (24) in letter-word identification, 76 (5) in reading fluency, 83 (13) in math fluency, 67 (1) in spelling, and 82 (11) in writing fluency (Parent Ex. 30).

Respondent's CSE met on March 29, 2004 for the student's annual review and to develop his IEP for the 2004-05 school year when he would be in the eighth grade (Parent Ex. 32 at p. 1). Due to the student's physical and learning disabilities, the CSE changed his classification from "other health impairment" (Parent Ex. 24 at p. 1) to "multiple disabilities" (Parent Ex. 32 at p. 4). Respondent's CSE recommended that for the 2004-05 school year the student continue to participate in a 15:1 departmentalized special class for English, social studies, and science; participate in a regular education class for math; receive resource room services daily in a group of 5:1; and receive speech-language therapy in a small group two times per six day cycle (Parent Ex. 32 at p. 4). The CSE also recommended an extended school year tutoring program "due to historical regression during the summer months" (Parent Ex. 32 at pp. 1, 2).

By letter dated April 20, 2004, petitioners requested a CSE meeting to discuss extended school year services and additional reading services, as well as an auditory training device, for the student (Parent Ex. 33). Respondent's CSE reconvened on June 8, 2004 and amended the student's 2004-05 IEP to include extended school year services consisting of three hours per week of individual reading instruction for summer 2004 (Tr. pp. 182-83; Parent Ex. 32 at p. 4). The CSE also recommended the use of an auditory trainer and amended the IEP to recommend a special class for math instead of math in the regular education environment as recommended by the March 29, 2004 CSE (Tr. pp. 215-16; Parent Ex. 32 at p. 4).

On January 3, 2005, the student's special education teacher administered the WJ-III ACH to the student (Parent Ex. 34). This testing revealed low abilities in reading (broad reading SS 74), average abilities in mathematics (broad math SS 96), and low average skills in written language (broad written language SS 86) (id.). The student achieved standard (and percentile) subtest scores of 68 (2) in letter word identification, 77 (6) in reading fluency, 80 (9) in math fluency, and 75 (5) in spelling (Parent Ex. 34). On January 10, 2005, the student was administered the eighth grade New York State English Language Arts (ELA) test (Parent Ex. 37). The student achieved a reading performance score of 687 (range 658-696) which placed him in level two, indicating that he demonstrated partial understanding of intermediate level written and oral text (Parent Ex. 37 at p. 2).

Respondent's CSE convened on March 8, 2005 for the student's annual review and to develop his IEP for the 2005-06 school year, when he would be in the ninth grade (Parent Ex. 35

4

at p. 1). Respondent's CSE recommended that for the 2005-06 school year the student continue in a 15:1 departmentalized special class for English and social studies, receive direct consultant teacher services in a regular education classroom for math and science three times per week, receive resource room services daily in a group of 5:1, receive speech-language therapy in a small group two times per six day cycle, and also receive extended school year services consisting of three hours per week of individual reading instruction for summer 2005 (Parent Ex. 35 at p. 4). The March 8, 2005 CSE also recommended goals and short-term objectives/benchmarks in reading comprehension; written language skills; mathematics reasoning, concepts, and computation; and speech-language (Parent Ex. 35 at p. 4).

At the end of the March 8, 2005 CSE meeting, because of the student's mother's concern about reading, the CSE chairperson advised her that respondent was considering developing a reading program for the high school that the student would be able to attend (Tr. pp. 693-95, 697). Ultimately, respondent advised petitioners that the high school would not have a reading program for their son (Tr. p. 698).

On May 10, 2005, the student was administered the eighth grade New York State Mathematics test (Parent Ex. 40). He achieved a mathematics performance score of 725 (range 716-759) which placed him in level three, indicating that he demonstrated proficiency (Parent Ex. 40 at p. 2). In June 2005 the student was administered the eighth grade New York State Social Studies test (Parent Ex. 38). He achieved a performance score of 60 (range 44-64) which placed him in level two, indicating that he did not fully meet the intermediate social studies learning standards (Parent Ex. 38 at p. 2). The student was also administered the eighth grade New York State Science test in June 2005 and achieved a performance score of 79 (range 65-84) which placed the student in level three, indicating that he met the intermediate science learning standards (Parent Ex. 39 at p. 2). The student's final report card for eighth grade showed grades in the high 80s and 90s in all of his eighth grade classes (Parent Ex. 51).

