UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                 :

R.C. and M.B., on behalf of their       :
minor child, N.C.,                     :
                                 :

                Plaintiffs,      :    07 CIV 2806 (KMK)(MDF)
                                 :

                                 :    REPORT AND RECOMMENDATION
  -against-                     :
                                 :

BOARD OF EDUCATION OF THE HYDE    :
PARK CENTRAL SCHOOL DISTRICT,     :
                                 :
                Defendant.     :
-------------------------------------------------------------X
TO: THE HONORABLE KENNETH M. KARAS, U.S.D.J.

       N.C., a child with a disability, by his parents ("Plaintiffs"), commenced this action

pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*.,

seeking to overturn the decision of the State Review Officer (the "SRO") denying their request

for reimbursement of the cost of N.C.'s tuition and expenses at the Kildonan School for the

2005-2006 school year, and to be awarded additional educational services based on the Hyde

Park Central School District's (the "District") alleged failure to provide an appropriate education

during the 2004-2005 school year.

       Plaintiffs have moved for summary judgment (Docket No. 8).  In response, the District

cross-moved for summary judgement (Docket No. 13), seeking dismissal of Plaintiffs' complaint

and reversal of the SRO's determination that the 2005-2006 Individualized Education Program

("IEP") designed by the District for N.C. was inappropriate.

## BACKGROUND

### Hyde Park Central School District

In June 1999, N.C., a second grader at the time, was referred to the District's Committee on Special Education ("CSE" or "Committee") by his mother due to concern for both his academic progress – his reading and language abilities, in particular – and the effect that scar tissue formations on his brain would have on his learning ability.  N.C.'s mother learned of these scar tissue formations from N.C.'s neurologist, who recommend that he be given comprehensive educational testing.  *See* Administrative Record, Parent's Ex. 2.  On January 28, 2000, the Committee determined that based on his initial evaluation, N.C. met the criterion to be classified as "Other Health Impaired" – that is, N.C. would require a special education program, which included direct consultant teacher services (5:1 student/teacher ratio) for language arts and math, as well as speech and language therapy.  At this time, the Committee also noted that N.C. had been diagnosed with a seizure disorder and prescribed Depakote and Tegretol to treat his condition.  Parent's Ex. 7, Committee Minutes.

On April 4, 2001, after an annual review, the Committee determined that N.C.'s needs would continue to require special education support – for less than 20 percent of the school day – in the form of a group resource room for three hours per week, direct consultant teacher services for two hours per week, and individual occupational therapy for thirty minutes each week. Parent's Ex. 13.

Through a series of neuropsychological evaluations conducted between May and October

2

2002, Andreas Smoller, Ph.D.,[1] found that N.C. had particular problems in the areas of "receptive and expressive language, processing speed, auditory processing, and verbal and visual memory," and that N.C. "exhibit[ed] significant age and grade normed deficits in reading, writing, and spelling." Parent's Ex. 18 at 8. Based on these findings, Dr. Smoller recommended that N.C. be placed in a small class led by a special education teacher skilled in working with children with mnemic and language deficits, and that N.C. be given multiple opportunities for individualized one-on-one tutorial instructions to supplement his core classroom curriculum. Dr. Smoller further recommended that N.C. be grouped with students who have similar educational disabilities, and that he should not be placed in a class of students with "high behavioral management needs." *Id.* Dr. Smoller opined, specifically, that "[a] program such as one run by the Kildonan School in Amenia, New York, would be able to provide [N.C.] with this level of service." *Id.* at 8-9.

N.C. attended the Haviland Middle School from 2002 until 2005. His 2002-2003 IEP stated that N.C.'s needs "require special education support for 21 to 60 percent of the day," and provided that he would receive, every other school day ("3 periods per 6 day cycle"), resource room (5:1 student/teacher ratio) sessions for reading and writing, as well as direct consultation teacher services for math, science and language arts. This IEP also provided for speech/language therapy (5:1 student/teacher ratio) once every three school days for thirty minutes ("2 times per 6 day cycle"). Parent's Ex. 19 at 1, 6.

N.C.'s 2003-2004 IEP provided for a 15:1 student/teacher ratio daily class schedule for

---

[1] N.C. was referred for this evaluation by Joyce Long, the CSE Chairperson. At this time, N.C.'s parents were seeking additional input regarding academic placement options for N.C. Parent's Ex. 18 at 1.

all academic subject and a 5:1 speech/language therapy class once every three school days for forty minutes.  Parent's Ex. 24 at 1.  The CSE also recommended certain modifications and accommodations for N.C., such as extended testing time, recorded answers (for essay tests) and explanation of test directions, as well as preferential seating, reteaching of materials and modified homework assignments.  *Id.*

At the impartial hearing requested by Plaintiffs pursuant to the IDEA and state law, N.C.'s mother testified that her son was unable to complete homework assignments independently during the 2003-2004 school year, N.C.'s seventh grade year.  Tr. at 630.  Due to his frustration, N.C.'s mother testified that N.C. had frequent emotional breakdowns, which apparently led other family members – even N.C.'s younger sister who was in the third grade at the time – to complete N.C.'s homework assignments with little or no input from N.C.  *Id.* at 630-32, 637-38, 645, 670-71, 675-78, 681-83.  N.C.'s report card in seventh grade for the period ended June 24, 2004, which was based, in part, on these homework assignments, shows a final average of 89 in English, 94 in Social Studies, 95 in Math and 90 in Life Science.  Parent's Ex. 51.  A number of N.C.'s teachers also commented that he had excellent class participation, and was pleasure to have in class.  *Id.*