By letter dated August 15, 2005, petitioners advised respondent that they rejected the March 2005 IEP for the 2005-06 school year because they did not believe it was appropriate for their son, that they intended to enroll their son in Kildonan for the 2005-06 school year, and that they would seek reimbursement from respondent for tuition and related expenses if he demonstrated educational progress there (Parent Ex. 41). In August, petitioners' son was privately evaluated after Kildonan indicated that more current information was needed (Tr. pp. 757-58; see Parent Ex. 42).

In response to petitioners' August 15, 2005 letter, by letter dated August 26, 2005 respondent scheduled a CSE meeting for August 31, 2005 (Tr. p. 710; Parent Ex. 44). Petitioners requested postponement of the meeting because their lawyer was not able to attend and asked the CSE for "preferably three weeks" advance notice of the rescheduled meeting date (Tr. p. 711; Parent Ex. 45). Respondent's CSE convened on August 31, 2005 without the student's parents in attendance (Parent Ex. 47 at p. 1; Tr. pp. 27-28, 711-712). Meeting minutes indicate that respondent's CSE chairperson contacted the student's mother by phone during the meeting; however, she declined to participate (Tr. p. 712; Parent Ex. 47 at pp. 4, 6). The CSE amended the student's IEP resulting from the March 29, 2006 CSE meeting to include an individualized reading program provided by a direct consultant teacher daily in a group of five to

5

one (Parent Ex. 47 at pp. 1, 4, 6), expanded the student's reading goals to include a decoding goal with two corresponding short-term objective/benchmarks, and added two short-term objectives/benchmarks to the student's existing reading comprehension goal (see Parent Ex. 47 at p. 5; Tr. pp. 85-86, 88-89). The CSE also recommended that the student receive an assistive technology evaluation (Parent Ex. 47 at p. 5). At the end of October or early November 2005, respondent provided petitioners with a copy of the IEP resulting from the August 31, 2005 meeting (Tr. pp. 716-17; Parent Ex. 59).

By letter from their attorney dated January 31, 2006, petitioners requested an impartial hearing and requested tuition reimbursement at Kildonan for the 2005-06 school year, reimbursement for the cost of the August 2005 private evaluation (Parent Ex. 42), and "compensatory education for failure to provide an appropriate education for [the student] from February 2004 through June 2004 and for the 2004-05 school year" (IHO Ex. 1 at p. 1).

By letter dated April 4, 2006, respondent, by its attorney, requested that the impartial hearing officer dismiss petitioners' claims relating to the 2003-04 and 2004-05 school years on the bases that those claims were barred by the statute of limitations or failed to state a cause of action (IHO Ex. 3). The impartial hearing officer rendered an interim decision dated April 17, 2006 and denied respondent's requests (IHO Ex. 6).

The impartial hearing officer heard sworn testimony on April 26, May 8, May 22, June 1, June 2, June 5, and July 5, 2006. During the impartial hearing petitioners advised the impartial hearing officer that their "compensatory education" requests relating to the February 2004 through June 2004 time period and for the 2004-05 school year were for "additional services" (see Tr. pp. 980-81). The impartial hearing officer rendered a decision dated September 26, 2006. With respect to petitioners' request for tuition reimbursement for the 2005-06 school year at Kildonan, the impartial hearing officer concluded that the relevant IEP was the March 8, 2005 IEP, which was "the [one] that had been provided to [petitioners] as of the time that they enrolled [the student] at Kildonan" (IHO Decision, p. 13). This was the position taken by petitioners at the hearing, which was not disputed by respondent (see IHO Ex. 13 at p. 21, IHO Ex. 14 at pp. 14-20).

The impartial hearing officer reviewed the IEP resulting from the March 8, 2005 CSE meeting and concluded that it denied the student a free appropriate public education (FAPE).[1] The impartial hearing officer found that the failure of the IEP to address decoding, reading fluency and spelling delays/deficits rendered it "substantively insufficient" and that the failure to adequately address the student's special education needs in those areas constituted a denial of a FAPE (id.).