On March 29, 2004, the CSE met to evaluate N.C.'s academic progress and to develop his IEP for the 2004-2005 school year.  Parent's Ex. 32.  At this time, the Committee's characterization of N.C.'s disability was changed from "Other Health Impaired" to "Multiple Disabilities."  *Id.* at 1.  The CSE recommended that N.C. attend mainstream Math classes, but that he continue with special departmentalized classes (15:1) in English, Social Studies and Science, and that he continue speech/language therapy once every three school days for 40

4

minutes. *Id.* at 4. The CSE continued to recommend certain modifications and accommodations, such as extended time and help with directions on tests, preferential seating, reteaching of materials, a multi-sensory approach for reading activities, modified homework assignments, large print materials and an additional set of books. *Id.* at 1-2. The 2004-2005 IEP notes that "[t]he Student's parent agreed with the recommendations as stated." *Id.* at 4.

It appears that the 2004-2005 IEP erroneously reported N.C.'s standardized test scores from March 2004,[2] the Woodcock-Johnson III Tests of Achievement. While standard scores of 104 for Broad Reading and 94 for Broad Written Language were reported in the IEP, the score report for this test shows that N.C. scored 85 in Broad Reading and 77 in Broad Written Language. *Compare id.* at 3 *with* Parent's Ex. 30.[3] N.C.'s mother testified that had she known the scores were reported incorrectly, she "would have been more vehement about the program that they were suggesting as being insufficient." Tr. at 653.

The Committee met again on June 8, 2004 to consider certain requests from N.C.'s mother – specifically, a summer program, a reading program for the fall and an auditory training device. Parent's Exs. 32 at 4, 33. The Committee decided that N.C. would receive three hours of reading instruction from his tutor as previously specified, that a "FM training device" would be provided to assist N.C. with auditory processing, and that N.C.'s reading goals would be addressed during his daily resource service. Parent's Ex. 32 at 4. The IEP also recommended a

---

[2] It also appears that the IEP incorrectly reports the date of this test as March 21, 2004 instead of March 15, 2004. *Compare* Parent's Ex. 32 at 3 *with* Parent's Ex. 30.

[3] N.C.'s printed score for Broad Reading on the March 15, 2004 score report is 85. Without explanation, there is also a 104 written above the 85. *See* Parent's Ex. 30. James Walsh, CSE Chairman, testified that he did not know who wrote this on the report or why the IEP listed inaccurate scores. Tr. at 176-77.

resource room for N.C. to attend over the summer (July 6, 2004 through August 16, 2004), three times each week for one hour.  *Id.* at 1.

N.C.'s eighth grade report card for the period ended June 15, 2005 shows a final average of 89 in English, 88 in Social Studies, 96 in Math and 90 in Physical Science.  Parent's Ex. 51. Plaintiffs submit that these grades do not reflect N.C.'s independent work product because they were based, in many respects, on N.C.'s homework assignments, which were completed by other members of his family.  *See* Tr. at 672-77; 764-66.  Moreover, N.C.'s special education teacher, Mary Cray, testified that N.C.'s academic skills in English and Social Studies were "average" for a special education student.  Tr. at 785.

N.C.'s score on the "Passage Comprehension" section of the Woodcock-Johnson standardized exam – a sentence completion exercise – dropped from the 58th percentile in March 2004 to the 19th percentile in January 2005.  Parent's Exs. 30, 34.  Karen Sullivan, N.C.'s resource room teacher, testified that this was a "significant" drop.  Tr. at 262-63.  During this time, N.C.'s score on the Letter-Word Identification section of this test also fell from the 24th percentile to the 2nd percentile, while his Broad Reading score decreased from the 16th percentile to the 4th percentile.  Parent's Exs. 30, 34.  Bridget Becker, Director of Special Education for the Hyde Park School District, testified that this reading score was indicative of N.C.'s "regression." Tr. at 133-34.  At the same time, N.C.'s "Writing Samples" score increased, from the 38th percentile in March 2004 to the 63rd percentile in January 2005.  Parent's Exs. 30, 34.

On March 8, 2005, the CSE met again to develop N.C.'s IEP for the 2005-2006 school year.  The Committee took note of N.C.'s mother's concern for the decline in her son's standardized scores in reading, and recommended a daily resource room program to support his

reading goals.  The Committee recommended a direct consultant teacher inclusion model every other school day for Math and Science, special (15:1) classes for English and Social Studies, and speech/language therapy (5:1) once every three school days.  The Committee also recommended a summer tutoring program (July 5, 2005 through August 15, 2005) with reading instruction three times weekly for one hour.  Program modifications and accommodations such as preferential seating, reteaching of materials, a multi-sensory approach for reading activities, modified homework assignments, large print materials, an additional set of books and various testing accommodations were also recommended at this time.  Parent's Ex. 35 at 1-2, 4.

In August 2005, N.C.'s parents employed psychologist Henry Goetz, Ph.D., to "determine the nature of [N.C.'s] educationally handicapping condition and to make recommendations regarding needed academic intervention."  Parent's Ex. 42 at 1.  Dr. Goetz found that N.C.'s reading and writing abilities were far below levels predicted by his intelligence, and that despite repeated IEP interventions, N.C. had continued to slip further behind his classmates.  Dr. Goetz recommended that N.C. be considered for placement in a school with expertise in working with severely learning disabled students and individualized instruction, to help him learn up to his potential and achieve basic reading and writing proficiency.  *Id.* at 7.