The impartial hearing officer also found that petitioners did not meet their burden to show that Kildonan was an appropriate placement for the 2005-06 school year (IHO Decision, pp. 16-21). The impartial hearing officer styled petitioners' requests for additional services as "claims for compensatory education/services." She determined that petitioners' compensatory education/services claim for the February through June 2004 period was time barred (IHO Decision, p. 23). She concluded that petitioners' claim for the 2004-05 school year, which was based on objections relating to the IEP resulting from the March 29, 2004 CSE meeting, was not

6

barred by the statute of limitations (id.). The impartial hearing officer denied petitioners' request for compensatory education/services for the 2004-05 school year. She also concluded that petitioners were not entitled to reimbursement for the cost of the August 2005 private neuropsychological evaluation.

Petitioners appeal the impartial hearing officer's conclusion that Kildonan was not an appropriate placement for their son for the 2005-06 school year. Petitioners also appeal the impartial hearing officer's decision denying their request for additional compensatory services with respect to the 2004-05 school year. Respondent cross-appeals from the impartial hearing officer's determination that the IEP resulting from the March 8, 2005 CSE meeting was inadequate and resulted in a denial of a FAPE to petitioners' son.[2]

Petitioners request tuition reimbursement for their son's tuition costs at Kildonan for the 2005-06 school year. The central purpose of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1487) is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; Schaffer v. Weast, 126 S. Ct. 528, 531 [2005]); Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]).[3] A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a written IEP (20 U.S.C. § 1401[8][D]; 34 C.F.R. § 300.17; see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.320).[4] "The core of the statute" is the collaborative process between parents and schools, primarily through the IEP process (see Schaffer, 126 S. Ct. at 532). A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parent's claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). In Burlington, the court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (Burlington, 471 U.S. at 370-71). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP" (Burlington, 471 U.S. at 370-71; Application of a Child with a Disability, Appeal No. 06-121; see 20 U.S.C. § 1412[a][10][C][ii]).

The first step is to determine whether the district offered to provide a FAPE to the student (see Mrs. C v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]). A FAPE is offered to a student when (a) the board of education complied with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 207 [1982]; Cerra, 427 F.3d at 192). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]). A denial of a FAPE occurs when procedural inadequacies either result in a loss of educational opportunity for the student, or seriously infringe on the parents' opportunity to participate in the IEP formulation process (see Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 [S.D.N.Y. 2005]; W.A. v. Pascarella, 153

7

F. Supp. 2d 144, 153 [D. Conn. 2001]; Briere v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242, 1255 [D. Vt. 1996]), or compromise the development of an appropriate IEP in a way that deprives the student of educational benefits under that IEP (see Arlington Cent. Sch. Dist. v. D.K., 2002 WL 31521158 [S.D.N.Y. 2002]). The Second Circuit has determined that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]), in other words, is likely to provide some "meaningful" benefit (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]). The IDEA, however, does not require school districts to develop IEPs that maximize the potential of a student with a disability (Rowley, 458 U.S. at 197 n.21, 199; see Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. § 300.550[b]; 8 NYCRR 200.6[a][1]; Walczak, 142 F. 3d at 122). The burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer, 126 S. Ct. at 536-37 [finding it improper to assume that every IEP is invalid until the school district demonstrates that it is not]).

An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (Application of the Bd. of Educ., Appeal No. 06-076; Application of a Child with a Disability, Appeal No. 06-059; Application of the Bd. of Educ., Appeal No. 06-029).

I will initially address respondent's cross-appeal. I find that the student's IEP for the 2005-06 school year insufficiently addressed the student's needs and thus did not offer petitioners' son a FAPE for the 2005-06 school year. At the time of the March 8, 2005 CSE meeting the IDEA (20 U.S.C. § 1414[d][1][A][ii]) and its applicable federal and related state regulations (34 C.F.R. § 300.347[a][2]; 8 NYCRR § 200.4[d][3]) provided that a student's IEP "list measurable annual goals," "consistent with the student's needs and abilities," and that such "goals, including benchmarks or short-term objectives relate to the student's needs resulting from his disability."[5]