In a letter dated August 15, 2005, Plaintiffs notified the District that because they found the recommended IEP inappropriate to meet N.C.'s needs, they intended to enroll N.C. at the Kildonan School.  Parent's Exs. 41.  The letter informed the District of Plaintiffs' intention to seek reimbursement of tuition and related expenses for the 2005-2006 school year at Kildonan should N.C. demonstrate educational progress.  *Id.*

On Friday, August 26, 2005, Plaintiffs received a letter from Mr. Walsh inviting them to

meet with the Committee to discuss N.C.'s academic progress on August 31, 2005. Parent's Ex. 44. On Monday, August 29, 2005, Plaintiffs faxed a letter to Mr. Walsh requesting an alternate meeting date because Plaintiffs' attorney was unable to attend the meeting as scheduled. Parent's Ex. 45. On August 31, 2005, during the CSE meeting, Ms. Becker called N.C.'s mother to invite her to participate in the meeting by phone. N.C.'s mother informed Ms. Becker that she did not want to participate in the meeting by phone without her lawyer.[4] Tr. at 34-35, 712. Nevertheless, the District went ahead with the meeting as scheduled. While Ms. Becker did not dispute at the hearing that the District is required, pursuant to the Part 200 Regulations of the Commissioner of Education, to schedule CSE meetings at a mutually agreed upon time and place for parents, she testified that she did not know why this meeting was not rescheduled. Tr. at 37.

Ms. Becker also testified that she was not aware of any issue involving N.C.'s academic program until the District received Plaintiffs' August 15, 2005 letter regarding their decision to enroll N.C. at Kildonan, at which point she wanted to put a CSE meeting together to devise a resolution that would meet N.C.'s needs and please his parents.[5] Tr. at 107-08. At the August 31, 2005 meeting that followed, the CSE recommended that N.C. be given a direct consultant teacher for reading, in a 5:1 setting, to focus on his reading and language needs. Tr. at 49-51. However, Plaintiffs were not provided with the 2005-2006 IEP recommending this direct consultant teacher reading program until after the 2005-2006 school year began. Tr. at 98.

---

[4] The parties apparently dispute whether N.C.'s mother told Ms. Becker that she was specifically advised by counsel not to participate in the meeting. Tr. at 35, 712.

[5] Notably, at the beginning of the 2005-2006 school year, no such reading program existed at Franklin D. Roosevelt High School, the high school N.C. would have attended had he remained a student in the Hyde Park Central School District. Tr. at 202-03.

**The Kildonan School**

In September 2005, N.C. began attending the Kildonan School, a private school in Amenia, New York that was founded in 1969 to serve the needs of dyslexic students of average to above-average intelligence.  Parent's Ex. 61.  All students at Kildonan receive individualized language training tutorials every day that are "Orton-Gillingham in nature" (Tr. at 340) – that is, a multisensory learning process that uses auditory, visual and kinesthetic elements to teach language.  Parent's Ex. 60 at 3.

Dr. Robert Lane, the Academic Dean at Kildonan, testified that a comparison of N.C's test scores from October 2005 and May 2006 reveals that he made good progress in all of the areas in which he was evaluated.  Tr. at 344.  He also testified, though, that N.C. was having difficulty understanding the material in his social studies (or Global Studies) class, particularly in "making connections with concepts between terms and between topics within the term," and that N.C. was quiet in class.  Tr. at 395-398.

**Impartial Hearing**

On January 31, 2006, Plaintiffs requested an impartial hearing pursuant to the IDEA, Section 4404 of the New York State Education Law, and Part 200 of Commissioner's Regulations, seeking: (1) tuition reimbursement for the Kildonan School for the 2005-2006 school year; (2) reimbursement of the cost of Dr. Goetze's services; and (3) compensatory education for the District's purported failure to provide an appropriate education for N.C. from February 2004 through June 2004, and during the 2004-2005 school year.  Impartial Hearing Officer's ("IHO") Ex. 1 at 1.

On September 26, 2006, after seven days of hearing, IHO Mindy Wolman issued her

findings of fact and decision, in which she denied Plaintiffs' claim for tuition reimbursement and compensatory educational services, as well as for reimbursement of the cost of Dr. Goetze's evaluation. IHO Findings of Fact and Decision, Sept. 26, 2006 ("IHO Dec.") at 24. The IHO determined that while N.C.'s March 8, 2005 IEP was insufficient in its short term and long term goals (in particular, because it failed to address N.C.'s reading and spelling deficits), Plaintiffs did not meet their burden of establishing that the Kildonan program met N.C.'s special education needs. The IHO held, therefore, that Plaintiffs were not entitled to tuition reimbursement. *Id.* at 16, 20. Specifically, the IHO determined that the Kildonan program did not meet N.C.'s needs with respect to reading instruction in content area classes, his combined expressive-receptive language disorder, or his auditory processing disorder. *Id.* at 20.

The IHO denied Plaintiffs' claim for compensatory educational services for February 2004 through June 2004 as untimely under the two-year statute of limitations applicable to both IDEA and New York state law claims. *Id.* at 22 (citing 20 U.S.C. § 1415(b)(6)(B) & (f)(3)(C); N.Y. Educ. Law § 4401(1)). The IHO also found that while Plaintiffs' claim for compensatory educational services for the 2004-2005 school year was timely, the claim should nevertheless be denied because there were no gross procedural violations depriving N.C. of appropriate services during this time period. *Id.* at 23.