The student's scores on the WJ-III ACH in January 2005 yielded a broad reading standard score of 74, indicating that the student's reading abilities were in the low range (Parent Ex. 35 at p. 4; Parent Ex. 31 at p. 2). In the January 2005 administration of the WJ-III ACH, the student achieved a standard score of 68 (very low range) in the letter-word identification subtest (Parent Ex. 34). Further, the student received standard scores of 77 in reading fluency and 75 in spelling in the January 2005 administration of the WJ-III ACH tests, both in the low range, which also reflected significant deficit areas (Parent Ex. 26; Parent Ex. 31 at p. 2). The March 8, 2005 CSE concluded that the student displayed academic deficits in reading, specifically in decoding and fluency (Parent Ex. 35 at p. 4). The CSE also concluded that the student's deficits in the language area "continue to impact academic progress, particularly in reading and written expression" (id.).

The impartial hearing officer concluded that the goals on the IEP were inadequate because they did not address the student's reading decoding, reading fluency, and spelling deficits (IHO Decision, p. 16). In light of the student's reading decoding, reading fluency, and spelling scores and the significant deficit areas that they represent, I concur with the impartial hearing officer that the student's IEP for the 2005-06 school year should have included goals and objectives in the areas of reading decoding and fluency and spelling. I also concur with the impartial hearing officer and find that the IEP developed for the 2005-06 school year is inadequate, was not reasonably calculated to enable the student to receive educational benefits, and did not offer petitioners' son a FAPE (Application of the Bd. of Educ., Appeal No. 06-108; Application of a Child with a Disability, Appeal No. 06-005; Application of a Child with a Disability, Appeal No. 05-057). Petitioners have, therefore, prevailed with respect to the first Burlington criterion.

I must now consider whether petitioners have met their burden of demonstrating that the placement selected for their son at Kildonan for the 2005-06 school year was appropriate to meet their son's special education needs (Burlington, 471 U.S. 359; Frank G., 459 F.3d at 363). In order to meet that burden, the parent must show that the services provided were "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., that "the private education services obtained by the parents were appropriate to the child's needs" (Walczak, 142 F.3d at 129; see Frank G., 459 F.3d at 363; Cerra, 427 F.3d at 192). "A private placement need not provide certified special education teachers or an IEP for the disabled student" (Frank G., 459 F.3d at 364). In addition, parents are not held as strictly to the standard of placement in the LRE as school districts are; however, the restrictiveness of the parental placement may be considered in determining whether the parents are entitled to an award of tuition reimbursement (Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21 [1st Cir. 2002]; M.S., 231 F.3d at 105; see Frank G., 459 F.3d at 364).

The impartial hearing officer concluded that Kildonan was "not appropriately addressing [the student's] expressive and receptive language needs or taking his auditory processing disorder into account in the implementation of his educational program" (IHO Decision, p. 18). Further, the impartial hearing officer concluded that "the Kildonan program did not address [the student's] need for reading instruction in content area classes or his deficits in the area of reading and understanding the content of material in those classes" (IHO Decision, p. 20). With respect to the student's speech and language needs and auditory processing needs, the impartial hearing officer stated "in this instance the program failed to address core components of [the student's] disability and special education needs. . .," thereby rendering it inappropriate (IHO Decision, p. 17).

I concur with the impartial hearing officer's conclusion and find that petitioners have not demonstrated that Kildonan was an appropriate placement for their son for the 2005-06 school year. I find that petitioners did not demonstrate that Kildonan addressed their son's special education needs related to his auditory processing disorder or his combined expressive-receptive language disorder and did not show that the school addressed either the student's need for reading instruction in content area classes or his deficits in reading and understanding of the content of material in those classes.

9

The student has a diagnosed seizure disorder, "severe delays in receptive and expressive language," and significant weaknesses in his auditory processing and memory abilities that affect his reading, communication, and written expression (Parent Ex. 6 at p. 5; Parent Ex. 7 at p. 1; Parent Ex. 14; Parent Ex. 18 at pp. 6, 7, 8). Petitioners have failed to show how Kildonan specifically addressed these needs. I note that none of the student's teachers or instructors at Kildonan testified, and the information about how the student's needs were specifically addressed at Kildonan was limited. Petitioners argue that the Kildonan dean testified that the speech and language objectives identified on the student's 2005-06 IEP are being addressed at Kildonan (Tr. pp. 371-73). The record does not support petitioners' argument.