Finally, the IHO denied Plaintiffs' claim for reimbursement of the cost of Dr. Goetze's evaluation of N.C. because Plaintiffs did not request an independent evaluation prior to obtaining it, as required by 8 N.Y.C.R.R. § 200.5(g). Plaintiffs did not advise the District that they were obtaining an evaluation from Dr. Goetze and did not provide the District with a copy of the evaluation. Moreover, the IHO found that the testimony of N.C.'s mother made clear that N.C.

was not evaluated by Dr. Goetze because Plaintiffs were concerned that the District's evaluation was inadequate – rather, the evaluation was obtained to determine whether placement at Kildonan was appropriate. *Id.* at 24.

**State Review Appeal**

Plaintiffs appealed (to the State Education Department) the IHO's decision to deny their tuition reimbursement and request for compensatory educational services, and the District cross-appealed the IHO's determination that N.C.'s IEP for the 2005-2006 school year failed to offer an appropriate educational program. On December 22, 2006, State Review Officer ("SRO") Paul Kelly issued a written decision dismissing both appeals, and concurring with the IHO that: (1) N.C.'s IEP for the 2005-2006 school year should have included goals and objectives to address N.C.'s deficiencies in reading and spelling; (2) Plaintiffs failed to demonstrate that Kildonan addressed N.C.'s special education needs with respect to his auditory processing or combined expressive-receptive language disorders, and did not show that Kildonan would address N.C.'s need for reading instruction in content area class; and (3) N.C.'s IEP for the 2004-2005 school year was appropriate. *Application of a Child with a Disability*, App. No. 06-127 (2006) ("SRO Dec.").

**Proceedings in this Court**

Plaintiffs filed the complaint in this action on April 6, 2007, seeking an order from this Court reversing the SRO's decision to deny Plaintiffs' claim for tuition reimbursement for the 2005-2006 school year and additional compensatory services for the 2004-2005 school year, and affirming the SRO's determination that the District failed to provide N.C. with an appropriate educational program for the 2005-2006 school year. *See* Compl. ¶¶ 41-57. On May 8, 2007, the

District filed an answer and counterclaim, seeking to reverse the SRO's finding that the District's

IEP for the 2005-2006 school year was inappropriate.

Currently pending before me are the Plaintiffs' motion for summary judgment and the

District's cross-motion for summary judgment.

## DISCUSSION

## I.    The IDEA

Pursuant to the IDEA, "Congress provides federal funds to those states that develop plans

to assure all children with disabilities the right to a free appropriate public education [FAPE]."

*Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citing 20 U.S.C. §

1412(1) (internal quotations omitted)).  "[A] 'free appropriate public education' consists of

educational instruction specially designed to meet the unique needs of the handicapped child,

supported by such services as are necessary to permit the child 'to benefit' from the instruction."

*Hendrick Hudson Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982) (analyzing the Education

for All Handicapped Children Act, amended and renamed IDEA).  Given the IDEA's "strong

preference for children with disabilities to be educated . . . with their non-disabled peers . . .

special education and related services must be provided in the least restrictive setting consistent

with a child's needs."  *Walczak*, 142 F.3d at 122.

Central to the IDEA's education delivery system is the IEP, which sets forth the particular

educational needs of a disabled child and the specially designed instruction and related services

necessary to meet his or her needs.  *See* 20 U.S.C. § 1414(d); *Lillbask v. Conn. Dept. of Educ.*,

397 F.3d 77, 81 (2d Cir. 2005).  The IEP is developed by a "team" of individuals, which consists

of the child's parents, teachers, and representatives of the school district.  *See* 20 U.S.C. §

1414(d)(1)(B).  The IEP must include, *inter alia*: (1) a statement of the child's present levels of educational performance; (2) a statement of measurable annual goals designed to meet the child's needs that result from the child's disability; and (3) a statement of the special education, related services, and supplementary aids and services to be provided to the child.  *Id*. at § 1414(d)(1)(A). The IEP must be reviewed at least annually to determine whether the goals set for the student are being achieved.  *See id*. at § 1414(d)(4)(A).

In addition to the IEP, the IDEA sets forth numerous procedures "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education."  *Id*. at § 1415(a).  These procedural safeguards include a requirement that states provide parents with an opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  *Id*. at § 1415(b)(6)(A).  Upon receipt of a complaint, the parents involved in such complaint "shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency."  *Id*. at § 1415(f)(1)(A).  The Supreme Court has held that at such a hearing, the party seeking relief bears the burden of proving their entitlement to the relief requested.  *See Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005).

The IDEA also provides any party who wishes to challenge the final administrative decision with the right to bring a civil action in state or federal court.  *See* 20 U.S.C. § 1415(i)(2)(A).  In any such action, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its

decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id*. at § 1415(i)(2)(C). While the administrative decision is subject to independent judicial review, *Walczak*, 142 F.3d at 129, such review is strictly limited, *see Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380-81 (2d Cir. 2003), such that, "[t]his assessment . . . 'is by no means an invitation to the courts to substitute their own notions of sound policy for those of the school authorities which they review.'" *Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F.Supp.2d 710, 715 (S.D.N.Y. 2003) (citing *M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96, 102 (2d Cir. 2000) (quoting *Rowley*, 458 U.S. at 206)). In *Rowley*, the Supreme Court held that in reviewing a state administrative decision, courts must give "due weight" to the administrative proceedings, "be[ing] careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 206-07. Federal courts are expected to remain "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (citations, internal alterations and quotations omitted).