The Kildonan dean testified that Kildonan meets the student's speech-language needs by addressing the goals and short-term objectives identified on the March 8, 2005 IEP (Tr. p. 371). The Kildonan dean testified that auditory recall strategies were explicitly taught in subject matter classes by teaching the students "how to discern what's the most important piece of information in a statement or in a discussion" (Tr. pp. 371-72). However, the witness did not describe which specific auditory recall strategies were taught to petitioners' son or how Kildonan's content area teachers taught these strategies. He further testified in reference to the student's speech-language goal that "conclusions and main ideas fit very well with written comprehension" and are addressed "not only in the language training tutorial but also in the subject matter classes," without further explanation (Tr. p. 372). Similarly as noted above, the witness did not describe how this need is addressed.

In reference to the student's need to understand and use vocabulary related to content area curricula, although the Kildonan dean testified that vocabulary was addressed directly in the language training tutorial, when asked whether any of the content area vocabulary used by the student was incorporated into the language training tutorial, he testified, "I can't say for sure one way or the other" (Tr. pp. 373, 403). The dean further testified that the language training tutors at Kildonan provided direct reading and writing instruction using the Orton-Gillingham methodology only in the language training tutorials and did not support the students in content area classes (Tr. p. 402). He testified that the student's individual language training tutor had worked with the student on cursive writing; solidifying his foundation of phonemes and graphemes; the five basic kinds of syllables; reading comprehension; spelling; grammar; and organization of expository writing (Tr. pp. 358-60). I also note that progress reports written by the student's individual language training tutor during the 2005-06 school year do not reflect that the student worked on content area vocabulary during individual language training tutorials (Parent Ex. 55 at p. 7; Parent Ex. 57 at p. 2; Parent Ex. 72 at p. 2).

I am not persuaded by the record that the student's significant speech and language needs were being met at Kildonan by addressing the short-term objectives in his IEP.

Although petitioners dispute the impartial hearing officer's conclusion that instruction in the content area classes primarily involves teachers reading to the student and argue that the impartial hearing officer's decision "repeatedly misstates and mischaracterizes" the testimony of the Kildonan dean, the record demonstrates otherwise. Testifying about Kildonan's philosophy and curriculum, the Kildonan dean stated that the curriculum at Kildonan was designed "to not include too many independent reading and writing requirements" (Tr. p. 334). When asked

10

about the advantages of educating students with learning disabilities in a segregated setting, he responded, "our students know they are not going to be required to read in class" (Tr. pp. 346-47). The dean further testified, "[the students] are not required to read in class," clarifying that "oftentimes students will volunteer to read," but because students are at different reading levels in the content area classes the teacher does a significant amount of the reading while the students follow along in their copy of the text (Tr. pp. 348, 389). The record further reveals that the students are primarily read to by the teacher in math and science classes as well, and when specifically asked by the impartial hearing officer whether content area class material is read to the students, the Kildonan dean responded, "[p]rimarily most of the instruction, any reading that's done in class is done primarily by the teacher while the students follow along in their copy of the text" (Tr. pp. 390, 420).

The student's significant auditory processing deficits limit his ability to follow verbal directions and/or absorb verbally-presented instructions. It is undisputed that the Kildonan content area teachers provide instruction to the student by reading aloud (Tr. pp. 334, 346-48, 389-90, 420, 427). While these teachers supplement this strategy with strategies employing other modalities, such as "hands on applied project based stuff," no specific information about the strategies that would employ multisensory methods more suitable for a student whose disabilities interfere with instruction through auditory input, other than an "Elmo" projector and video clips, was provided (Tr. pp. 428-29).

I concur with the impartial hearing officer that petitioners did not demonstrate that placement of their son at Kildonan for the 2005-06 school year was appropriate and did not demonstrate that this "placement was reasonably calculated to enable the child to receive educational benefit" (Frank G., 459 F.3d at 364 [citations omitted]; see Application of a Child with a Disability, Appeal No. 06-030; Application of the Bd. of Educ., Appeal No. 05-094). As set forth above, petitioners did not demonstrate how Kildonan addressed their son's special education needs related to his significant auditory processing disorder, his combined expressive-receptive language disorder, his need for reading instruction in content area classes, or his deficits in reading and understanding of the content of material in those classes.