In district court, IDEA cases are typically resolved through motions for summary judgment under Rule 56, which provides that summary judgment shall be rendered where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." In IDEA cases, however, a summary judgment motion "often triggers more than an inquiry into possible disputed issues of fact," *Lillbask*, 397 F.3d at 83 n.3, and the existence of a disputed issue of fact will not defeat such a motion. *J.R. v. Bd. of Educ. of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). "Rather, the motion serves as a pragmatic procedural mechanism for

14

reviewing a state's compliance with the procedures set forth in IDEA and determining whether

the challenged IEP is reasonably calculated to enable the child to receive educational benefits."

*Lillbask*, 397 F.3d at 83 n.3 (citations and internal quotations omitted).  Indeed, courts have

characterized the summary judgment procedure in IDEA cases as an appeal from an

administrative determination.  *See id.* (citing *Capistrano Unified Sch. Dist. v. Wartenberg*, 59

F.3d 883, 892 (9th Cir. 1995)).

## II.    **Tuition Reimbursement**

Claims under the IDEA challenging an IEP and seeking reimbursement for private school

tuition are analyzed using a two-step process, meaning that a board of education may be required

to pay for educational services obtained for a student by his or her parent where: (1) the services

offered by the board of education were inadequate or inappropriate; and (2) the services selected

by the parent were appropriate.  *Gagliardo v. Arlington Central School Dist.*, 489 F.3d 105, 111-

12 (2d Cir. 2007) (citing *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359, 370 (1985);

*Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006)).  The party who

commences the impartial hearing – here, the parents – bears the burden of persuasion on both of

these factors.  *Id.* (citing *Schaffer*, 546 U.S. at 57-58).  If the parents meet their burden, this Court

has broad discretion in considering equitable considerations relevant to fashioning relief.  *Id.*

(citation omitted).

### A.    **Services Offered by the District for the 2005-2006 School Year**

Plaintiffs bear the burden of proving that the services offered by the District were

inappropriate by establishing either that the District did not comply with the procedural

requirements of the IDEA, or that the challenged IEP was not "reasonably calculated" to enable N.C. to receive educational benefits. *Rowley*, 458 U.S. at 206-07.

Here, the IHO and SRO properly focused this inquiry on the March 8, 2005 IEP, rather than the IEP prepared as a result of the August 31, 2005 CSE meeting,[6] which was not provided to Plaintiffs prior to the beginning of the 2005-2006 school year. *See* IHO Dec. at 13 n.4; Tr. at 98. With respect to the March 8, 2005 IEP, the SRO concurred with the IHO's finding that the District's failure to direct N.C.'s IEP goals and objectives to address his low range standardized test scores in the areas of reading and spelling was inconsistent with the IDEA's requirement that a student's IEP provide measurable annual goals that meet a child's needs that result from the child's disability. SRO Dec. at 8-9.

I find that this determination by the SRO is supported by evidence in the record of N.C.'s low range standardized reading and spelling scores in January 2005, and the District's failure to articulate specific goals to address these particular deficiencies. *See* Parent's Exs. 34, 35. N.C.'s special education teacher, Mary Cray, testified that the goals set forth in N.C.'s 2005-2006 IEP did not specifically address reading decoding or spelling. *See* Tr. at 321-24. Likewise, CSE Chairperson Linda Fasolino testified that the 2005-2006 IEP did not address reading decoding. *Id.* at 829.

_____

[6] Notably, the District offers no reasonable explanation as to why the Committee refused to reschedule the August 31, 2005 meeting at Plaintiffs' request. *See* Tr. at 37; IHO Dec. at 14 ("Since the sole purpose of the meeting was purportedly to develop a reading program that would address the Parents' concerns and, hopefully, obviate the need for a private school placement, the decision to proceed without [N.C.'s] Parents' input makes little sense.")

The District argues that because the SRO concluded that N.C.'s 2004-2005 IEP was sufficient, and the 2004-2005 IEP did not include goals specific to decoding, fluency[7] and spelling, the lack of these same specifics in N.C.'s 2005-2006 IEP does not warrant a finding that N.C. suffered the loss of educational opportunity that deprived him of a free appropriate public education.  District's Moving Br., Aug. 3, 2007 at 22.  The SRO's decision, however, is based on N.C.'s January 2005 test scores that were unavailable when the District was creating N.C.'s 2004-2005 IEP, and which, when considered together with N.C.'s earlier scores, demonstrate N.C.'s continued lack of progress in the areas of reading and spelling.  *See* Parent's Exs. 26, 30, 34.  Indeed, what remains unaccounted for here is why the reading goals that were annunciated in N.C.'s 2004-2005 IEP – i.e. goals regarding inferences, expression, fluency and independent completion of classroom reading assignments – were not part of N.C.'s 2005-2006 IEP, notwithstanding N.C.'s continued academic deficits and declining standardized test scores in reading.  *Compare* Parent's Ex. 32 at 4-5 *with* Parent's Ex. 35 at 4-5.

The Second Circuit has noted that whether a procedural or substantive issue, "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers."  *Grim*, 346 F.3d at 382.  I respectfully recommend that this Court also defer to the expertise of the administrative officers in this case, and deny Defendant's cross-motion for summary judgment to the extent it seeks to

---

[7] The goals named in N.C.'s 2004-2005 IEP do, in fact, include fluency.  *See* Parent's Ex. 32 at 4.

reverse the SRO's finding that the District's IEP for the 2005-2006 school year was inappropriate.[8]

**B.     The Kildonan Program Selected by Plaintiffs**

Plaintiffs also bear the burden of establishing the appropriateness of the program they chose for N.C. – that is, they must show the educational program offered by Kildonan was specifically designed to meet N.C.'s unique special education needs. *Gagliardo*, 489 F.3d at 115 (citations omitted).