Accordingly, based on my review of the record, I concur with the impartial hearing officer and find that petitioners have not met their burden of proving that Kildonan was an appropriate placement for their son for the 2005-06 school year. Therefore, the necessary inquiry with respect to petitioners' tuition reimbursement claim for the 2005-06 school year is at an end and there is no need to determine whether equitable considerations support that claim (M.C., 226 F.3d at 66; Walczak, 142 F.3d at 134; Application of the Bd. of Educ., Appeal No. 06-030; Application of the Bd. of Educ., Appeal No. 05-118; Application of a Child with a Disability, Appeal No. 03-058).

I will now consider petitioners' request for additional services with respect to the 2004-05 school year. Compensatory education is instruction provided to a student after he or she is no longer eligible because of age or graduation to receive instruction. It may be awarded if there has been a gross violation of the IDEA resulting in the denial of, or exclusion from, educational services for a substantial period of time (Mrs. C. v. Wheaton, 916 F.2d 69 [2d Cir. 1990]; Burr v. Ambach, 863 F.2d 1071 [2d Cir. 1988]). State Review Officers have awarded equitable relief in

the form of additional educational services to students who remain eligible to attend school and have been denied appropriate services, if such deprivation of instruction could be remedied through the provision of additional services before the student becomes ineligible for instruction by reason of age or graduation (Application of a Child with a Disability, Appeal No. 02-042; Application of a Child with a Disability, Appeal No. 02-030). In general, the award of additional educational services, for a student who is still eligible for instruction, requires a finding that the student has been denied a FAPE (Application of the Bd. of Educ., Appeal No. 04-085; Application of the Bd. of Educ., Appeal No. 02-047).

As outlined below, I find that the IEP for the 2004-05 school year was reasonably calculated to enable the student to receive educational benefit and offered petitioners' son a FAPE. Accordingly, I find that petitioners have not demonstrated that respondent should provide their son with additional educational services.

More specifically, the program offered by respondent to petitioners' son for the 2004-05 school year was appropriate. I note that the CSE first met on March 29, 2004 to develop an IEP (Parent Ex. 32 at p. 4). The CSE met again at petitioners' request on June 8, 2004 to amend the earlier IEP (Parent Ex. 32 at p. 4). The amended IEP resulting from the June 8, 2004 meeting superseded the March 29, 2004 IEP and set forth the student's program for the 2004-05 school year (Tr. pp. 214-15). There is no showing that any procedural error resulted in the loss of educational opportunity, seriously infringed on petitioners' opportunity to participate in the IEP formulation process, or compromised the development of an appropriate IEP in a way that deprived their son of educational benefits under that IEP. The IEP for the 2004-05 school year (see Parent Ex. 32) was reasonably calculated to enable the student to receive educational benefit. It was based on the results of evaluations including an educational evaluation, a parent report and observations, a psychological evaluation, medical health records, and a social history update (Parent Ex. 32 at p. 4). At its March 29, 2004 meeting, the CSE reviewed the results of relevant evaluations including the results of recent cognitive tests given to the student, his progress during the 2003-04 school year to that date, and achievement test results (id.). These evaluations properly identified the student's individual needs. The IEP, when considered in combination with the underlying evaluations that were used and discussed at the CSE meeting properly described the student's needs. The IEP noted that the student's language deficits "continued to affect his academic progress in reading and written expression" and provided information about the student's abilities, the level of his academic skills, and his performance in school during the 2003-04 school year. The IEP contained individualized annual goals and short-term instructional objectives related to the student's particular needs in reading comprehension, written expression, mathematics problem-solving skills, and receptive and expressive language skills (Parent Ex. 32 at pp. 4-6).