Here, the SRO concluded that Plaintiffs "did not demonstrate how Kildonan addressed their son's special education needs related to his significant auditory processing disorder, his combined expressive-receptive language disorder, his need for reading instruction in content area classes, or his deficits in reading and understanding of the content of material in those classes." SRO Dec. at 11. The SRO came to this conclusion after noting that none of N.C.'s teachers testified at the impartial hearing to explain how the student's particular needs were addressed. The SRO also noted that while Dr. Lane, the Kildonan dean, testified that N.C.'s speech-language needs were addressed through the teaching of auditory recall strategies taught in content area classes, he did not explain which particular strategies were taught to N.C., or how content area teachers taught these strategies. *Id.* at 10 (citing Tr. at 371-72).

The SRO further noted that while Dr. Lane testified that N.C.'s vocabulary needs were addressed in a language training tutorial, he admitted that he did not know whether any of the content area vocabulary used by N.C. was incorporated into this tutorial. *Id.* (citing Tr. at 373,

---

[8] Because the SRO's finding that the District's IEP for the 2005-2006 school year was inappropriate can be affirmed on this basis, it is unnecessary to consider Plaintiffs' remaining arguments regarding the inadequacy of this IEP. *See* Pls.' Moving Br., June 29, 2007 at 12-17.

403).  Moreover, the SRO observed that the progress reports prepared by N.C.'s individual language training tutor during the 2005-2006 school year do not show that N.C. worked on content area vocabulary during his individual language training tutorials.  *Id.* (citing Parent's Ex. 55 at 7; Parent's Ex. 57 at 2; Parent's Ex. 72 at 2).

As further evidence of Plaintiffs' failure to demonstrate how Kildonan addressed N.C.'s special education needs, the SRO cited Dr. Lane's testimony indicating that students are primarily read to by teachers in content area classes, despite N.C.'s "significant auditory processing deficits," which limit his ability to "follow verbal directions and/or absorb verbally-presented instructions."  *Id.* at 11 (citing Tr. at 334, 345-48, 389-90, 420, 427).

Plaintiffs assert that the SRO erroneously found that Kildonan was an inappropriate placement for N.C. because the SRO ignored objective evidence of N.C.'s progress at Kildonan, and because the school addressed N.C.'s auditory processing and expressive-receptive language disorders and provided proper reading instruction.  Pls.' Moving Br. at 18-23.

First, Plaintiffs maintain that the SRO ignored objective evidence of N.C.'s progress in his grades, teacher feedback, standardized test scores and improved confidence and self-esteem.  *See* Parent's Exs. 55, 56, 57, 63, 72.  The Second Circuit has specifically held, however, that while a child's progress is relevant to a court's review, it does not itself demonstrate that private placement was appropriate.  *Gagliardo*, 489 F.3d at 115.  Rather, "a unilateral private placement is only appropriate if it provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child."  *Id.* (emphasis in original) (citations and internal quotations omitted).

19

To the extent N.C.'s progress at Kildonan should be reviewed by this Court, it appears to vary. While N.C. received As and Bs in his American Literature, Algebra and Health and the Human Body classes, he received Cs and Ds on Global Studies exams, a class in which he had trouble understanding the material, particularly in "making corrections with concepts between terms and between topics within the term." Tr. at 397; *see* Parent's Exs. 57, 72. And, while N.C. showed some marginal improvement on his standardized test scores from October 2005 to May 2006, his percentile rank on the Gray Oral Reading Test remained below the fifth percentile, with no improvement on the rate portion (i.e., how quickly students read passages) of the exam. Parents Ex. 63. These standardized test scores and progress reports – which do not indicate or explain what, if any, approach was taken during this time with respect to N.C.'s expressive language and auditory processing issues – do not demonstrate how N.C.'s particular needs were addressed by Kildonan.

Second, Plaintiffs assert that Kildonan provided N.C. additional services and accommodations to address N.C.'s auditory processing and expressive-receptive language disorders. Pls.' Moving Br. at 20-23. Plaintiffs cite as evidence of this assertion the benefit N.C. received from the size and pacing of his content area classes, the provision of extra class notes in his social studies class, and simplified written directions in his science class. *Id.* at 20. Plaintiffs also contest the SRO's assertion that the Kildonan program is not appropriate for N.C. because the program is designed for dyslexic students, and, as such, material is read to students in content area classes.[9] Plaintiffs cite testimony from Dr. Lane, Ms. Cray and N.C.'s speech therapist, Ms.

_____

[9] N.C., as noted by the IHO, has not been diagnosed with dyslexia, and because of his auditory processing difficulties, the presentation of material in a primarily verbal fashion at Kildonan was found by the SRO and IHO to be inappropriate for N.C. SRO Dec. at 11; IHO

Beaudry, to support their assertion that N.C. was, in fact, able to absorb verbally-presented material.  Plaintiffs also cite Dr. Lane's testimony that material is taught in a multisensory way at Kildonan, and that the school "stress[es] very seriously the fact that no class should be predominantly auditory or discussion-based in nature as some of [their] students have difficulties with auditory processing."  *Id.* at 21 (citing Tr. at 429).