The IEP provided for appropriate special education services for petitioners' son and adequately addressed his deficits in reading. The services included small "departmentalized" special education classes for English, Social Studies, Science and Math with a student to staff ratio of 15:1; daily resource room services in a group of five; speech-language therapy in a small group two times during every six day cycle (Parent Ex. 32 at pp. 1, 2, 3, 4; Tr. p. 229). This program was individually designed to address the student's particular needs (Tr. pp. 166, 169, 187-88, 216). The resource room program was recommended "to focus on reading and writing

skills" (Parent Ex. 32 at p. 4; see also Tr. p. 213) and the resource room teacher, who was to provide the student with additional support with reading in the recommended resource room program, was "a very seasoned teacher who was trained in multisensory reading" (Tr. pp. 172, 213). Because of "historical regression during the summer months," the IEP also provided for an extended school year tutoring program during the summer which included 3 hours of private reading instruction during the summer (Parent Ex. 32 at pp. 1, 4; Tr. pp. 182-83). The IEP also provided for the use of an auditory trainer, which would assist the student in focusing, and address his auditory processing needs (Tr. pp. 166, 168; Parent Ex. 32 at p. 4). The IEP also included appropriate program modifications relating to the student's individual needs including preferential seating, reteaching of materials, checking for understanding, use of a multisensory approach to reading activities, modified homework assignments, large print materials, and an additional set of books (Parent Ex. 32 at p. 2). The record indicates that the CSE increased modifications from the previous year (Tr. pp. 222-23). The record shows that the CSE provided an open forum to listen to petitioners' concerns and the CSE amended the IEP in relevant part to address concerns raised by the student's mother (see Parent Ex. 32 at p. 4; Parent Ex. 33).

Petitioners assert that the 2004-05 IEP contained "admittedly false" scores in broad reading, broad math, and broad written language, and that therefore the IEP is not based upon appropriate evaluative information. While the student's mother stated at the hearing that she was not sure about the fact of this error until her attorney requested the records for the hearing (Tr. p. 763), she also testified that during the March 2004 CSE meeting she was advised that one or more of the scores were wrong and that "they corrected it in the meeting" (Tr. p. 647). In light of this testimony, the record does not show that the student's IEP for the 2004-05 school year was developed based on erroneous information. The record does not indicate that petitioners requested a further CSE meeting to specifically discuss these scores. I also note that the student's special education teacher who administered the WJ-III ACH was in attendance at the March 29, 2004 CSE meeting and that the CSE minutes reflect that the educational evaluation of March 15, 2004 was considered in developing the student's proposed program for the 2004-05 school year (Parent Ex. 32 at p. 4; see Parent Ex. 30). Further, the tutor who historically provided individual reading instruction to the student during the extended school year also attended the March 2004 CSE meeting (see Parent Ex. 32 at p. 4). Respondent's CSE chairperson of the March and June CSE meetings testified that "each person who does their evaluation present (sic) their finding on the testing that was done" (Tr. p. 176). I find that petitioners have not shown that respondent's CSE had insufficient current evaluative information upon which to base the student's IEP for the 2004-05 school year.

I have reviewed the IEP in light of petitioners' claim that it does not adequately set out the student's academic abilities and needs with respect to the student's reading deficits and spelling and writing needs. The IEP contains narrative information relative to these areas and the CSE had before it the results of relevant achievement tests (Parent Ex. 32 at pp. 1, 2, 4; Parent Ex. 30). I find that petitioners have not demonstrated that their son was not provided a FAPE on this basis.

Petitioners also argue that the goals and objectives on the student's 2004-05 IEP failed to address the student's needs in decoding, fluency, and spelling and that the program recommended in the 2004-05 IEP was "markedly deficient" because it did not recommend a daily,

13

individualized, multisensory reading program. The record reveals that the student achieved subtest standard scores of 90 (low average) in letter-word identification, 76 (low range) in reading fluency, and 67 (low range) in spelling on the WJ-III ACH (Parent Ex. 30; Parent Ex. 31 at p. 2). The student's IEP contained goals and corresponding objectives related to both reading and written expression (Parent Ex. 32 at pp. 4-5). I note that short-term objectives developed for the student include an objective related to reading "a paragraph or story with appropriate expression and fluency," as well as a short-term objective related to the student demonstrating the ability to "independently proofread and correct his written work by revising, editing, and rewriting" (Parent Ex. 32 at p. 4). Further, in light of the student's letter-word identification achievement test score and the information available to the CSE with respect to the student's progress in his educational and subject program for the 2003-04 school year, contrary to petitioners' claim the student's IEP was not required to include goals and objectives relating to decoding. I find that the goals and objectives set forth in the 2004-05 IEP adequately addressed the student's identified needs.