Despite these assertions, the record reflects that N.C. has a history of auditory processing difficulties, the result of which is difficulty with "the ability to analyze and synthesize auditory stimuli."  Parent's Ex. 29 at 3.  Dr. Lane testified, moreover, that at Kildonan, "[p]rimarily most of the instruction, any reading that's done in class is done primarily by the teacher."  Tr. at 420.  Dr. Goetz also testified, based on his observation of classes at Kildonan, that no direct reading or writing instruction is given in content area classes.  Tr. at 605.   While Plaintiffs cite the evaluations of both Dr. Smoller and Dr. Goetze to note that these psychologists did not specifically recommend reading instruction in math, social studies or science, Pls.' Moving Br. at 23, Dr. Smoller did conclude, after a number of evaluations from May through October 2002, that N.C. had very limited auditory processing skills that "would argue against introducing a phonics based instructional approach for reading."  Parent's Ex. 18 at 9.  Dr. Goetze also testified that N.C.'s auditory deficiency makes it difficult for him to answer or respond to verbally presented information.  Tr. at 596-97.

With respect to the size and pacing of classes at Kildonan, and provision of extra notes, the Second Circuit's admonition in *Gagliardo* – that, "even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where . . . the chief benefits of

_____

Dec. at 19.

the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not," 489 F.3d at 115 – is applicable here, where Plaintiffs point to the type of academic services any parent would want for their child.

Plaintiffs also complain of the SRO's finding that they failed to set forth the manner in which the Kildonan program addressed N.C.'s combined expressive-receptive disorder. Plaintiffs cite Dr. Lane's testimony that while Kildonan does not provide N.C. with speech therapy, N.C.'s speech-language needs were addressed through the teaching of auditory recall strategies taught in content area classes. Tr. at 371-72. They submit that the fact that N.C.'s progress reports do not reference the particular strategies employed at Kildonan to address his expressive-receptive language disorder does not contradict Dr. Lane's testimony. Pls. Moving Br. at 22. As noted by the SRO, however, missing from the testimony that Plaintiffs cite is an explanation of which particular strategies were taught to N.C., or how content area teachers taught these strategies. SRO Dec. at 10 (citing Tr. at 371-72).

Additionally, Plaintiffs offer in their opposition papers to the District's cross-motion for summary judgment an April 2007 speech/language evaluation conducted by the District, wherein N.C. scored within the average range of language abilities, and the evaluator, Linda Wojszynski, a speech pathologist, advised that speech therapy was no longer necessary for N.C. Pls.' Opp. Br., Aug. 10, 2007, Ex. B. The District contends that the Court should not consider this supplemental evidence because it is irrelevant to the determination of whether N.C.'s placement at Kildonan was appropriate during the 2005-2006 school year, and receipt of this additional evidence would transform this proceeding from one of review to a trial *de novo*. *See* Dist.'s Reply Mem. of Law, Aug. 17, 2007.

While the "IDEA itself empowers a Court to consider material outside the administrative record," *Matrejek v. Brewster Central School Dist.*, 471 F. Supp. 2d 415, 420 (S.D.N.Y. 2007) (citing 20 U.S.C. § 1415(i)(2)(B)(i)-(iii)), the issue of whether it is appropriate for a district court to consider evidence of what has occurred after a state administrative decision to evaluate either an IEP or a parent's private placement decision – so-called "retrospective" evidence – remains unsettled in this Circuit. *Id.* at 430-31; *see D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595 (2d Cir. 2005).

The propriety of permitting parties to an administrative appeal to supplement the record is dubious for many reasons, not the least of which is that such review would require the Court to engage in Monday-morning quarterbacking of a hearing officer's decision that is necessarily prospective in nature. *See*, *e.g.*, *A.S. v. Trumbull Bd. of Educ.*, 414 F. Supp. 2d 152, 170-71 (D. Conn. 2006) (considering the validity of "retrospective" evidence with respect to IEP); *J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 395 (S.D.N.Y. 2004) (same). Nevertheless, the Court need not reach this issue in this case because the supplementation requested, even if considered, would prove unhelpful. Plaintiffs rely on one evaluation for the proposition that N.C. did not require speech/language therapy at Kildonan – as such, Plaintiffs maintain that N.C.'s success on this evaluation belies the SRO's determination that Kildonan did not address N.C.'s speech and language needs. Pls.' Opp. Br. at 6. It cannot be determined, however, whether all records or evaluations relevant to this determination have been disclosed. To be useful to the Court, this evaluation would have to be explained in context with further testimony and potentially more related discovery. As other courts have observed, "[i]n effect, the Court would have to conduct a full administrative hearing regarding the [here, 2006-2007] school

23

year in order to determine the relevance of this information to the [2005-2006] school year. To do so would have the doubly impermissible result of converting these proceedings in a de novo trial about a school year that is not even at issue." *A.S.*, 414 F. Supp. 2d at 172 (citations omitted).

It should be noted, finally, that while parents seeking alternative placement may not be subject to the same mainstreaming requirements as a school board, the "IDEA's requirement that an appropriate education be in the mainstream to the extent possible . . . remains a consideration that bears upon a parent's choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate." *M.S.*, 231 F.3d at 105 (citation omitted). It is appropriate, therefore, to consider the restrictiveness of the program chosen by Plaintiffs, *see* SRO Dec. at 9; IHO Dec. at 17, particularly where, as here, the Kildonan program chosen by Plaintiffs has been recognized by New York State's Office of Review as a "highly restrictive" placement, *see Matrejek*, 471 F. Supp. 2d at 421 (citation omitted), and, prior to N.C.'s placement at Kildonan, he showed some signs of success at the Haviland Middle School. For example, N.C. showed proficiency in Math and Science, according to the results of his May and June 2005 New York State standardized tests, and the 2004-2005 report cards from N.C.'s Haviland Middle School teachers indicate that N.C. was prepared for class, eager to work and well-liked by his teachers. Parent's Exs. 39, 40, 51.

Since Plaintiffs have failed to establish that alternative private placement at Kildonan was appropriate, the Court need not consider in whose favor the equities weigh.