I concur with the impartial hearing officer that the student did not require a daily 1:1 multisensory reading program during the 2004-05 school year in order to have received appropriate services and ensure a FAPE (see IHO Decision, p. 23). Respondent's CSE chairperson from the middle school, who had been one of the student's teachers during the 2004-05 school year, testified that respondent provided the student with individual reading and language instruction during the extended school year; however, this was not recommended for the regular school year because the student was receiving speech-language services, special class, and resource room daily to address his reading needs (Tr. pp. 312-14). The record reflects that the student's resource room teacher during the 2004-05 school year was "very seasoned" and was trained in multisensory reading instruction (Tr. p. 172). Consistent with the 2004-05 IEP, the student's resource room teacher for that school year testified that her resource room responsibilities for that school year were to support the student's reading in his academic areas and to help him to improve his reading skills (Tr. p. 238). Consistent with the IEP for that school year, she worked with the student individually several times a week for oral reading and in a group for vocabulary, sentence structure, free writing, and reading (Tr. pp. 238-39, 241). She also provided the students with "words of the day," which included instruction and work relating to oral reading (Tr. p. 239). I note also that petitioners' private evaluator testified that the recommended program for the school year was "insufficient," not because it was not appropriate but because he felt that it was not an "optimal" setting (Tr. pp. 565, 605). This is not the relevant standard (see Rowley, 458 U.S. at 197 n.21, 199; see Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132; see also Application of a Child with a Disability, Appeal No. 06-118; Application of a Child with a Disability, Appeal No. 03-084).

Lastly, I note that the record indicates that the student would benefit from a central auditory processing evaluation (CAPE) and that such an evaluation has not yet been done (see Parent Ex. 16 at p. 3). Accordingly, I encourage respondent's CSE to obtain a CAPE with respect to petitioners' son and to make any appropriate recommendations with respect to the student's instruction and programming for use in the development of his next IEP.

I have considered petitioners' other arguments and find them unpersuasive.

14

THE APPEAL IS DISMISSED.

THE CROSS-APPEAL IS DISMISSED.

Dated: Albany, New York
       December 22, 2006

PAUL F. KELLY
STATE REVIEW OFFICER

---

[1] The term "free appropriate public education" means special education and related services that -
   (A) have been provided at public expense, under public supervision and direction, and without charge;
   (B) meet the standards of the State educational agency;
   (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
   (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
20 U.S.C. § 1401[8].

[2] There is no appeal from the impartial hearing officer's finding regarding the application of the statute of limitations and that finding is therefore final and binding and I do not reach its propriety (Application of a Child with a Disability, Appeal No. 03-108; Application of a Child with a Disability, Appeal No. 02-100; Application of a Child with a Disability, Appeal No. 02-073). I note, however, that the relevant statue of limitations for the filing of a request for an administrative due process hearing is the statute of limitations in effect at the time the underlying claim accrued (Application of a Child with a Disability, Appeal No. 06-083).

[3] On December 3, 2004, Congress amended the IDEA; however, the amendments did not take effect until July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004 [IDEA 2004], Pub. L. No. 108-446, 118 Stat. 2647). The relevant events at issue in the instant appeal took place prior to the effective date of the 2004 amendments to the IDEA. Therefore, the provisions of the IDEA 2004 do not apply and citations contained in this decision are to the statute as it existed prior to the 2004 amendments.

[4] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006. In this case, none of the new provisions contained in the amended regulations are applicable because all relevant events occurred prior to the effective date of the new regulations. However, for convenience, and unless otherwise specified, citations herein refer to the regulations as amended because the regulations have been reorganized and renumbered.

[5] Similar provisions of law relating to the need for relevant goals are currently found at 20 U.S.C. § 1414(d)(1)(A)(i)(II), 34 C.F.R. § 300.320(a)(2) and 8 NYCRR 200.4(d)(2)(iii)(a).