Accordingly, I recommend that this Court not disturb the underlying policy determinations and ultimate decision of the SRO to deny Plaintiffs' claim for tuition

reimbursement based on their failure to demonstrate that Kildonan was an appropriate placement for N.C. for the 2005-2006 school year.  *See M.S.*, 231 F.3d at 105.

## III.    Compensatory Education for the 2004-2005 School Year

"[W]hereas the provision of a FAPE is a legal right provided by the IDEA, compensatory education is a judicially-crafted equitable remedy designed to make up for a denial of a FAPE that has already occurred."  *Somoza v. New York City Dept. of Educ.*, 475 F. Supp. 2d 373, 390 (S.D.N.Y. 2007); *see J.H. v. Plainfield Bd. of Educ.*, No. 3:03 CV 1696, 2004 WL 2381724, at *2 (D. Conn. Sept. 30, 2004) ("Compensatory education has been recognized as an appropriate remedy under the IDEA to compensate for past deficiencies in educational services.").[10]

Here, Plaintiffs assert that the procedural and substantive failings of the District's 2004-2005 IEP warrant an award of additional, compensatory services.  Pls.' Moving Br. at 24.  Specifically, they claim that the 2004-2005 IEP failed to sufficiently describe N.C.'s levels of academic performance, was based on inaccurate scores, lacked goals addressing decoding, fluency or spelling, and failed to recommend services that would lead to meaningful progress in N.C.'s reading and writing skills.  *Id.* at 24-25.

The SRO found that the 2004-2005 IEP for N.C. was appropriate because it addressed the results of an educational evaluation, a parent report and observations, a psychological evaluation, medical health records and a social history update.  SRO Dec. at 12 (citing Parent's Ex. 32 at 4).

---

[10] "Although compensatory education most often has been awarded in cases of a gross and egregious IDEA violation where the claimant is over age 21, or where the Board of Education is unable to provide a free appropriate public education within the public school system, compensatory education awards in the form of extra hours of educational services has also been found appropriate."  *J.H.*, 2004 WL 2381724, at *2 (citations omitted).

25

The SRO found that the Committee based N.C.'s IEP on these evaluations and created "individualized annual goals and short-term instructional objectives related to the student's particular needs in reading comprehension, written expression, mathematics problem-solving skills, and receptive and expressive language skills." *Id.* at 12 (citing Parent's Ex. 32 at 4-6). The SRO also found that N.C.'s reading and writing deficits were addressed by small departmentalized special education classes in English, Social Studies, Science and Math, speech-language therapy, and a daily resource room services in groups of five students, where the teacher was a "[v]ery seasoned teacher also trained in multi-sensory reading." *Id.* at 13 (citing Parent's Ex. 32; Tr. at 172, 213).

With respect to the purportedly false test scores, the SRO noted that while N.C.'s mother testified that she was unaware of this reporting error until her attorney requested the records for the hearing, she also testified that she was advised during the March 2004 CSE meeting that the inaccurate scores were corrected at the meeting. *Id.* (citing Tr. at 647). The SRO further noted that there is nothing in the record to indicate that Plaintiffs requested another CSE meeting to discuss these scores. *Id.* The 2004-2005 IEP reflects, moreover, that notwithstanding any errors in the reading and writing scores reported, the Committee addressed N.C.'s deficits in these particular areas by noting that "[d]eficits in the language area continue to impact academic progress, particularly in reading and written expression," and recommending daily resource support to focus on reading and writing skills. Parent's Ex. 32 at 4.

Because the administrative record supports the SRO's findings, and any contrary determination herein would necessarily delve into the realm of education policy, I recommend

that this Court defer to the decision of the school authorities to deny Plaintiffs' claim for

compensatory education services. *See M.S.*, 231 F.3d at 102; *Walczak*, 142 F.3d at 129.

## CONCLUSION

Understandably, Plaintiffs want N.C. to receive the best education possible. The best

education, however, is not what the IDEA guarantees. The IDEA does not require a school

district to provide "everything that might be thought desirable by loving parents." *Walczak*, 142

F.3d at 132 (citations omitted).

Accordingly, I respectfully recommend that this Court uphold the judgment of the school

authorities by denying Plaintiffs' motion for summary judgment, granting the District's cross

motion to dismiss the complaint, and denying the District's cross motion to the extent it seeks

reversal of the SRO's determination that the 2005-2006 IEP designed for N.C. was inappropriate.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties

shall have ten (10) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(e), or a

total of thirteen (13) working days (*see* Fed. R. Civ. P. 6(a)), from the date hereof, to file written

objections to this Report and Recommendation. Such objections, if any, shall be filed with the

Clerk of the Court, with extra copies delivered to the chambers of The Honorable Kenneth M.

Karas, at the United States Courthouse, 300 Quarropas Street, Room 533, White Plains, New

York, 10601, and to the chambers of the undersigned at Room 434, 300 Quarropas Street, White

Plains, New York 10601.

Failure to file timely objections to the Report and Recommendation will preclude later

appellate review of any order to judgment that will be entered by Judge Karas. *See Thomas v.*

*Arn*, 474 U.S. 140 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825

(1992); *Small v. Secretary of H.H.S.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); *Wesolek v.*

*Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988). Requests for extensions of time to file objections

must be made to Judge Karas and should not be made to the undersigned.

IT IS SO ORDERED.


Dated: March 6, 2008
White Plains, New York


Respectfully submitted,


_____
MARK D. FOX
UNITED STATES MAGISTRATE JUDGE